```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK



UNITED STATES OF AMERICA        *    Case No. 21-CR-186(EK)
                                *
                                *    Brooklyn, New York
                                *    October 6, 2021
       v.                       *
                                *
KYLE BALKISSOON,                *
                                *
              Defendant.        *
                                *
     * * * * * * * * * * * * * * * *
```

        TRANSCRIPT OF CRIMINAL CAUSE FOR SUPPRESSION HEARING
              BEFORE THE HONORABLE ERIC R. KOMITEE
                  UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:             GAREN MARSHALL, ESQ.
                                IAN RICHARDSON, ESQ.
                                Asst. United States Attorney
                                United States Attorney's Office
                                271 Cadman Plaza
                                Brooklyn, NY 11201


For the Defendant:              MIA EISNER-GRYNBERG, ESQ.
                                Federal Defenders of New York
                                One Pierrepont Plaza
                                Brooklyn, NY  11201




Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

1          (Proceedings commenced at 9:50 a.m.)

2          THE CLERK:  Criminal cause for suppression hearing,

3     United States of America vs. Kyle Balkisson, docket no. 21-

4     CR-186.  Would you all please state your appearances for the

5     record, starting with the government.

6          MR. MARSHALL:  Good morning, Your Honor.  Garen

7     Marshall for the United States with my colleague, Assistant

8     United States Attorney, Ian Richardson, and NYPD Detective

9     Alan Seligon (ph).

10          THE COURT:  Good morning.

11          MS. EISNER-GRYNBERG:  Federal Defenders, by Mia

12     Eisner-Grynberg, for Kyle Balkissoon, who's to my left.  I'm

13     joined by a paralegal specialist from my office, Josh Dufant.

14     Good morning.

15          THE COURT:  Good morning, Mr. Balkissoon.  Good

16     morning to you.

17          THE DEFENDANT:  Good morning.

18          THE COURT:  Okay.  We are here for a suppression

19     hearing this morning.  I think my courtroom deputy has let

20     people know that if anyone in the courtroom is fully

21     vaccinated and intending to be speaking and wishes to remove

22     the mask under those circumstances, they should feel free to

23     do so.

24          We will probably hear from witnesses with the face

25     shield that the witnesses at trial have been using.

3

1          But before we get to the witness testimony, I just
2     wanted to walk through the legal issues a little bit to make
3     sure that we sharpen up the focus on what's really in
4     dispute.
5          I think in that regard it would probably make sense
6     for me just to put the question to defense counsel what facts
7     are in dispute, in your view?
8          MS. EISNER-GRYNBERG:  Yes, Judge.  The first fact
9     that's in dispute is the location of Mr. Balkissoon's car at
10    the time of the stop.
11         THE COURT:  All right.  So you dispute that he was
12    in the crosswalk basically.
13         MS. EISNER-GRYNBERG:  Well, I dispute where he was
14    prior to the turning on of the body camera.
15         THE COURT:  Right.
16         MS. EISNER-GRYNBERG:  Yes.
17         THE COURT:  The government says when they found the
18    car it was in the crosswalk.
19         MS. EISNER-GRYNBERG:  Yes.
20         THE COURT:  And you're saying the defense does not
21    -- at least does not accept that characterization and wants
22    to put the government --
23         MS. EISNER-GRYNBERG:  Correct.  We're not conceding
24    that.  That's right.
25         THE COURT:  Okay.  And so we have a fact issue

4

1   perhaps concerning the location of the car when the NYPD

2   makes its first contact or observation.

3           MS. EISNER-GRYNBERG:  Right.  Correct.

4           THE COURT:  Okay.

5           MS. EISNER-GRYNBERG:  We dispute that Mr.

6   Balkissoon was rolling a marijuana cigarette at the time of

7   the police approach.

8           THE COURT:  Okay.  But do you dispute that there

9   was marijuana in plain view?

10          MS. EISNER-GRYNBERG:  We do not dispute that there

11  was the sealed bag of marijuana in plain view on the center

12  console.  We dispute the characterization of what he was

13  doing on his lap at the time of the approach.

14          THE COURT:  Okay.  And why might that matter?  Is

15  it because it goes to the likelihood that somebody was going

16  to be driving under the influence of marijuana, as opposed to

17  simply possessing it?

18          MS. EISNER-GRYNBERG:  Right.  And it goes to

19  whether the possession of the -- the presence of the

20  marijuana in the car provided probable cause for any evidence

21  of any additional crime.

22          THE COURT:  Okay.  Because you dispute -- if all

23  the police had at the time they initially encountered Mr.

24  Balkissoon was probable cause to believe that an infraction -

25  - a violation had been committed, you say that would not have

5

1      justified the fuller search of the automobile.

2                MS. EISNER-GRYNBERG:  That's right.  Yes.

3                THE COURT:  Okay.  Anything else in dispute?

4                MS. EISNER-GRYNBERG:  And third we dispute the

5      proximity of Mr. Balkissoon at the rear of the vehicle to the

6      backpack within the car.

7                THE COURT:  Which goes to the question of whether

8      Mr. Balkissoon was in reaching distance at the time of the

9      search of the car?

10               MS. EISNER-GRYNBERG:  Yes.

11               THE COURT:  Okay.  Does the government agree that

12     its case against suppression depends potentially -- I mean, I

13     realize your alternative legal theories on some of the issue

14     here, but do you dispute that we need to hash out the facts

15     as to any of those issues?

16               MR. MARSHALL:  Your Honor, so these issues

17     obviously are material to the question at issue.  But as you

18     mentioned, the alternative bases for the stop -- for the

19     search are based on facts that aren't in dispute.

20               For example, Your Honor, the odor of marijuana from

21     the car and the marijuana actually being in the center

22     console is a sufficient basis for the search of the vehicle,

23     whether or not the defendant was actually rolling a marijuana

24     cigarette.

25               THE COURT:  So that's a legal question that I have,

6

1    which is if we're contemplating the question of how you get

2    from the observation of marijuana in the center console to

3    the legal authorization to search the backpack in the back

4    seat, you say you've got two reasons for searching the

5    backpack.

6            One is it's in reaching distance and, therefore,

7    searchable incident to arrest.  And two is the observation --

8    and there may be more, but at least these two, the

9    observation of marijuana in the center console gives rise to

10   probable cause that there's going to be marijuana in the

11   backpack also.

12           Is that necessary under *Gant* for a search incident

13   to arrest or a search under the automobile exception?

14           MR. MARSHALL:  I'm sorry, Your Honor.  Is what --

15   is what necessary?

16           THE COURT:  So my question is, you now, the

17   officers obviously have probable cause to believe that

18   there's marijuana in the vehicle because they see it right in

19   the center console.  But then they continue to search the

20   vehicle for more evidence.

21           And the question is what is the source of their

22   legal authorization to open the backpack and dig through it?

23   You know, why don't you just answer that question first.

24           MR. MARSHALL:  Yes.  So there are actually three

25   bases.  One, as you mentioned, is search (indiscernible) to

1       arrest based on the defendant's proximity to the vehicle.

2            But as far as the marijuana goes, there's a search

3       incident to arrest basis and an automobile exception basis.

4       The search incident to arrest basis is that officers may

5       search a vehicle for evidence of the offense of arrest.

6            THE COURT:  Right and so there's all this -- let me

7       just stop you there.

8            There's all this back and forth in the Supreme

9       Court about what that means. So if the reason for the arrest

10      is driving without a driver's license, you, I think -- I

11      can't remember who the justice was but somebody observes,

12      that doesn't give rise to cause to believe that there's going

13      to be additional evidence in the car of driving without a

14      driver's licence.

15           But you say here, you know, evidence that there's

16      marijuana in the center console gives rise to I think you say

17      probable cause to believe that there will be additional

18      evidence of the crime of marijuana possession in the car,

19      either more marijuana or more paraphernalia, whatever it's

20      going to be.

21           And my question is what is the source of authority

22      of that? I realize you cite this phase in the case F-I-A-S-O-

23      N, from the Southern District where it seems like that was

24      the holding, essentially, that once the police have found

25      marijuana in the car they had a basis to search every

8

1   container throughout the rest of the car that could contain

2   marijuana.  But the judge doesn't really say that explicitly

3   and I'm not sure why it would be true.

4          MR. MARSHALL:  Well, Your Honor, so there are two

5   parts to that.  So there's the *Gant* aspect.  And that doesn't

6   require for the defendant to actually be within reaching

7   distance of the vehicle when there's the offense of arrest --

8   when there's reason to believe that there's evidence of the

9   offense of arrest in the vehicle. So there are two parts to

10  *Gant*, Your Honor.

11         THE COURT:  So you just said reason to believe that

12  there will be evidence of the crime giving rise to arrest in

13  the vehicle.

14         Is that something different from the probable cause

15  standard and lower?  In other words, do the officers, under

16  the automobile exception, do the officers need probable cause

17  to believe that there will be evidence of marijuana

18  possession in the back or something less than that?

19         MR. MARSHALL:  Your Honor, there are two separate

20  analyses.  There's the one where the search incident to arest

21  where the offense of arrest involves something that may be in

22  the vehicle, and that's separate from the probable cause

23  analysis.

24         But then there's the automobile exception that

25  doesn't require arrest where --

9

1          THE COURT:  Doesn't require an arrest.

2          MR. MARSHALL:  Right.  If the officers have

3     probable cause to believe that there is evidence or --

4     contraband or evidence of a crime in the vehicle, they may

5     search the vehicle and the containers therein where that

6     evidence or contraband may be hidden.

7          So this is completely aside from whether there is

8     an arrest.  So there are -- if I can just clarify, Your

9     Honor.

10         There are two bases to search for marijuana in the

11    car.

12         THE COURT:  So take them one at a time.

13         MR. MARSHALL:  Okay.

14         THE COURT:  Search incident to arrest  -- hold on a

15    second.

16       (Pause.)

17         Okay.  Search incident to arrest.

18         MR. MARSHALL:  Your Honor, maybe I can just break

19    it down this way.

20         THE COURT:  Yes.

21         MR. MARSHALL:  So search incident to arrest under

22    *Gant* there are two purposes or two interests served by the

23    search incident to arrest in the automobile context.

24         One is the search incident to arrest for the safety

25    of the officers.

1          THE COURT:  Right.

2          MR. MARSHALL:  The second is search incident to

3    arrest for the safeguarding of evidence in the vehicle.

4          The first one of those incidents, the safety of the

5    officers, requires -- it requires that the -- or allows that

6    the officers search the vehicle when it is in reaching

7    distance of the individual --

8          THE COURT:  Right.

9          MR. MARSHALL:  -- no matter what the offense of

10   arrest is.

11         THE COURT:  Right.

12         MR. MARSHALL:  So the traffic infraction and arrest

13   pursuant to that traffic infraction while the defendant is

14   within reaching distance of the vehicle the officers,

15   pursuant to *Gant*, are allowed to search the vehicle for their

16   safety.

17         Separately under *Gant* there is the interest of

18   safeguarding evidence in the vehicle.  And this specifically

19   in the -- as *Gant* says specifically in the automobile

20   context, where there's more of an issue of safeguarding

21   evidence where the vehicle is mobile and --

22         THE COURT:  Okay.  But we're still under the rubric

23   of search incident to arrest rather than the automobile

24   exception.

25         MR. MARSHALL:  Yes.  So under *Gant* when you're

1   serving the purpose of safeguarding evidence, it's just that

2   when you're serving the purpose of safeguarding evidence,

3   it's just that the offense of -- that the arrest is for, when

4   there maybe evidence of that offense in the vehicle, the

5   officers may search the vehicle to safeguard the evidence and

6   the containers therein, even if the defendant is not within

7   reaching distance.

8            THE COURT:  Okay.  But what is the scope of the

9   search that is authorized under this rubric of safeguarding

10  evidence in the vehicle?  Are they allowed to open every part

11  of the car, the trunk, the glove compartment, with or without

12  any cause to believe that there's additional evidence located

13  therein?

14           MR. MARSHALL:  Your Honor, I'd say anywhere that

15  they believe that they have reason to believe that there

16  would be evidence of the offense.  So in this instance --

17           THE COURT:  Reason to believe but not probable

18  cause to believe, or is it probable cause to believe?

19           MR. MARSHALL:  So it's still probable cause, Your

20  Honor, under those circumstances.

21           THE COURT:  Okay.  So then we get back to the

22  question I started with, which is why is it and do the cases

23  support the notion that seeing marijuana in the open in the

24  center console gives rise to probable cause to believe that

25  the backpack will contain additional evidence of that same

1    crime, right?

2           Just because somebody has one bag of marijuana, you

3    know, how much more likely than not does that make it that

4    they're going to have a second bag of marijuana.  Where does

5    that come from?

6           MR. MARSHALL:  Well, Your Honor, it's not just that

7    there would be more marijuana.  It's also evidence of the

8    offense.

9           So if they had marijuana in the center console,

10   there's reason to believe -- of course, the defendant says

11   that there were no rolling papers.  But there's reason to

12   believe that there would be evidence of the crime of

13   marijuana possession in the vehicle.

14          So the officers don't just have to search for --

15          THE COURT:  It might actually better for the

16   defense if you -- well, I guess there's a downside to that

17   also.

18          But the fact that there are -- let's say we find

19   that there are no rolling papers in the defendant's lap, then

20   it makes perhaps more sense just from a probalistic

21   standpoint to think that there would be some paraphernalia,

22   some way of ingesting marijuana in the car because they

23   haven't seen it yet.  Do you know what I'm saying?

24          Whereas, if there are rolling papers in his lap,

25   then that might make it less likely that the backpack needs

1    to contain or is likely to contain a bong, a set of rolling

2    papers, whatever it is that people are using to ingest

3    marijuana in these technologically advanced days.

4            So your position is, if I understand the

5    government's legal position, that when you find a meaningful

6    quantity of marijuana in a bag in the center console of the

7    car, that is probable cause to search the backpack for

8    additional -- either additional narcotics or other evidence

9    of the violation like rolling papers or whatever

10   paraphernalia might be found.  Is that correct?

11           MR. MARSHALL:  Your Honor, yes.  Yes.

12           THE COURT:  And is your best case for that

13   phrasing?

14           MR. MARSHALL:  You know, I'd have to double check

15   the authorities, Your Honor, but I would say just one thing

16   to point out here is that this is for probable cause here.

17   It's just that there's a fair probability.

18           THE COURT:  I understand what probable cause is.

19           MR. MARSHALL:  Of course, Your Honor.

20           THE COURT:  I mean, this issue must have been

21   litigated many, many times, right?  Forget about marijuana.

22   Like the police have been arresting people for drunk driving

23   for decades.

24           And it either is or isn't the case, reading the

25   case law, that if the police find a motorist with a bottle of

14

1     vodka in his lap that that gives them the authority under the

2     search incident to arrest doctrine to start opening glove

3     compartments and backpacks and everything else in the car on

4     that basis to look for more vodka, or solo cups, or whatever

5     paraphernalia one would use to ingest vodka or it doesn't.

6              And I may want to just call for a letter from the

7     government to sharpen up that legal issue a little bit after

8     we're done here, but I think that does seem to me it may be

9     where this case really comes to a head.

10             Okay. I think I understand the issues well enough

11    that if you want to proceed to call your first witness the

12    government should do so now.

13             MR. MARSHALL:  Thank you, Your Honor.

14             THE COURT:  Sorry.  Unless there's anything else

15    the defense wants to say beforehand in light of that

16    colloquy.

17             MS. EISNER-GRYNBERG:  Judge, I --

18             THE COURT:  I'll give you all the time in the world

19    to argue after the hearing.

20             MS. EISNER-GRYNBERG:  Yes, Judge.

21             THE COURT:  Just anything you think is relevant to

22    my understanding before we get started.

23             MS. EISNER-GRYNBERG:  I just think it's important

24    within that paradigm that Your Honor laid out when

25    considering whether the presence of one sealed bag of

1    marijuana produces probable cause of any other evidence being

2    found in the car to remember the state of the law in New York

3    at the time of the stop, which was that marijuana possession

4    in the quantity and manner that it was found had been

5    decriminalized.

6         THE COURT:  But that -- if I understand the search

7    incident to arrest doctrine correctly, that's not necessarily

8    legally relevant, right?  If the stop was driving without a

9    license, which is also not a -- is that more of a crime in

10   New York?

11        MS. EISNER-GRYNBERG:  No, they're the same.

12        THE COURT:  Okay.  So if the stop is just driving

13   without a licence --

14        MS. EISNER-GRYNBERG:  Right.

15        THE COURT:  And the police actually have probable

16   cause somehow miraculously to believe there's additional

17   evidence of driving without a license in the car --

18        MS. EISNER-GRYNBERG:  But that's not --

19        THE COURT:  That probable cause still justifies the

20   search, even though we're only talking about a violation

21   under federal law.

22        MS. EISNER-GRYNBERG:  No, that's the point.  Under

23   federal law the finding that a driver is -- doesn't have a

24   valid license does not give rise to believe there will be an

25   additional evidence of that, driving without a license.

1          THE COURT:  I think you're fighting my factual

2     hypo.

3          MS. EISNER-GRYNBERG:   No, no.  So the presence of

4     a lawful or decriminalized quantity of marijuana in a sealed

5     bag likewise being a non-crime does not give any basis to

6     believe that there will be any further evidence of that non-

7     crime, just the same as a traffic infraction.  It's a

8     completed offense or a completed non offense.  It's a

9     completed civil infraction that the thing that you have is

10    what it is.

11         And as Your Honor I think is querying, does the

12    presence of a sealed bag of marijuana give rise to any

13    logical or any legal belief that there will be more.

14         THE COURT:  So I think I understand what you're

15    saying, but I read the cases a little differently in the

16    sense that the cases that say look, if you've got probable

17    cause to believe that the defendant is driving without a

18    license because the police have asked him for a license, and

19    he says I don't have one, that doesn't give rise to probable

20    cause to search the rest of the car, not because of the level

21    of legal violation we're talking about, whether it's a

22    felony, a misdemeanor, a simple violation.

23         The reason it doesn't give rise to authorization to

24    search the rest of the car is because there's just no -- as a

25    factual matter there's just no reason to believe that the car

1  will contain additional evidence of the violation of driving

2  without a license.

3          But assume counter factually maybe that the police

4  had received a tip from the world's most reliable informant

5  before they stopped this guy for driving without a license,

6  that said hey, I happen to know that he's carrying a letter

7  from the Department of Motor Vehicles in New York in his

8  backpack that says your license is suspended and you'd better

9  not be driving, they would be allowed to search the backpack

10  under that circumstance, right?

11          MS. EISNER-GRYNBERG:  Yes, I think that's exactly

12  right.

13          THE COURT:  Okay.

14          MS. EISNER-GRYNBERG:  So in this case you have a -

15  -

16          THE COURT:  So it's not about felony versus

17  violation.

18          MS. EISNER-GRYNBERG:  I think it impacts the

19  analysis because in this case when you have the sealed bag of

20  $50 fine worth of thing, there would need be some outside

21  information, as Your Honor just suggested, that that's

22  indicative of some more of that offense being found elsewhere

23  in the car.

24          And the fact that it's non criminal impacts whether

25  it gives rise to any suspicion whatsoever.

1          THE COURT:  Right. I agree with that.  It's

2     extraneous evidence or it's reasonable inference and I think

3     Judge Gardephe in the *Fiason* case seems to be drawing that

4     inference, but he doesn't make it very explicit, at least in

5     my eyes.

6          And I do want to bear down on that legal question

7     of just because somebody has one piece of contraband X, what

8     is the reasonable basis to assume from that that they also

9     have piece number 2 of that same contraband.

10          MS. EISNER-GRYNBERG:   Right.

11          THE COURT:  I think it's -- well, I'll stop there.

12     Okay.  All right.  Thank you all for helping me to make sure

13     I understand the issues.

14          The government shall call its first witness,

15     please.

16          MR. MARSHALL:  Thank you, Your Honor.

17          The government calls NYPD Officer Fabian Modesto.

18          THE COURT:  Let me just tell the parties. You'll

19     see me typing.  That's me taking notes, not surfing the

20     internet or otherwise disengaging

21      OFFICER FABIAN MODESTO, GOVERNMENT'S WITNESS, SWORN

22          THE CLERK:  Speak into the mic and tell us your

23     name and spell it for the record, please.

24          THE WITNESS:  My name is Officer Fabian Modesto, F-

25     -A-B-I-A-N, M-O-D-E-S-T-O.

1                        DIRECT EXAMINATION

2    BY MR. MARSHALL:

3    Q     Good morning.

4    A     Good morning.

5    Q     Are you employed?

6    A     Yes.

7    Q     Who do you work for?

8    A     I work for the New York City Police Department.

9    Q     How long have you worked for the New York City Police

10   Department?

11   A     Approximately ten years now.

12   Q     What is your title?

13   A     Police Officer.

14   Q     And what is your current assignment?

15   A     Assigned to public safety.

16   Q     Is that with a particular precinct?

17   A     Yes.  The 67th Precinct.

18   Q     How long have you worked for the 67th Precinct's public

19   safety squad?

20   A     Approximately ten years now.

21   Q     Does the 67th Precinct public safety squad work in a

22   particular area or part of Brooklyn?

23   A     Yes.  We cover the neighborhood of East Flatbush and a

24   little part of Brownsville.

25   Q     Does that include the area around the intersection of

1    Cortelyou Road and East 34th Street?

2    A    Yes, it does.

3    Q    As part of the 67th Precinct public safety squad, what

4    kind of crime do you generally investigate?

5    A    Well, as a public safety officer our main focus is to

6    focus on high crime areas within the precinct and make

7    firearms arrests.  That's what we normally do.  And we focus

8    our attention on any gang activity that's going on in the

9    precinct and make those type of arrests.

10   Q    During the course of your employment with the NYPD have

11   you been involved in car stops?

12   A    Yes.

13   Q    Approximately how many?

14   A    I would say around -- more than a thousand.

15   Q    During the course of your employment with the NYPD have

16   you also been involved in arrests involving marijuana?

17   A    Yes.

18   Q    Approximately how many?

19   A    I would say over a hundred.

20   Q    Have you received training from the NYPD related to car

21   stops?

22   A    Yes, I have.

23   Q    Have you received training from the NYPD related to

24   narcotics, including marijuana?

25   A    Yes, I have.

Modesto - Direct - Marshall                    21

1    Q    Turning your attention to the late evening of February

2    26th, 2021 into the early morning of February 7th, 2021, were

3    you working?

4    A    Yes. I was.

5    Q    What were the hours of your shift?

6    A    On that night I was working a 1730 to 0205 in the

7    morning, which is the next day?

8    Q    Is that 5:30 p.m. until 2:05 p.m.?

9    A    Yes.  It's 5:30 p.m. until 0205 in the morning.

10   Q    Were you working that shift with anyone else?

11   A    Yes, I was working with Officer Martinez, Officer Blum,

12   Officer Hassan, Officer Gomez and my supervisor at the time

13   was Sgt. Whiteman.

14   Q    Were you in a police car?

15   A    Yes, I was.

16   Q    What kind of a police car?

17   A    I was operating an unmarked vehicle.

18   Q    Was anyone else in your car?

19   A    Yes.  In my vehicle I had Officer Martinez to my right.

20   He was the front passenger.  And then directly behind me was

21   Officer Blum.

22   Q    And were you driving the car?

23   A    Yes, I was driving.

24   Q    Do you always drive?

25   A    The majority of the time I do, yes.

Modesto - Direct - Marshall                  22

1    Q    Were you and the other five officers wearing uniforms?

2    A    We were, yes.

3    Q    And where were the other three officers, Hassan Gomez

4    and Whiteman?

5    A    The other officers were in the second vehicle, also

6    unmarked vehicle.  They were directly behind us.  And that

7    vehicle consisted of Officer Hassan, Officer Gomez and my

8    supervisor, Sgt. Whiteman.

9    Q    Directing your attention now to the early morning hours

10   of February 7th, 2021.  Did you make an arrest?

11   A    We did, yes.

12   Q    Who did you arrest?

13   A    An individual by the name of Kyle Balkissoon.

14   Q    Do you see Mr. Balkissoon in the courtroom today?

15   A    Yes.

16   Q    Can you please identify him by an article of clothing

17   he's wearing?

18   A    Sure.  He's directly in front of me straight ahead

19   wearing a brown shirt; light brown shirt.

20            MR. MARSHALL:  Your Honor, I ask that the record

21   reflect that the witness has identified the defendant.

22            THE COURT:  The record should so reflect.

23   Q    Where were you when you arrested the defendant?

24   A    I was approaching the intersection of East 34 and

25   Cortelyou Road.

1    Q    And when you say East 34 is that East 34th Street?

2    A    Correct.  Yes.  I'm sorry.  East 34th Street, yes.

3    Q    Which street had you been driving on when you arrived at

4    that intersection?

5    A    I was traveling actually southbound on East 34

6    approaching the intersection of Cortelyou Road.  Both of

7    those streets are one way streets.  So East 34 travels

8    southbound. It's a one way and then Cortelyou travels

9    eastbound, also a one way.

10   Q    And at that point which car was in front?

11   A    My vehicle.  My car.

12   Q    And approximately how far behind was the other -- with

13   the other officers at the point where you approached that

14   intersection?

15   A    I would say no more than a car length behind me.  We

16   caravan so we stay together close.

17   Q    Why were you driving there at that time?

18   A    That night we were just conducting routine patrol.

19   Q    Were your windows open on your vehicle that night?

20   A    Yes.

21   Q    When you drive on safety patrol do you usually keep your

22   windows open?

23   A    Yes.

24   Q    Why?

25   A    It's just something that we do.  We try to listen to

Modesto - Direct - Marshall                    24

1    people on the street just in case we hear an argument,

2    especially with what we do.  We try and listen for gunfire

3    and at the time we would -- one of our tools would be if we

4    could smell marijuana in the area, we would try to figure out

5    and investigate where it was coming from.  And that was the

6    purpose of our driving with our windows down.

7    Q    As you drove towards the intersection of East 34th

8    Street and Cortelyou Road, what happened?

9    A    Well, as I was traveling southbound on East 34 I

10   observed the black vehicle, black Mercedes on the corner that

11   was blocking a pedestrian ramp at the time.

12   Q    And when you're referring to a pedestrian ramp is that a

13   cross walk?

14   A    It's directly next to the crosswalk, yes.

15   Q    And what corner was that Mercedes at?

16   A    You want actual directional location?

17   Q    Yeah, as you're traveling southbound on East 24th

18   approaching Cortelyou Road where exactly was that vehicle?

19   A    If I'm traveling it's to my left.

20          THE COURT:  Near left or far left?

21          THE WITNESS:  Excuse me?

22          THE COURT:  Near left --

23          THE WITNESS:  My left, yes.

24          THE COURT:  I said near left or far left?

25          THE WITNESS:  Oh, at the time it was near.

1    Q    Approximately how far from where you were sitting was

2    that vehicle when you approached that intersection?

3    A    When I approached the vehicle I was probably no more

4    than five feet.

5    Q    From the Mercedes?

6    A    Yes, from the car. From the Mercedes, yes.

7    Q    Aside from seeing the vehicle there in the crosswalk,

8    the Mercedes in the crosswalk, what else did you observe?

9    A    Well, what I did was I took my vehicle and I drove right

10   up next to the Mercedes.  So basically the Mercedes was at an

11   angle so I placed my vehicle at an angle as well so at that

12   point we were parallel.  And I could see directly inside the

13   car.

14              THE COURT:  From your car?

15              THE WITNESS:  From where I was sitting on the

16   driver's side, yes, I could see directly into the window,

17   yes.

18   Q    And approximately how far would you say you were from

19   the vehicle at that point?

20   A    That would be less than five feet. I was like right next

21   to it.

22   Q    And what did you observe at that point?

23   A    Well, as I pulled up and I looked inside I saw an

24   individual sitting behind the steering wheel with his head

25   down and with his hands in front of him.

1          When I looked I just kind of picked myself up from the

2     seat a little, I looked over and I could see that the

3     individual was rolling what I believe was a marijuana

4     cigarette.

5     Q    Did you later come to learn the identity of that

6     individual?

7     A    Yes, I did.

8     Q    Who is that?

9     A    That was Kyle Balkissoon.

10    Q    And where in the vehicle in the Mercedes was he seated?

11    A    He was sitting on the driver's seat.

12    Q    Was there anyone else in the Mercedes with the defendant

13    at that time?

14    A    Negative.  No.

15    Q    Officer Modesto, I'll hand you a binder.

16              MR. MARSHALL:  Your Honor, may I approach the

17    witness?

18              THE COURT:  Yes, please.

19              MR. MARSHALL:  The parties don't need permission to

20    approach NYPD witnesses today.

21    Q    Officer Modesto, you have in front of you a document

22    which has been marked for identification as Government

23    Exhibit 1.  Do you recognize it?

24    A    Yes.

25    Q    What is it?

Modesto - Direct - Marshall                    27

1   A    That's a still image of the map of East 34 and Cortelyou

2   Road.

3   Q    Does that map fairly and accurately depict the location

4   of the February 7th, 2021 arrest of the defendant?

5   A    It does, yes.

6   Q    Officer Modesto, you have another document in front of

7   you that has been marked as Government Exhibit 2.

8        Do you recognize it?

9   A    I do, yes.

10  Q    What is it?

11  A    That is a still image of the corner of East 34th and

12  Cortelyou Road.

13  Q    Does the image fairly and accurately depict the

14  intersection of East 34th Street and Cortelyou Road on the

15  night in question?

16  A    It does, yes.  Only it as nighttime at the time of the

17  arrest.

18        MR. MARSHALL:  Your Honor, the Government offers

19  Government Exhibit 1 and 2 into evidence.

20        MS. EISNER-GRYNBERG:   May I quickly voir dire the

21  witness on Exhibit 2?

22        THE COURT:  Yes.

23               VOIR DIRE EXAMINATION

24  BY MS. EISNER-GRYNBERG:

25  Q    Officer Modesto, you have Exhibit 2 in front of you?

1    A    I do, yes.

2          THE COURT:  Would you mind just -- sorry.  Would

3    you mind publishing the exhibit to me so that I can -- I

4    don't know that I can pull up the larger version on the

5    screen, although it looks like Ms. Guy may --

6          THE CLERK:  No, he has to do it on his screen.

7          THE COURT:  Okay.

8          (Pause.)

9    Q    Officer Modesto, you just indicated that on the night in

10   question it was, of course, dark compared to being light in

11   this photograph, right?

12   A    That is correct, yes.

13   Q    There was also significant quantities of snow on the

14   ground that are not depicted in this photograph, right?

15   A    The snow was on the sidewalk, yes.

16   Q    And on the ground as well.

17   A    Correct.  Yes.

18          MS. EISNER-GRYNBERG:   No, objection to the

19   admission of the photographs.

20          THE COURT:  Okay.  So Exhibits 1 and 2 are both

21   received in evidence.

22          (Government Exhibit Nos. 1 and 2 received into

23   evidence.)

24          Somebody just wrote on number 2, at least on my

25   screen. I don't know if that's --

1          MR. MARSHALL:  My screen's gone down, Your Honor.

2          Ms. Guy, are you able to get the image up on the

3    rest of the screen?

4          THE CLERK:  Yes, I can see.  Everyone else can see

5    it.  I don't know why it's down.

6          MR. MARSHALL:  Just the TV and the projector seem

7    to be down as well as the screen.

8          THE COURT:  You don't have it on your monitor?

9          MR. MARSHALL:  I do not. It had been working up

10   until we got started and now it seems to be on the fritz.

11         THE COURT:  Okay.  This will be a good test run of

12   some new technology here, but you may proceed.

13         MR. MARSHALL:  Thank you, Your Honor.

14               CONTINUED DIRECT EXAMINATION

15   BY MR. MARSHALL:

16   Q    Officer Modesto, what did you do with your car after you

17   saw the defendant attempting to roll a marijuana cigarette in

18   the front seat of the Mercedes?

19   A    I placed my vehicle directly in front of him at an

20   angle.

21   Q    On what road were you at that point?

22   A    My vehicle was closer to Cortelyou Road.

23   Q    Officer Modesto, I ask that you please take Government

24   Exhibit 1, the google map, and you should have a marker there

25   next to you to your left, I believe.

Modesto - Direct - Marshall                    30

1    A    Yes.

2    Q    And please draw a triangle with the number 1 in the

3    approximate location where you parked your car at that point?

4    A    Okay.

5    Q    Now, Officer Modesto, please draw a rectangle on

6    Government Exhibit 1 with the letter D on it where the

7    defendant's car was parked.

8    A    Okay.

9         THE COURT:  I'm not sure if we're supposed to be

10   seeing this writing, but I'm not seeing it.

11        MR. MARSHALL:  I apologize, Your Honor. I was going

12   to display it once he's finished drawing but if you'd like I

13   can display it in between.

14        THE COURT:  It's up to you. I just want to make

15   sure I'm not missing something you intend to be displayed.

16        THE WITNESS:  Okay.

17   Q    Officer Modesto, where was the second police car once

18   you pulled your vehicle up in front of the defendant's

19   Mercedes?

20   A    From what I recall the second vehicle was directly

21   behind the black Mercedes.  So the front of our vehicle,

22   basically the (indiscernible) was towards the back right side

23   and closer to the rear end of the Mercedes.

24   Q    And when you say our vehicle you're referring to the

25   second police vehicle?

Modesto - Direct - Marshall                    31

1    A    Correct.  Yes.

2    Q    Officer Modesto, please take Government Exhibit 1, the

3    Google map, again, and draw a triangle with the number 2 in

4    the approximate location where the other police officer --

5    where the other police car was parked.

6    A    Okay.

7         MR. MARSHALL:  Ms. Guy, if you would please switch

8    us over to the ELMO for a moment.

9         Your Honor, I've now placed the copy of Government

10   Exhibit 1 that Officer Modesto have marked up on the ELMO and

11   would like to offer it as Government Exhibit 1A.

12        MS. EISNER-GRYNBERG:   No objection.

13        THE COURT:  Government Exhibit 1A is admitted.

14   (Government Exhibit 1A received into evidence.)

15   Q    Officer Modesto, did you say when you were drawing on

16   this that you had made a mistake?

17   A    Yeah, with the second vehicle.  For some reason I almost

18   drew a square but my intention was to draw a triangle.

19   Q    Okay.  And now when we're looking at Government Exhibit

20   1A here is this triangle, if you look up at the screen, this

21   triangle, the triangle with the number 1 in Cortelyou Road is

22   that your vehicle?

23   A    That would be my vehicle, correct, yes.

24   Q    And this square --

25   A    Square, rectangle, sorry.

1    Q    -- is it -- which vehicle is that?

2    A    That would be the black Mercedes.

3    Q    And is this square in the exact location where the

4    defendant's vehicle was when you arrived on scene?

5    A    Correct.  Approximately in that location, yes.

6    Q    How far into the crosswalk was the defendant's vehicle

7    when you arrived on the scene?

8    A    From what I recall I think -- from what I recall it was

9    -- half of his vehicle was on the cross walk on the front

10   half of the vehicle was over the crosswalk, pointing closer

11   to Cortelyou Road.

12   Q    So how much of the crosswalk is actually obstructed by

13   the vehicle?

14   A    I would say half.  It was half.

15   Q    And then the other triangle with the 2 in it back behind

16   what you've identified as the defendant's vehicle, which

17   vehicle is that?

18   A    That would be our second car, unmarked vehicle that we

19   have.

20   Q    And when that vehicle was parked was it on the

21   crosswalk?

22   A    I think it was in the middle -- it was definitely in the

23   middle of the street but I would say from what I remember it

24   was closer -- I think it was in between the stop sign -- I'm

25   sorry.  The lettering on -- the word "stop" on the ground and

Modesto - Direct - Marshall                    33

1    maybe right before the crosswalk begins.

2         Like I said, I didn't draw the size of the vehicle. I

3    didn't take that into account but --

4    Q    So can you describe, Officer Modesto, this triangle with

5    the number two, where -- with that being the second police

6    vehicle, the rear of that vehicle how far back onto East 34th

7    Street would it go?

8    A    It would go up to where the line is, where the lettering

9    for the word "stop."  Right where that lettering is at it

10   would --

11   Q    Are you referring to --

12   A    Yes.

13   Q    -- the word "stop" here?

14   A    Yes.  Correct.  That one.

15   Q    So that is the word "stop" towards the top of the

16   picture of what is the southern portion of East 34th Street.

17   A    Correct.

18   Q    And so the second police vehicle went from this area

19   where you drew the second triangle to the area of --

20   A    Yes.  Correct.

21   Q    -- that word "stop"?

22   A    Yes.

23        MR. MARSHALL:  Ms. Guy, if we can just switch back

24   to the computer now, please.

25   Q    Officer Modesto, I've put on the display Government

1    Exhibit 2.

2    A    Yes.

3    Q    And I'll ask where in this image -- and if you would

4    please approach the screen here.

5    A    Sure.  Sure.

6    Q    Where in this image was the defendant's vehicle when you

7    arrived on the scene?

8    A    When I arrived on the scene -- you see this brown

9    electrical pole with the green signs for the streets?  His

10   vehicle was angled -- like I said half of the front of the

11   vehicle was angled towards Cortelyou where from what I recall

12   the brown electrical pole would be right in between the

13   middle of the frame of the car.

14        So from the front passenger door, the rear passenger

15   door in the middle that vehicle was angled and parked there.

16   Q    And when you're referring to this pole in the image, is

17   it from -- so there are the four street corners here.  Are

18   you referring to the pole at what's the bottom left street

19   corner?

20   A    Yeah, the bottom left where the stop sign is at.  That

21   right pole.

22   Q    And is it the left side of the defendant's vehicle that

23   was closer to that pole?

24   A    Oh, yes, his left side driver door and left side rear

25   driver door.

Modesto - Direct - Marshall                          35

1   Q    And so when you look at this crosswalk, how much of the

2   crosswalk would you say the vehicle was obstructing?

3   A    Half of the back of the vehicle was blocking that

4   crosswalk.  And then the other half was blocking the

5   pedestrian ramp that's right next to it.

6   Q    All right.  And Officer Modesto, is this the location

7   where the defendant was parked when you arrived on the scene?

8   A    That is correct, yes.

9   Q    Did the defendant at any point move the car?

10  A    No.

11  Q    Now please show on Government Exhibit 2 up on the screen

12  where you were when you first saw the defendant in the

13  driver's seat.

14  A    Where I was at?

15  Q    Where was your vehicle when you first saw the defendant

16  in the driver's seat of the Mercedes.

17  A    So if his vehicle's right there, you can picture it

18  here, my vehicle was to the right of it.  Like I said, we

19  were parallel, even, right next to the right side of his

20  vehicle.

21  Q    So when you pulled up and the defendant's vehicle was

22  next to that pole at the bottom left corner, were you --

23  A    On the right side.

24  Q    You were on the right side of him.  Was your vehicle in

25  the crosswalk would you say?

Modesto - Direct - Marshall                    36

1    A    Yes.

2              THE COURT:  Can I just jump in for a second?  I'm

3    not sure we have a dispute of fact that the vehicle -- Mr.

4    Balkissoon's vehicle ends up in the crosswalk.  So the only

5    question is whether it moved to get there or started there.

6    And if that's the case then maybe we don't need all of this

7    detail on precisely were the car was in relation to

8    electrical poles and stops signs and otherwise maybe until

9    redirect.  We'll see.

10             MR. MARSHALL:  I understand, Your Honor. I'm also -

11   - just to get at what Officer Modesto would have been able to

12   see at that point when he arrived on the scene.  But I will

13   move this part along.

14             THE COURT:  Okay.  Am I right to say --

15             MS. EISNER-GRYNBERG:   Yes.

16   BY MR. MARSHALL:

17   Q    Officer Modesto, if you would just point out where you

18   parked your car after viewing the defendant?

19   A    After that I parked my car in front of his, closer to

20   the area here at an angle.

21   Q    Is that on Cortelyou Road?

22   A    Yes.

23   Q    And where was the second police car, approximately?

24   The second police car approximately?

25   A    The second police car would be towards right where this

Modesto - Direct - Marshall                    37

1   car is at, the black car.  Right in the middle.  Exactly,

2   right in the middle, yes.

3   Q    And so the second police car is where the black car is

4   in this image except further towards the center of East 34th

5   Street?

6   A    The center of the street, yes.

7   Q    All right.  Officer Modesto, I have a CD which I'll hand

8   to you.  The CD has been marked for identification as

9   Government Exhibit 3.  Do you recognize it?

10  A    I do, yes.

11  Q    How do you recognize it?

12  A    It has my signature on it.

13  Q    And are you aware of what is on that CD?

14  A    I am, yes.

15  Q    What is that?

16  A    It's a recording of my body cam of the night.

17  Q    Does Government Exhibit 3 -- or does the video on

18  Government Exhibit 3 fairly and accurately depict the

19  February 7th, 2021 incident involving the defendant?

20  A    It does, yes.

21  Q    Officer Modesto, you have in front of you documents

22  which have been marked for identification as Government

23  Exhibits 4, 5, 6 and 7.

24  A    Yes.

25  Q    Do you recognize them?

Modesto - Direct - Marshall                    38

1    A    I do, yes.

2    Q    What are they?

3    A    Those are still images of my body cam from that night.

4    Q    Do Government Exhibits 4 through 7 fairly and accurately

5    depict the February 7th, 2021 incident involving the stop and

6    arrest of the defendant?

7    A    They do, yes.

8         MR. MARSHALL:  Your Honor, the government offers

9    Government Exhibits 3 through 7 into evidence.

10        MS. EISNER-GRYNBERG:   No objection.

11        THE COURT:  Exhibits 3 through 7 -- Government

12   Exhibits 3 through 7 are received in evidence.

13        (Government's Exhibit Nos. 3-7 received into evidence.)

14   Q    Officer Modesto, are the time stamps on the body camera

15   footage from the incident involving the stop with black

16   Mercedes generally accurate?

17   A    I would say yes.  It's relatively close to our end of

18   tour and from time to time I always check -- throughout the

19   night I check the time on tour so, yes, it's correct.

20   Q    Officer Modesto, returning to February 7th, once you

21   parked, after having seen the defendant rolling a marijuana

22   cigarette what happened next?

23   A    Well, when I saw the rolling -- attempt to roll a

24   marijuana cigarette I advised my partner, Officer Martinez,

25   to relay that message to the second vehicle behind us just to

Modesto - Direct - Marshall                    39

1    let them know that we were going to exit our vehicle an

2    approach.

3            And like I said, I put my vehicle directly in front of

4    his after that.

5                    THE COURT:  Can I just clarify?  You said you saw,

6    I think, and correct me if I'm wrong, the defendant looking

7    down --

8                    THE WITNESS:  Correct.

9                    THE COURT:  -- in front of him and you saw that his

10   arms were in front of him.  Are you inferring from that that

11   he's rolling a marijuana cigarette or were you able to

12   actually see from your car what was in his hands.

13                   THE WITNESS:  From where I was at I could see the

14   rolling paper.  So he was sitting down but he was looking

15   down with his hands right above his lap.  And when I looked

16   he kind of did a little look like that and I could see the

17   rolling paper.

18                   THE COURT:  Okay.  The record may reflect that the

19   witness is gesturing that he sat up higher in his seat.  That

20   was the gesture.  Sorry, you can continue.

21   BY MR. MARSHALL:

22   Q    Back to where we were with the stop, after you pulled up

23   and parked your car, what happened next?

24   A    Well, from there, like I said, I advised my partners

25   that we were going to exit and approach and I parked the car.

Modesto - Direct - Marshall                    40

1    As I parked I think they exited the vehicle first.

2    Q    And which officers, if any, approached the vehicle?

3    A    From what I recall Officer Martinez approached the

4    passenger side and Officer Hassan approached the driver's

5    side.

6    Q    And by the vehicle that they approached you're referring

7    to the Mercedes, correct?

8    A    Yes.  Sorry.  Correct.

9    Q    Why did you decide at that time to make an approach of

10   the vehicle?

11   A    At that point in time we had a violation and like I

12   said, I stated to them that I observed the motorist, the

13   individual appearing to be rolling a marijuana cigarette and

14   from there we were further going to investigate whether that

15   was the case or not.

16   Q    And the violation that you're referring to, what was

17   that?

18   A    He was blocking the pedestrian ramp.

19   Q    And who did you tell about the marijuana cigarette?

20   A    I stated that to Officer Martinez and, obviously,

21   Officer Blum.  He was in my car.  But I informed them to

22   advise the second car that we were going to approach the

23   vehicle.

24   Q    Are you aware of whether anyone called over to the other

25   vehicle?

Modesto - Direct - Marshall                    41

1    A    From what I recall normally that's the case.  Yes, he

2    definitely relayed over the message through out department

3    radios.

4    Q    Do you recall what exactly they relayed over at this

5    time?

6    A    Oh, negative.  No.

7    Q    Aside from seeing the defendant attempting to roll a

8    marijuana cigarette, did you observe at the point where you

9    were still at your car any other indication of there being

10   marijuana in the car?

11   A    At that time, just the rolling paper.  And initially

12   when I pulled my vehicle next to him, this is before I exited

13   my vehicle, there was a slight smell of marijuana in the air

14   that I could smell.  So yes.

15   Q    And when did you first smell that?

16   A    So when I approached the car and I placed my car

17   directly to the right of his and I looked and I could see and

18   smell that as well.

19   Q    And just to clarify was your driver's side window open,

20   the window closest to you?

21   A    It was open, yes.

22   Q    Where did you think at that point the smell was coming

23   from?

24   A    At the time my assumption -- being as there were no

25   other cars or people on the street, my assumption was that it

Modesto - Direct - Marshall                42

1    was the vehicle, the black Mercedes.

2    Q    And why did you make that assumption?

3    A    Like I said there was nobody else around.  And I saw the

4    rolling paper.  Like I said my assumption was that there was

5    marijuana there.

6    Q    Did you later get a better sense of where the smell of

7    marijuana was actually coming from?

8    A    Towards the end, yes.

9    Q    And where was that smell from?

10   A    That was the Mercedes.

11   Q    Do you recall whether at the time of this the

12   defendant's windows on the Mercedes were open?

13   A    From what I recall his passenger side window was open.

14   When I initially approached, yes.

15   Q    Is this the front or rear passenger side?

16   A    The front passenger side window.

17   Q    Is that the window of the Mercedes through which you

18   initially saw the defendant?

19   A    Yes, correct.

20   Q    How would you describe the weather during this incident

21   in the early morning of February 7th, 2021?

22   A    It was cold.  There was a lot of snow on the sidewalks

23   and streets.  And from what I recall it was a little

24   slippery.

25   Q    Yet, the defendant was parked with his front passenger

Modesto - Direct - Marshall                    43

1    window open?

2    A    Yes.

3    Q    What happened next after you stepped out of the vehicles

4    and Officer Hassan and Martinez approached the Mercedes?

5    A    Well, when I exited my vehicle I attempted to go to the

6    car but my attention went over to the side.  There was a

7    female on the sidewalk asking questions.

8         And I think I answered whatever -- I don't recall what

9    she asked or what I answered, but then from there I made my

10   way to the back of the black Mercedes and I assisted further

11   in the car stop there.

12   Q    And then what happened?

13   A    From there I had a conversation with Officer Gomez.  I

14   looked at our department phone, or his department phone,

15   looked up some information on the vehicle and then from there

16   Officer Hassan advised me that there was marijuana present

17   and that point we were going to ask the driver to step out of

18   the vehicle.

19   Q    Did Officer Hassan say where there was marijuana

20   present?

21   A    I don't recall.  No, I don't.

22   Q    Did he indicate whether it was in the vehicle?

23   A    He indicated there was marijuana present.  He didn't

24   tell me exactly where.

25   Q    What happened next?

Modesto - Direct - Marshall                    44

1    A    Well, from there Officer Hassan asked the driver to step

2    out. I then approached that driver's side door and assisted

3    him and then from there I guided the driver to the rear of

4    his car, which is the black Mercedes by the bumper.

5    Q    Were you aware of why Officer Hassan had asked the

6    defendant to step out of the vehicle?

7    A    Yes.  Yes.  Like I stated, Officer Hassan stated that

8    there was marijuana present.  At that point in time we

9    normally do ask the motorist to step out and that part.

10   Q    Why take the driver out of the car though?

11   A    At that point in time, being as marijuana is present in

12   the vehicle, we were going to conduct a search of the car.

13   Q    And what were you going to search for?

14   A    Additional marijuana or other narcotics.

15   Q    Once you took the defendant to the rear of the vehicle,

16   what happened at the vehicle?

17   A    I started to have a conversation with him. I noticed

18   that he -- oh, I was having a conversation with him. I

19   attempted to have him face forward.  To have him face

20   directly towards me, but he angled his body focused on what

21   Officer Martinez was doing.  So he was facing Officer

22   Martinez.  So I was talking to him, but he was facing Officer

23   Martinez.  And my attempt was just to get him to face

24   forward.

25   Q    Did he look at Officer Martinez the entire time or was

Modesto - Direct - Marshall                    45

1    he looking back and forth towards you in the vehicle?

2    A    I think he was looking around and he was looking at the

3    other officers.  But he definitely at one point in time he

4    was looking at what Officer Martinez was doing.

5    Q    And what were Officer Hassan and Martinez doing at that

6    time?

7    A    They were -- at that point they were conducting the

8    search of the car.

9    Q    And where in the car did they search?

10   A    Officer Hassan searched basically the driver's side and

11   the rear driver's side.  And Officer Martinez searched the

12   passenger side and the rear passenger side.

13   Q    And the search was limited to the passenger compartment?

14   A    That is correct, yes.

15   Q    And what were you doing while that search was going on

16   while you were standing in the back of the vehicle with the

17   defendant?

18   A    I was having a conversation with him. I was asking him

19   about an arrest he had in the past. So I was asking him about

20   that.  And my intention was just to have him face forward. I

21   would say distract him from what was going on behind him.

22   That was my attempt.

23   Q    Why would you -- when you say face forward, are you

24   referring to him looking away from the Mercedes?

25   A    Yes, correct.

Modesto - Direct - Marshall                46

1    Q    So you were attempting to keep him from looking at the

2    vehicle. Is that correct?

3    A    Correct, yes.

4    Q    Why would you do that?

5    A    Tactical reasons. For us it's a safety concern.

6    Obviously, we don't know what's in the car.  You know, that's

7    just for the safety of me, my partners, also obviously the

8    motorist. I want to talk to him. I want to keep his attention

9    towards me and not what's going on behind him.

10   Q    Were you concerned that the defendant posed a danger at

11   that point?

12   A    I'll be honest ever car stop that I do I treat it the

13   same.

14   Q    Why is that?

15   A    My work consists of the majority of time I make firearms

16   arrests.  So I approach every car stop with that sense -- a

17   sense of danger where eventually a firearm could be

18   recovered. I don't want to like turn it off at one point and

19   something happens one day.

20   Q    Regarding the information you learned about the

21   defendant's past arrest, at what point did you learn that?

22   A    I think that was right before we asked him to step out.

23   Q    And did you relay that information to Officer Hassan or

24   Officer Martinez before the began their search?

25   A    Negative.  No.

1  Q    Now what happened next?

2  A    As I'm having a conversation with him I noticed that he

3  was a little nervous. I noticed that he kept looking forward

4  at what Officer Martinez was doing.

5      And like I said, I was just having a conversation.  My

6  intention is to distract him from what's going on. So, yeah,

7  I asked him about a firearm arrest and what it consisted of

8  (indiscernible) the case.  But that's just to talk to him

9  and, I'll say it again, distract him from what's going on.

10      And then at what point he was looking at what

11  Officer Martinez was doing?  And when Officer Martinez went

12  to the rear passenger side of the car, he attempted to flee

13  from the car stop.

14  Q    At the point when the defendant attempted to flee, was

15  Officer Martinez -- do you recall whether Officer Martinez

16  was already searching the rear passenger seat?

17  A    Yes, I think he was inside. I think he was in the middle

18  of it, yes.

19  Q    So Officer Martinez was searching the rear passenger

20  seat of the Mercedes at the time when the defendant ran.

21  A    He was, yes.

22  Q    Officer Modesto, I'm going to play a few clips from your

23  body camera footage, which is Government Exhibit 3 in

24  evidence.

25      After I play each clip, I'll ask if you could please

Modesto - Direct - Marshall                    48

1    explain what is depicted in clip, okay?

2    A    Sure.

3    Q    I'm not going to play the first clip from your body

4    camera footage, which is from timestamp 012357 to 012454.

5              THE COURT:  Sorry.  This is an excerpt of what

6    exhibit?

7              MR. MARSHALL:  Government Exhibit 3, Your Honor.

8              THE COURT:  Thank you.

9         (Body cam footage is played.)

10   Q    Officer Modesto, what was depicted in that clip?

11   A    That was the initial approach.  That's when I stated

12   when I exited my vehicle and I went to the side.  I spoke to

13   a female and then I directed myself back to the car. And then

14   that's when I observed -- I was talking to Officer Gomez and

15   observed the information on the phone.  And then I think it

16   ended right before I approached the driver's side.

17   Q    And did you see who was next to the Mercedes in the

18   video?

19   A    The officers?

20   Q    Who are they?

21   A    Yes, they were -- Officer Hassan was by the driver and

22   Officer Martinez was on the passenger side.

23   Q    Officer Modesto, please take a look at Government

24   Exhibit 4 in evidence.

25   A    Okay.

1    Q    What is shown in this image, Officer Modesto?

2    A    That's the still image of my camera.  That's when I was

3    standing directly behind the Mercedes Benz and Officer

4    Hassan's to my left and Officer Martinez towards the right.

5    Q    And where is the Mercedes Benz located in this image?

6    A    Directly in front of me blocking that pedestrian ramp

7    there.

8    Q    Is that the location the defendant's car was in when you

9    arrived on the scene?

10   A    Yes.

11   Q    Did the defendant move the car at any point while you

12   were on the scene?

13   A    No.

14   Q    Officer Modesto, before we move onto the next clip,

15   regarding your body camera footage, when did you turn your

16   camera on?

17   A    I turned my camera on as I was approaching the driver's

18   side and we were going to ask him to step out.

19   Q    Why did you wait until that point to turn it on?

20   A    Well, at that moment we just had the violation.  Once

21   the -- like I said, we had the violation.  I kind of got

22   distracted a little bit.  But once we determined that we were

23   going to ask him to step out I activated my camera.

24           THE COURT:  What does it mean to activate the

25   camera?

1          THE WITNESS:  In order to activate our camera you

2     have to tap it twice.  And you tap it twice and it makes a

3     sound.  And then it starts recording the audio.  And our

4     cameras basically have a one minute buffer.  So it's

5     recording at all times. It's recording at all times.

6     Q     Recording video at all times.

7     A     It's recording video at all times.  When we activate it

8     it starts recording the audio. So that's when I activate it.

9     But it's on at all times.

10    Q     And so when we get a clip from your body camera footage,

11    the period before the sound turns on, is that the buffer

12    period you were referring to?

13    A     Yes, that's what we would refer to as the buffer period,

14    yes.

15    Q     And that's the minute before you tapped your camera.

16    A     That is correct, yes.

17    Q     And why turn the body camera on at the point where you

18    realized they were going to take the camera out of the car?

19    A     Like I stated, we had the violation, but at that point

20    it -- being as we were going to talk to him and ask him to

21    step out, I activated my camera just because it was going

22    further beyond the violation.

23    Q     Do you have any way of know when another officer turns

24    their body camera on?

25    A     Yes.

1    Q    Do you sometimes turn your body camera on after hearing

2    -- well, withdrawn.

3         How can you tell whether another officer turns their

4    body camera on?

5    A    Well, like I stated, you have to double click it.  And

6    when you click it it makes a beeping noise.

7    Q    So you know another officer turns their body camera on

8    when you hear that beep?

9    A    That is correct, yes.

10   Q    Do you sometimes turn your body camera on after hearing

11   another officer turn their body camera on?

12   A    Yes.

13   Q    Why?

14   A    At that point in time maybe that officer is seeing

15   something that I can't see.  So he takes the initiative to

16   turn his camera on and then we follow along.

17   Q    Do you turn your camera on immediately every time you

18   make a traffic stop?

19   A    No, not always.

20   Q    Why not?

21   A    It all depends on the situation.  If we have -- if we

22   conduct like a normal car stop then yeah, we would do it.

23   But sometimes -- in this situation it's like not a typical

24   car stop.  We try to investigate and find information and

25   then we activate our camera.

1       But like I said I think in this situation it was just a

2   different type of car stop but sometimes we do on -- the

3   majority of the time.

4   Q    What do you mean when you say this wasn't a normal car

5   stop?

6   A    Well, a regular car stop is that you're driving, you see

7   a violation.  You attempt to pull it over.  You know, you

8   report from behind.  This wasn't this case.  The car wasn't

9   moving.  It was parked.  It was parked in that corner.  So it

10  was just a different scenario.  It's not a stereotypical car

11  stop like you see on TV.

12  Q    Let me ask you Officer Modesto.  Did you have a previous

13  CCRB investigation where they determined that you turned your

14  camera on late?

15  A    I did, yes.

16  Q    What happened there?

17  A    From that situation from what I recall I was chasing a

18  guy on a scooter.  He was on the sidewalk. He -- well, let me

19  begin again.

20      We observed an individual riding a scooter. He was going

21  the wrong way.  We attempted to stop it.  When he didn't he

22  almost hit my partner at the time.

23      So then at that point I gave chase and as I'm giving

24  chase he's driving with one hand and he's reaching in his

25  waistband.  So at that point, at that time, I did remove my

Modesto - Direct - Marshall                    53

1  firearm from my holster and I had my radio in the other hand

2  and I gave chase.

3       I didn't activate my camera until I had -- I was

4  standing next to the -- I was apprehending the individual at

5  the time.

6  Q    Approximately how long did that chase go on for?

7  A    I don't recall.

8  Q    Would say it was minutes or longer?

9  A    No, no. I would say 30 seconds to less than a minute.

10 Everything was going on so fast I wouldn't be giving an

11 accurate time.

12 Q    In hindsight do you feel that you waited too long to

13 turn your body camera on in that situation?

14 A    I don't know because in that situation it's just like a

15 high tense moment. I believe the guy had a firearm.  So my

16 main concern is obviously for my safety, the safety of

17 others.  My attention was towards him and my hands were --

18 I'll be honest with you they're occupied. I had my firearm

19 and I had my radio. I'm trying to give directions over.

20      When I was able to take a breather yes, and notice

21 everything was on control I activated my camera.  That stuff

22 happens.  It's just --

23           THE COURT:  Did this other individual have a

24 firearm?

25           THE WITNESS:  Negative.  No.

Modesto - Direct - Marshall                              54

1        THE COURT:  Okay.  Let's move on and save the rest

2   of this topic for redirect.

3   Q    Officer Modesto, returning to your body camera footage,

4   I'm going to play a second clip. This clip is from timestamp

5   012454 to 012605.

6        (Body cam footage is played)

7   Q    What was depicted in that clip?

8   A    That was me approaching the driver's side and I assisted

9   Officer Hassan in asking the motorist to step out.  And then

10  from there I guided the driver to the rear of the vehicle,

11  the black Mercedes.

12  Q    Officer Modesto, please take a look at Government

13  Exhibit 5 in evidence.

14  A    Yes.

15  Q    What is shown here?

16  A    That's a still image of my body cam. It's showing the

17  inside of the vehicle, the black Mercedes.

18  Q    And what's shown with that yellow arrow?

19  A    That is a backpack or a handbag.  A backpack that's

20  located in the rear driver's side of the seat.

21  Q    And at what point in this incident was this image taken?

22  A    This was right as we were taking him -- the vehicle. You

23  can see his hands on top of his vehicle and that's when that

24  took place.

25  Q    And by him, who are you referring to?

Modesto - Direct - Marshall                    55

1    A    Mr. Balkissoon.

2    Q    The backpack that you pointed out in the back seat, is

3    the main compartment on that backpack open or closed?

4    A    It's open.

5    Q    Are you aware of where in the vehicle the gun was found?

6    A    It was inside that bag.

7    Q    Was it in that open, main compartment?

8    A    Yes.

9    Q    Officer Modesto, I'm going to play one more clip from

10   your body camera footage.  This is from 012605 to 012723.

11        (Body camera footage played.)

12   Q    Officer Martinez [sic] what's depicted in that video?

13   A    I'm Modesto.

14   Q    I apologize.  Officer Modesto, what's depicted in that

15   video?

16   A    Well, like I stated as I'm talking to him I'm trying to

17   get him to face forward.  He's obviously concerned with

18   what's going on behind him.  I'm just making conversation.

19   I'm trying to talk about whatever I can, have him face

20   forward and then at that point I guess Officer Martinez goes

21   to the rear back and then he attempts to run.  And then he

22   tries to take off and I think at that point Office Blum was

23   able to grab him and then we placed him under arrest.

24   Q    When you say you were talking to him and he attempts to

25   run, who are you referring to?

Modesto - Direct - Marshall                              56

1  A    I was talking about Mr. Balkissoon.

2  Q    And what happened at that video once the defendant was

3  caught?

4  A    I could hear Officer Martinez say 92.  And then I tried

5  to assist but there was enough people there so then I went

6  back to the car because I hear Officer Martinez say it's in

7  the bag and then I checked and the gun was present there,

8  yes.

9  Q    And when Officer Martinez said 92, what did you

10  understand that to mean?

11  A    That's just like a radio code for us for an arrest.

12  Q    So what did you understand him to be communicating to

13  you.

14  A    Well, for us being -- as we work as a team 92, the

15  majority of time, if anything, it's the firearm arrest.

16  Q    Officer Modesto, please look at Government Exhibit 6 in

17  evidence.

18  A    Okay.

19  Q    What's depicted in this image?

20  A    This is -- once again a still image of my body cam.

21  This is me in the back with Mr. Balkissoon.  He's the one

22  with the red arrow and then Officer Martinez I guess at that

23  point he's searching.  He's the one with the green arrow.

24  Q    And can you describe what direction the defendant

25  appears to be looking in?

Modesto - Direct - Marshall                    57

1    A    As  you could see his face is looking at what Officer

2    Martinez is doing.

3    Q    And how long before the defendant ran do you believe

4    this image to be from?

5    A    I would say a couple of seconds.

6    Q    Officer Modesto, please look at Government Exhibit 7 in

7    evidence.

8    A    Yes.

9    Q    What's shown in this image?

10   A    It's a still image of Mr. Balkissoon attempting to flee

11   the car stop.

12   Q    And at what point -- how long after he started running

13   is this image from?

14   A    This is right after Officer Martinez is searching the

15   rear of the vehicle.

16   Q    So how long had the defendant been running at this point

17   that this image was taken?

18   A    I would say a couple of seconds as well.

19   Q    How was the defendant able to run with several officers

20   standing near him?

21   A    Well, he's -- he can move freely.  He's not placed in

22   handcuffs of anything like that.

23   Q    When the defendant is running in this image, did he get

24   close to the location of the gun?

25   A    Yes. Yes, he did.

1    Q    Approximately where was the gun in the vehicle?

2    A    It was inside, I would say he was maybe about five feet

3    from me at that point.

4    Q    So if the defendant had turned left at this point rather

5    than making a right, do you believe that he could have gotten

6    to the gun?

7    A    Yes, I believe so, yes.

8            MR. MARSHALL:  Your Honor, may I have a moment?

9            THE COURT:  Yes.

10           MR. MARSHALL:  Thank you, Officer Modesto. I have

11   no further questions.

12           THE WITNESS:  Okay.  Thank you.

13           THE COURT:  Let's take a -- call it a ten minute

14   break.  We'll be back somewhere between 20 and 25 after.

15       (Recess from 11:14 a.m. until 11:27 a.m.)

16           THE COURT:  We're back on the record.

17           Ms. Eisner-Grynberg, your witness.

18           MS. EISNER-GRYNBERG:   Thank you, Judge.

19                       CROSS EXAMINATION

20   BY MS. EISNER-GRYNBERG:

21   Q    Good morning, Officer Modesto.

22   A    Good morning.

23   Q    You mentioned that at the time of your arrest you were

24   on patrol with the 67th Precinct, right?

25   A    Yes.

1    Q    And that's where you still work?

2    A    That is correct.

3    Q    On that day you were assigned to a specialized unit.

4    A    Yes.

5    Q    And that specialized unit's specialization was looking

6    for firearms, correct.

7    A    Yes.

8    Q    You were not in the marijuana enforcement unit, right?

9    A    We enforce all traffic rules, all penal law, and -- we

10   enforce all those types of laws and traffic rules.

11   Q    Your specialization at that time was to look for guns,

12   right?

13   A    That's just one thing that we do.

14   Q    That was the focus.

15   A    It's one of the things that we do, yes.

16   Q    You said it's the majority of the arrests that you make.

17   A    Lately, yes, in the last few years we've made a majority

18   of gun arrests, yes.

19   Q    And this arrest is from February of this year, correct?

20   A    Correct.

21   Q    You said that one of the tools I think is the word that

22   you used in making firearms arrests is looking for the smell

23   of marijuana, right?

24   A    Yes.

25   Q    Why is that?

Modesto - Cross - Eisner-Grynberg                60

1    A    It would indicate something -- it would indicate

2    something that's being done that's not supposed to be done.

3    At the time it was illegal to do it.  So that's just one

4    thing you do.

5    Q    What you really mean by that is that when you smell

6    marijuana you believe that gives you a basis to approach,

7    right?

8    A    We're allowed to approach, yes.

9    Q    And you believed at that time it gave you the ability to

10   search, correct?

11   A    When it comes to a vehicle, yes.

12   Q    On that day you were part of a two car patrol teams,

13   right?

14   A    Yes.

15   Q    And you were driving the lead car you said?

16   A    Yes.

17   Q    You said that while you're on patrol you communicate

18   with the other officers that you're with, right?

19   A    Correct.

20   Q    You need to rely on their observations in addition to

21   your own.

22   A    Yes.

23   Q    And when those people are not with you, like when

24   they're in another police car, the way you communicate is by

25   police department radio, correct?

Modesto - Cross - Eisner-Grynberg                    61

1    A    Yes.

2    Q    And that police department radio, depending on which

3    frequency you're using, can be recorded, correct?

4    A    Yes.

5    Q    If you're using the radio to communicate over a central

6    frequency, we can after the fact request those radio messages

7    to hear what was said, right?

8    A    That is -- from my understanding, yes.

9    Q    If you use the radio in more of a point to point

10   function that's not recorded, right?

11   A    I'm not aware.  My assumption it is.

12   Q    Okay.  Is your car the police car, the car that you were

13   driving on this date, equipped with a dashboard camera?

14   A    Negative.

15   Q    You though had a body worn camera.

16   A    I did, yes.

17   Q    You explained a bit on direct examination how the body

18   camera works, right?

19   A    Yes.

20   Q    When you use the body camera it's actually stored at the

21   police station, right?

22   A    At the end of the night we remove the camera and we

23   docket it to a station.

24   Q    Right.  And when it's docked into the station that's

25   when it's charging, right?

Modesto - Cross - Eisner-Grynberg                    62

1    A    It charges, yes.

2    Q    So when you get it at the beginning of the shift you

3    take it from the station to make sure it's charged, right?

4    A    Correct.

5    Q    And to make sure it's working properly.

6    A    Correct.

7    Q    And you put it on your chest.

8    A    That is correct.

9    Q    You know in your training that as a police officer

10   you're supposed to activate the body camera when you observe

11   a potential crime in progress, right?

12   A    Correct.

13   Q    And you said that you do that by tapping it twice?

14   A    Yes.

15   Q    I think you explained this pretty well in direct, but

16   just so that it's clear, so the camera is always running in

17   the background, right?

18   A    That is correct.

19   Q    Just the video though, not the sound.

20   A    That is correct.

21   Q    And what that does is when you press the button it

22   reaches back in time 60 seconds to grab whatever happened in

23   the minute before you pressed it, right?

24   A    Yeah, it saves that one minute.

25   Q    So other than that though whatever happens prior to that

Modesto - Cross - Eisner-Grynberg                    63

1    one minute, that's all lost, right?

2    A    My understanding it's not retained, no.

3    Q    So we can watch whatever you have and you press activate

4    the one minute before then.

5    A    Yes.

6    Q    Other than that, we only have your word to rely on

7    right?

8    A    Yes.

9    Q    Okay.  So let's go to the early morning hours of

10   February 7th, 2021 when you stop Mr. Balkissoon, okay?

11   A    Okay.

12   Q    You said that you were driving south on East 34th Street

13   at the intersection of Cortelyou Road, correct?

14   A    Yes.

15   Q    And you said that his car was blocking the pedestrian

16   ramp, I think you called it.

17   A    Pedestrian ramp, yes.

18   Q    You'd agree with me that on that day and at that time it

19   was cold, right?

20   A    It was cold.

21   Q    And there was snow on the ground.

22   A    Yes.

23   Q    There was snow piled up on the sides of the road where

24   it had been plowed.

25   A    Correct.

Modesto - Cross - Eisner-Grynberg                    64

1    Q    You parked your car in the middle of the street, right?

2    A    I would say so yes, on Cortelyou, yes.

3    Q    You didn't pull into a parking spot.  You parked it

4    right in the middle of the street.

5    A    No.  I mean -- what was the question?

6    Q    You parked it in the middle of the street.

7    A    Yes.  I'm sorry, yes.

8    Q    Let's take a look at Government Exhibit 3.  And I'll ask

9    Mr. Dufont to just queue it up right to the beginning at zero

10   seconds.

11        What we're looking at here on Government Exhibit 3, the

12   silver car, that's the car that was the rear car of the team,

13   correct?

14   A    Yes.

15   Q    That was the car that Officer Hassan had been driving?

16   A    I don't know who was operating the vehicle that night.

17   Q    You recognize that to be the rear car.  That was the

18   partner car to yours?

19   A    I recognize that car, yes.

20   Q    And where it's located on the screen in front of you,

21   that's where it was parked during the car stop, right?

22   A    Correct.

23   Q    Also just in the middle of the street, correct?

24   A    Yes.

25   Q    Because there was nowhere else to park.

1    A    From that image, no.

2    Q    You can see that there's snow on the passenger side --

3    between the passenger side of the police car and the parked

4    white car on the left of the screen, correct?

5    A    Yes.

6    Q    Let's play from the first eight seconds.  Take a look at

7    this.

8         (Body camera footage played.)

9         Stop it there.  This is from your vantage point, right?

10   A    Yes.

11   Q    So we saw you looking at the car that your partners have

12   driven, correct?

13   A    Correct.

14   Q    And then you turned around to see the woman on the

15   sidewalk, correct?

16   A    Correct.

17   Q    And now you're facing the crosswalk that's at issue in

18   this case, right?

19   A    Well, the crosswalk is that one directly in front of me

20   with the white line?

21   Q    Yes.

22   A    Am I facing that?

23   Q    Right.

24   A    Yes.

25   Q    This is the crosswalk at the corner of 34st Street and

1    Cortelyou Road that you say Mr. Balkissoon was blocking,

2    right?

3    A    His vehicle -- from this image he's to my left.

4    Q    Correct.  There's only one crosswalk thought, right?

5    This is the same crosswalk --

6    A    That's only the one crosswalk, yeah.  But he was

7    blocking the pedestrian ramp.

8              MS. EISNER-GRYNBERG:  Right.

9              THE COURT:  Let me just say for the record, we've

10   paused the video at one hours, 24 minutes and five seconds,

11   if I'm reading the timestamp correctly, and this is

12   Government Exhibit 3.

13             MS. EISNER-GRYNBERG:  Thank you, Judge.

14   Q    The crosswalk that we're looking at here is the very

15   same one that you said his car was half in front of, correct?

16   A    Yes.

17   Q    You agree with me looking at Government Exhibit 3 at

18   1:24:05 that there's an enormous amount of snow on that

19   crosswalk, right?

20   A    Yes.

21   Q    It covers the entire width going up and down on the

22   image of the crosswalk, right?

23   A    On that image, yes.

24   Q    And it's several feet high at its highest point, right?

25   A    I would say so.

Modesto - Cross - Eisner-Grynberg                    67

1    Q    So it's fair to say that it was not possible for any

2    person to cross this street using this crosswalk, given that

3    giant mound of snow, right?

4    A    From that side of the street?

5    Q    Correct.

6    A    Yes.

7    Q    I'd like to play until 30 seconds from here.

8         (Body camera footage played.)

9         We're stopping Government Exhibit 3 at 1:24:28.

10        What we see here on the bottom right of the screen is

11   where Mr. Balkissoon's car was pulled over, right?

12   A    Yes.

13   Q    And it was pulled over right next to the curb, correct?

14   A    Yes.

15   Q    And you can see, just as you testified, that behind his

16   car part of the crosswalk was accessible, correct?

17   A    Yes.

18   Q    He was blocking you said half of it.

19   A    Yes.

20   Q    Okay.  Now you said that when you were driving you

21   pulled up next to his car, correct?

22   A    Yes.

23   Q    So if I'm looking at this screen here you're telling us

24   that you made a left hand turn and you were parallel -- even

25   with his car, correct?

Modesto - Cross - Eisner-Grynberg                    68

1    A     That is correct, yes.

2    Q     And did you stop the car when you were right next to

3    him?

4    A     My vehicle?

5    Q     Yes.

6    A     I did come to a full stop, yes.

7    Q     Okay.  And so your driver's side window was right next

8    to his passenger side window.

9    A     It was even with his, yes.

10   Q     And you from that vantage point were able to look inside

11   of his car.

12   A     Yes.

13   Q     You saw that he had no front passenger, right?

14   A     There was no one else in the vehicle.

15   Q     So you were able to look directly at him.

16   A     Yeah, my attention just went to him, yes.

17   Q     And you were able to see him clearly.

18   A     Yes.

19   Q     And what you testified so it that what you saw from that

20   vantage point directly next to him was that he was rolling a

21   marijuana cigarette, right?

22   A     Yes.

23   Q     Rolling a marijuana cigarette requires paper, right?

24   A     Uh-hm.

25   Q     It requires loose marijuana that you put into the paper,

Modesto - Cross - Eisner-Grynberg                    69

1    right?

2    A    Well, like I stated I observed him -- what I believe he

3    was doing was rolling a marijuana cigarette. I don't know at

4    what point he was in -- I don't know at what point of that

5    process he was in, but he was in the process of it.

6    Q    Right.  So the process of rolling a marijuana cigarette

7    requires you to put marijuana into the paper, right?

8    A    Correct.

9    Q    And to roll it up.

10   A    Correct.

11   Q    And to light it to smoke, right?

12   A    That is correct, yes.

13   Q    So you're sure that what you saw when you were right

14   there was him rolling a marijuana cigarette, right?

15   A    I believe he was in the beginning process, yes.

16   Q    And you told that to Officer Martinez and Officer Blum.

17   A    Yes.

18   Q    You told Officer Martinez to tell that to the people in

19   the other car.

20   A    That I believe he was rolling, yes.

21   Q    You told that to a state prosecutor when Mr. Balkissoon

22   was originally arrested.

23   A    I would say yes.

24   Q    You told that to federal prosecutors here several times

25   when you met with them in preparation for this hearing.

Modesto - Cross - Eisner-Grynberg                    70

1    A    Yes.

2    Q    And you just told that to a federal judge under oath,

3    right?

4    A    I did, yes.

5    Q    We come to find out when you watch the video from this

6    incident that it turns out you were wrong, right?

7    A    Where was I wrong?

8    Q    Mr. Balkissoon was not, in fact, rolling a marijuana

9    cigarette in the car that night, was he?

10   A    I don't know what evidence is there that states that.  I

11   don't know.

12   Q    Well, there was no marijuana cigarette ever recovered

13   from that vehicle, right?

14   A    Once again, I stated that he was in the process. I never

15   stated that he had a full marijuana cigarette already

16   completed.  He had started to.  It looked like he was

17   starting.  He was in that angle.

18   Q    What I'm asking you is whether you recovered a marijuana

19   cigarette from the vehicle?

20   A    I didn't do any recovery of evidence from that vehicle.

21   Q    Are you aware of any of your partners recovering a

22   marijuana cigarette from that vehicle?

23   A    I am not aware.

24   Q    Are you aware of any of your partners recovering any

25   lose marijuana whatsoever from that vehicle?

1    A    My understanding is that there was marijuana present in

2    the vehicle.

3    Q    What I'm asking you is if there was any loose marijuana

4    in the vehicle, not in package, loose.

5    A    Okay.  I'm not aware.

6    Q    Did you see any?

7    A    I never looked.

8    Q    Did any of your partners ever tell you that they

9    collected loose marijuana in the vehicle?

10   A    My understanding Officer Hassan did.

11   Q    Let's take a look at what's been marked for

12   identification as Government Exhibit 12.

13        If you take a look at the screen, what's been marked for

14   identification as Government Exhibit 12 is on the TV screen

15   that's in front of you.

16   A    Correct.  Yes.

17   Q    Did you ever see this inside of the car that night?

18   A    No.

19   Q    When you were on direct examination the government

20   showed you three clips from your body camera, right?

21   A    Correct.

22   Q    The first clip had no sound whatsoever, Right?

23   A    Right.

24   Q    So that was the buffer period.

25   A    That is correct.

Modesto - Cross - Eisner-Grynberg                    72

1   Q    That indicates to us that that's the minute prior to you
2   activating your body camera, right?
3   A    That is correct,  yes.
4   Q    So there is no video from your body camera of your
5   initial approach of the Mercedes, right?
6   A    No.
7   Q    You don't have any video that shows us where Mr.
8   Balkissoon's car was located at the time that you were
9   driving south on 34th Street?
10  A    When I initially approached?
11  Q    Right.
12  A    No.
13  Q    We don't have any video of during your initial approach
14  that shows us whether his car was moving or parked, right?
15  A    No.
16  Q    We don't have any video that shows us how it is that he
17  came to end up on top of the crosswalk.
18  A    No.
19  Q    We don't have any video that tells us whether or not his
20  passenger side window was open or closed at the time of the
21  approach, right?
22  A    I don't know about that one. I'm not too sure.  Based
23  off my camera?
24  Q    Off your camera.
25  A    Okay.  No.

1    Q    You said that you pulled up next to him and you stopped

2    your car right next to him and took a look at him, right?

3    A    Uh-hm.

4    Q    And that what you saw when you looked at him you

5    believed was him rolling a marijuana cigarette.

6    A    Correct.

7    Q    You did not press go at that point, right?

8    A    Correct.

9    Q    You did not press go for at least a minute after that

10   point, right?

11   A    I would say so, yes.

12   Q    So there's no video footage of whatever he was doing on

13   his lap at the time when you were stopped directly next to

14   him, right?

15   A    Yes.

16   Q    And the reason that footage doesn't exist is because you

17   chose not to turn it on, right?

18   A    Negative.

19   Q    You did not turn it on.

20   A    I didn't turn it on but I didn't chose not to turn it

21   on.

22   Q    Well, the way you turn it on is by tapping your camera

23   twice, right?

24   A    Correct.

25   Q    And when you saw the car, as you say, parked on the

Modesto - Cross - Eisner-Grynberg                    74

1     crosswalk, you didn't turn it on, right?

2     A     Well, I didn't activate my camera because like I said I

3     asked them to further investigate what I initially saw.  So

4     when I moved my vehicle to park it, they exited.  And

5     whenever they made the observation, they made an observation.

6     Q     I'm asking about what you did and you did not turn on

7     your camera when you saw a car --

8     A     I did not.  Okay.

9     Q     -- parked the way you say it was, right?

10    A     Correct.  No, I didn't.

11    Q     And you didn't turn it on when you say you saw him

12    rolling his marijuana cigarette, right?

13    A     No.

14    Q     And you didn't turn it on when you got out of the car,

15    correct?

16    A     No.

17    Q     You didn't turn it on to capture the audio of your

18    partner's radioing about what you had claimed to have

19    observed.

20    A     No.

21    Q     You've not heard any radio runs in this courtroom of you

22    relaying this message about the marijuana in the car to the

23    other officers, correct?

24    A     No.

25    Q     You turned on your body camera only as you approached

Modesto - Cross - Eisner-Grynberg                    75

1    the Mercedes, correct?

2    A    Correct.

3    Q    And that was when you directed Officer Hassan to take

4    Mr. Balkissoon out of the car, right?

5    A    I don't recall who told him -- who asked him to step

6    out.

7    Q    Among all the officers who were there, it was your

8    decision that he should come out of the car, correct?

9    A    My understanding that if there was marijuana present,

10   then yeah, he can come out of the car.

11   Q    That's not what I'm asking you.

12        Of the officers who were present it was your decision,

13   not the other people's, that he was coming out of the car.

14   Is that right?

15   A    Okay.  From what I -- okay, from what I recall, I think

16   it was.  Yes. From what I remember it was my decision, yes.

17   Q    Okay.  So Officer Hassan, after you come towards him,

18   takes Mr. Balkissoon out of the car, right?

19   A    Yes.

20   Q    And he directs him to go to the rear of the vehicle

21   where you're standing, right?

22   A    Correct.

23   Q    Now you told us on direct examination that at this point

24   when Mr. Balkissoon is at the rear of the car you had already

25   reviewed some information about Mr. Balkissoon on an iPhone

Modesto - Cross - Eisner-Grynberg                    76

1    app, right?

2    A    Yes.

3    Q    And at that time when Mr. Balkissoon had come out of the

4    car, you had not relayed that information to Officer Hassan.

5    A    Negative, no.

6    Q    And you had not relayed that information to Officer

7    Martinez.

8    A    No.

9    Q    And those two individuals at this time began to search

10   the car, right?

11   A    Yes.

12   Q    You saw Officer Hassan searching the car on the driver's

13   side.

14   A    Yes.

15   Q    And you saw Officer Martinez searching the car on the

16   passenger side, right?

17   A    Yes.

18   Q    The reason that you decided that Mr. Balkissoon should

19   come out of the car is because of his prior gun arrest.  Is

20   that right?

21   A    Negative.

22   Q    What was the reason that you decided he should come out

23   of the car?

24   A    Because there was marijuana in the vehicle.

25   Q    You're trained that because there's marijuana in he

1    vehicle you as police officers at that time were allowed to

2    look through the car, right?

3    A     We're allowed to search the vehicle.

4    Q     And what you were searching for at that point was

5    searching for a gun, right?

6    A     We were searching for additional marijuana, not a

7    firearm.

8    Q     You testified that the majority of arrests that you make

9    are for firearms, right?

10   A     Correct.

11   Q     And you testified that the enforcement unit that you

12   were in was the specialized unit looking for firearms, right?

13   A     That's just one thing we do, yes.

14   Q     But you're asking this court to believe that what you

15   were looking for was additional marijuana, right?

16   A     That's what we're allowed to do.  That's what we're

17   allowed to -- at the time we're allowed to search for

18   marijuana if it's in the vehicle, yes.

19   Q     What was it about the presence of marijuana in the

20   vehicle that led you to believe there would be more marijuana

21   in the vehicle?

22   A     Can you ask that again?

23   Q     Why was your team searching this car?

24   A     For marijuana.

25   Q     Because of why?

Modesto - Cross - Eisner-Grynberg                78

1    A    Because we're allowed to search -- if there's additional

2    marijuana, we're allowed to search for it.

3    Q    So your training at that time and your belief at that

4    time is if you see marijuana in a car, you're allowed to

5    search the entire car, right?

6    A    For additional marijuana, yes.

7    Q    And your belief at that time was if you see one bag of

8    marijuana in the car, you're allowed to search even bags

9    within that car for additional marijuana, right?

10   A    Yes.

11   Q    Let's take a look at Government Exhibit 6 in evidence.

12              THE COURT:  So Exhibit 12 is still not admitted?

13              MS. EISNER-GRYNBERG:   No, he was not able to

14   authenticate it.

15   Q    This is Government Exhibit 6 in evidence that you saw

16   during your direct examination. Is that right?

17   A    Yes.

18   Q    And I'm going to approach the screen here.

19        The red arrow shows where Mr. Balkissoon was located at

20   the rear of the vehicle.  Is that right?

21   A    Yes.

22   Q    And the green arrow depicts where Mr. -- where Officer

23   Martinez was searching inside the rear passenger side of the

24   vehicle, correct?

25   A    Yes.

Modesto - Cross - Eisner-Grynberg                    79

1    Q    Now this is your body camera, right?

2    A    Yes.

3    Q    So this is where were you positioned at the time -- this

4    is from the vantage point of where you were positioned at the

5    time you were talking to Mr. Balkissoon, right?

6    A    That is correct.

7    Q    And on the right, that's your partner, Officer Gomez,

8    looking at his phone, right?

9    A    Correct.

10   Q    And there's another police officer as well in between

11   Mr. Balkissoon and Officer Gomez and Officer Martinez,

12   correct?

13   A    Yes.

14   Q    We could see from this vantage point that Officer

15   Martinez is already searching the vehicle at this point,

16   correct?

17   A    Yes.

18   Q    He's already in the back seat, right?

19   A    Yes.

20   Q    Where Mr. Balkissoon is standing here is in front of the

21   trunk of the vehicle, right?

22   A    Correct.

23   Q    So is it fair to say at this point in time Mr.

24   Balkissoon, standing where he's standing, could not reach

25   into the backpack in the back seat, correct?

1    A    From where he's standing?

2    Q    From where he's standing.

3    A    I would say no.

4    Q    His left arm certainly could not reach all the way

5    around the car in to the back seat, right?

6    A    No.

7    Q    And neither could his right arm.

8    A    No.

9    Q    So at the time of the search by Officer Martinez of the

10   back seat, Mr. Balkissoon was not in reaching distance of

11   whatever was in the back seat.  Is that right?

12   A    From that position, no.

13   Q    You made this stop in February of 2021, right?

14   A    February of 2021, yes.

15   Q    And as a police officer you need to know what the laws

16   are at any point in time in the State of New York.  The

17   criminal laws, right?

18   A    Correct.

19   Q    So that you're able to enforce them correctly.

20   A    Correct.

21   Q    So that people aren't getting away with committing

22   crimes, right?

23   A    Yes.

24   Q    But also so that you're not punishing people that are

25   not crimes, correct?

Modesto - Cross - Eisner-Grynberg                    81

1    A    Correct.

2    Q    On February 7th of 2021 when you made this stop you know

3    that having your car be in a crosswalk is a traffic

4    infraction, Right?

5    A    It's a violation, yes.

6    Q    It's not a crime.

7    A    No.

8    Q    It's something that you can write out a summons for,

9    right?

10   A    At the time, yes.

11   Q    And sitting in a crosswalk has always been a summonsable

12   event, right?

13   A    Yes, yes.

14   Q    And you did not give him a summons for sitting in a

15   crosswalk, correct?

16   A    We never got to that point, no.

17   Q    Well, you chose not to get to that point.

18   A    We never got to it, no.

19   Q    You never issued a summons for standing in the

20   crosswalk.

21   A    We've issued -- I've issued multiple summonses for a lot

22   of things.

23   Q    In this case with Mr. Balkissoon you did not write a

24   summons for standing in a crosswalk.

25   A    No.

Modesto - Cross - Eisner-Grynberg                    82

1    Q    You were also aware on February 7th of 2021 that

2    possession of a sealed one gram bag of marijuana was also not

3    a crime in the State of New York, right?

4    A    In the State of New York?

5    Q    Yes.

6    A    I'm not aware. I would say -- I don't know much

7    marijuana was in the car though.  That's the thing.

8    Q    Okay.  You were aware as far back as August of 2019 that

9    the marijuana laws had changed in the State of New York,

10   correct?

11   A    Yes.

12   Q    It used to be prior to 2019 that possession of a bag of

13   marijuana in public was a misdemeanor, correct?

14   A    Yes, this was a vehicle though.

15   Q    Right.  And I'm talking about -- you've been working for

16   about ten years you said, right?

17   A    Yes, ma'am.

18   Q    And it used to be that if you saw a bag of marijuana in

19   plain view in public you could arrest somebody for a

20   misdemeanor.

21   A    In public, not a vehicle.

22   Q    Okay.  In August of 2019 that law changed, right?

23   A    Yes.

24   Q    Instead of being a crime it became also just a

25   summonsable offense to possess a small quantity of marijuana,

1    correct?

2    A    Correct.

3    Q    It became a non-criminal infraction punishable by a

4    fine, right?

5    A    Yes.

6    Q    When you saw somebody after August of 2019 in possession

7    of a bag of marijuana the most you could do was give them a

8    $50 ticket, correct?

9    A    A summons, yes.

10        MR. MARSHALL:  Objection, Your Honor.  It misstates

11   the law.

12        THE COURT:  We can take it up afterwards.

13   Q    You just said you could give them a summons, right?

14   A    A summons, yes.

15   Q    And that summons was for a fine of no more than $50,

16   right?

17   A    I'm not aware of the fee.

18   Q    It's for a fine, right?

19   A    I'm not aware. I can't tell you what the fee was but a

20   summons I can give, yes.

21   Q    Okay.  When you saw Mr. Balkissoon here you told us you

22   didn't give him a traffic summons, right?

23   A    No.

24   Q    And you also didn't give him a summons for the marijuana

25   possession.

Redirect - Modesto - Marshall                84

1     A     At this point?

2     Q     Right.

3     A     No.

4     Q     At any point?

5     A     At this point, no.

6     Q     And you didn't give him a desk appearance ticket for the

7     marijuana infraction either, right?

8     A     No.

9     Q     What you did with the knowledge of the marijuana

10    infraction was searched his vehicle.

11    A     Yes.

12          MS. EISNER-GRYNBERG:   Nothing else for now.   Thank

13    you, Judge.

14          THE COURT:  Okay.  Redirect?

15          MR. MARSHALL:  Thank you, Your Honor.

16                    REDIRECT EXAMINATION

17    BY MR. MARSHALL:

18    Q     Officer Modesto, you stated that when you observed the

19    defendant in the car rolling what appeared to be a marijuana

20    cigarette you alerted the other officers in the car.

21    A     That is correct.

22    Q     Do you recall at this time exactly what you told them?

23    A     Word for word, no.

24    Q     Do you recall -- and you also said that something went

25    over the radio to the other car?

Redirect - Modesto - Marshall                    85

1    A    Yes.

2    Q    Do you recall exactly what went over the radio to the

3    other car?

4    A    Like I said, word for word, no.  I just know that

5    normally he would just advise, hey, we're going to approach

6    the car.  We're going to get out and we're going to approach

7    the car.  We're going to check this car out.

8    Q    Do you recall ever telling the prosecutors in the case

9    at a previous time that you remembered exactly what you told

10   the other officers in the car?

11   A    Yes, I stated that he might be rolling -- I told them

12   he's rolling marijuana.  He's rolling up. I told them he's

13   rolling up and he's blocking the pedestrian ramp.

14   Q    And do you remember right now as we sit here exactly

15   what you told the prosecutors about what went over the radio?

16   A    No, not word for word, no.

17   Q    Officer Modesto, in your training experience when there

18   are drugs in a car, when you have identified drugs in a car,

19   is it often the case that there will be more drugs found in

20   that car?

21   A    Yes.

22   Q    And based on that knowledge from your past experiences,

23   having seen a bag of marijuana in the defendant's vehicle did

24   you believe it to be likely that there was more marijuana or

25   paraphernalia in the car?

Redirect - Modesto - Marshall                              86

1    A    Of course, yes.

2    Q    And again, aside from seeing the bag of marijuana was

3    there anything else about the car that made you think there

4    was more marijuana in the car?

5    A    From my initial approach the smell obviously played a

6    part, yes.

7    Q    And you were aware -- did you become aware at some point

8    that that smell of marijuana was coming from the car?

9    A    Well, yes.  At one point Officer Hassan had stated that

10   there was marijuana present.

11   Q    When you smelled the marijuana did you eventually learn

12   whether the smell was coming from the car?

13   A    Yes.

14   Q    Was it coming from the car?

15   A    My belief, yes.

16   Q    Did you know exactly where in the car the smell was

17   coming from?

18   A    Negative.

19   Q    Did you know when you were standing outside of the car

20   that the smell was coming only from that bag of marijuana in

21   the center console?

22   A    If I could tell -- I couldn't tell it was coming from

23   that bag.

24   Q    So did you believe that it as a fair probability that

25   the smell was coming from other marijuana in the car?

Redirect - Modesto - Marshall                    87

1    A    Yes.

2    Q    Officer Modesto, when you had the defendant standing at

3    the back of the Mercedes, did you place in him handcuffs?

4    A    No.

5    Q    Did you take any other measures to secure the defendant?

6    A    No. I just asked him to put his back against the car.

7    That's about it.  No.

8    Q    So when he ran he was able to move around freely before

9    that?

10   A    Correct. Yes.

11   Q    In your training and experience when a subject is

12   outside of a car can they quickly reach back inside?

13   A    Of course, yes.

14   Q    Even when they're surrounded?

15   A    Of course.  I mean, as you can see he was able to get

16   away from me and he was able to get away from Officer Gomez

17   who was standing right next to me.  Those things happen in a

18   split second and maybe my reaction time at that moment wasn't

19   the best.  But yeah, it can happen.  Because as you can see,

20   someone can easily get away from you.

21   Q    Are you aware, Officer Modesto, if on the night at issue

22   you were authorized to arrest the defendant for the

23   possession of marijuana?

24   A    I was aware, yes.

25   Q    So were you allowed to at that point?

1    A    From what I recall -- my understanding at that time, we

2    were allowed to write summonses and depending how much

3    marijuana is we can make an arrest.

4    Q    And were you sure at the time when you were standing

5    outside of the car of how much marijuana there was in the

6    car?

7    A    Negative.

8    Q    You did believe that there was marijuana though,

9    correct?

10   A    I believed there was marijuana.  My understanding there

11   was but how much I don't know.

12   Q    So when you went to search the car did you believe that

13   you might find more marijuana that would lead to an arrest?

14   A    Correct, yes.

15        MR. MARSHALL:  Thank you, Officer Modesto.  Nothing

16   further, Your Honor.

17        THE COURT:  Anything else?

18                    RECROSS EXAMINATION

19   BY MS. EISNER-GRYNBERG:

20   Q    Officer Modesto, at the time when you had Mr. Balkissoon

21   at the rear of the car you were standing right by him, right?

22   A    I was standing directly in front of him.

23   Q    And on his other side was Officer Gomez, right?

24   A    To my right was Officer Gomez.

25   Q    And Mr. Balkissoon wasn't free to talk around wherever

Modesto - Recross -- Eisner-Grynberg                89

1    he wished, right?

2    A    Well, we were conducting a car stop.  He wasn't allowed

3    to leave the car stop at the time.

4    Q    Right.  He was detained at the rear of the car by you

5    and your partner, right?

6    A    At that point in time, yes.

7    Q    And it was your choice how to detain him at the rear of

8    the car.

9    A    Yes.

10   Q    You opted not to put handcuffs on him at that point,

11   right?

12   A    I don't think we were at that level, no.

13   Q    Right. So what you decided to do when he was at the rear

14   of the car was just simply just surround him with officers?

15   A    This is what we do -- tactically is what we do, yes.

16   Q    And that was a tactical choice that you made in this

17   case.

18   A    We do that for every car stop.

19   Q    I'm talking about this case.

20   A    Yes.

21   Q    In this case you decided to have Mr. Balkissoon stand

22   unhandcuffed at the rear of the car with officers on the

23   sides of him.

24   A    Yes.

25   Q    You testified that at that point in time in February of

Modesto - Recross -- Eisner-Grynberg                90

1    2021, whether you could make a custodial arrest for marijuana

2    depended on the quantity, right?

3    A    Correct.

4    Q    What was the quantity by which you could make a

5    custodial arrest?

6    A    I think from my understanding at that time I think it

7    had to be more than eight ounces or something like that.

8                MS. EISNER-GRYNBERG:   Thank you.  Nothing else.

9                THE COURT:  Okay.  All right.

10               Let's break here for the morning.  We can let the

11   witness go but I'd like to talk to the lawyers for a few more

12   minutes.

13               (Witness excused.)

14               Does it matter whether he was allowed to effectuate

15   a custodial arrest or simply write a summons? I thought it

16   didn't affect the extent of the scope -- the scope of the

17   search that would be authorized under either circumstance.

18               MS. EISNER-GRYNBERG:   So under the search incident

19   to arrest framework there first needs to be an arrestable

20   offense. Otherwise, there is no search incident to arrest

21   because there is no arrest.

22               The thing that he was authorized to do at the time

23   of that stop was right a summons, not to prolong the stop in

24   order to look for other evidence of some different crime.

25               THE COURT:  Okay.  So it would not affect the

1    automobile exception analysis.

2              MS. EISNER-GRYNBERG:  That's right.

3              THE COURT:  But it would -- the search incident to

4    arrest analysis, even with respect to safeguarding evidence

5    in the vehicle under that rubric.

6              MS. EISNER-GRYNBERG:  Yes.

7              THE COURT:  Okay.  Goes the government disagree

8    with that?

9              MR. MARSHALL:  We do, Your Honor.  The defense is

10   just wrong about what New York law allows under those

11   circumstances, Your Honor.

12             THE COURT:  What federal law allows?

13             MR. MARSHALL:  Well, it's --

14             THE COURT:  Oh, she's wrong about --

15             MR. MARSHALL:  New York law as to whether --

16             THE COURT:  Okay.

17             MR. MARSHALL:  -- they were allowed to make an

18   arrest, Your Honor.  And in this instance the New York penal

19   law authorizes officers to make an arrest for any offense.

20   So this is a violation.

21             So a traffic infraction or the possession of

22   marijuana in violation at this time, they were allowed to

23   make a warrantless arrest at that time because they observed

24   the offense.

25             THE COURT:  A custodial arrest for any amount of

1    marijuana regardless of quantity.

2            MR. MARSHALL:  Yes, Your Honor.  At this point,

3    that quantity, or a small amount was a violation.

4            A violation is defined by -- and officers were

5    allowed to make an arrest, a custodial arrest for an offense.

6    An offense is defined as a conduct for which there is a term

7    of imprisonment or a fine.

8            Here the possession of marijuana, which was a

9    violation, there was a fine allowed and thus it's an offense

10   for which the officers can make an arrest.

11           What the defense is talking about here is really

12   what happens next, Your Honor, how the defendant is handled

13   after he's arrest.

14           So, for example, if they were to say issue a desk

15   appearance ticket, Your Honor, they would place the defendant

16   under arrest.  They would put him in handcuffs.  They would

17   put him in the police vehicle, take him back to the precinct,

18   put him in a holding cell and then do a desk appearance

19   ticket investigation.

20           And it's only at that point that they would decide

21   whether the defendant was free to leave with a court date or

22   if he had to be held until arraignment.

23           So the defense is really focusing on that.  Like

24   what happens after the defendant is arrested.

25           THE COURT:  But you say the scope of the search

1    that's permitted is the same under the search incident to

2    arrest doctrine, not the automobile exception, but the search

3    incident to arrest doctrine, regardless of whether the arrest

4    is made for a felony, a misdemeanor or a violation because

5    under New York law arrests -- full custodial arrests are

6    authorized, if I got this right, for anything where

7    imprisonment or a fine is an authorized consequence and here

8    we have a fine.

9               MR. MARSHALL:  Yes, Your Honor.  That's with

10   regard to the marijuana and also traffic infractions

11   themselves are specifically included as offenses.

12              THE COURT:  Right.  Tell me again what provision of

13   New York law you're talking about.

14              MR. MARSHALL:  So Section 140.1 is the provision

15   that authorizes warrantless arrests for offenses.

16              THE COURT:  Section 140.1 of what?

17              MR. MARSHALL:  I'm sorry, Your Honor.  Of the New

18   York Procedure Law.

19              And then the -- an offense -- the words "offense,"

20   that 140.1 allows officers to make an arrest for is defined

21   in Section 10 of the New York penal law, which defines an

22   offense as conduct for -- sentence to a term of imprisonment

23   or to a fine is provided by any law.

24              In addition to that, Your Honor, Section 155 of the

25   New York vehicle and traffic law specifically states that for

1    purposes of an arrest without a warrant, pursuant to Article

2    140 of the Criminal Procedure Law, a traffic infraction shall

3    be deemed an offense.

4            THE COURT:  Right.  So parking in the crosswalk.

5            MR. MARSHALL:  Yes, Your Honor.

6            So because both blocking the crosswalk was an

7    offense and because the possession of marijuana, a violation

8    at that time, was an offense, they were both -- both types of

9    conduct were bases for the officers to make an arrest.

10           THE COURT:  Okay.

11           MR. MARSHALL:  And these sites, Your Honor, also

12   are covered in our brief at page 11 and 12 if you would like

13   them for reference.

14           THE COURT:  Okay.  Thank you.

15           MS. EISNER-GRYNBERG:   Judge, may I just add

16   something to that?

17           THE COURT:  Please.

18           MS. EISNER-GRYNBERG:   This is from my reply brief

19   on page 6.

20           Section -- New York CPL 140.10 was amended on

21   January 1st of 2020 by New York Criminal Procedure Law

22   Section 150-20.

23           THE COURT:  Sorry. Section 10 was amended.

24           MS. EISNER-GRYNBERG:   Section 140.10.

25           THE COURT:  Okay.

1          MS. EISNER-GRYNBERG:   Was amended by Section

2     150.20.   That was on January 1st of 2020.   And that amendment

3     required that whenever a police officer is authorized under

4     that prior section to make a warrantless arrest, if it was

5     not for an A, B, C or a D felony or under circumstances that

6     were not present in this case, or if there are certain

7     exceptions that were not present in this case, the officer

8     shall instead issue a desk appearance ticket, not make a

9     warrantless arrest.   And none of those circumstances are

10    present here.

11          THE COURT:   So New York law you're saying forbade a

12    custodial arrest under the circumstances.

13          MS. EISNER-GRYNBERG:   Yes.   The clause says shall.

14          MR. MARSHALL:   Your Honor, if might just add to

15    that.

16          So first, 140.10 wasn't actually amended.   140.10

17    is still in force, which authorizes the officers to make

18    arrests.

19          150.20 that did say that under those circumstances

20    they shall issue a desk appearance ticket, again, just covers

21    what the officers can do after the arrest is made.

22          It controls once the defendant is placed in custody

23    and brought back to the precinct and placed in a holding cell

24    --

25          THE COURT:   Okay.   So we have a question about

1    federal law here then because the defense is saying the

2    search incident to arrest doctrine only applies where arrest

3    is authorized.

4           And you seem to be saying -- no, but I think you're

5    saying that even the desk appearance ticket requires arrest

6    along the way, because somebody's got to be put in custody

7    and taken to the precinct to appear at the desk where they

8    get the ticket.

9           MR. MARSHALL:  Yes, Your Honor.  So we're saying

10   that for purposes of this analysis what the arrest is is

11   governed by federal law.

12          And for the purposes of federal law, the process of

13   issuing a -- doing a desk appearance ticket investigation,

14   putting the individual into handcuffs, placing them in a

15   police car, transporting them and their vehicle back to the

16   precinct --

17          THE COURT:  Right.  Okay.

18          MR. MARSHALL:  -- that's an arrest.

19          THE COURT:  Okay.  So you guys are not fighting

20   about what New York law says and doesn't say.  It seems like

21   everybody agrees that -- I mean, we don't know maybe what

22   quantity of marijuana we're dealing with but if you assume

23   over -- whatever that minimum is, New York law is going to

24   authorize at most a desk appearance ticket.

25          But even then you say the constitutional law of

1    search incident to arrest kicks in because something's going

2    to happen en route to the desk appearance ticket that for all

3    federal laws purposes is an arrest.

4              MR. MARSHALL:  That's correct, Your Honor.

5              THE COURT:  Okay.

6              Has any court said that explicitly in the post

7    January 1st, 2020 context?

8              MR. MARSHALL:  They have not, Your Honor.

9              The Second Circuit as recently as August has,

10   again, indicated that officers are authorized under New York

11   law to make arrests for offenses such as these.

12             THE COURT:  What case are you talking about there?

13             MR. MARSHALL:  I'd have to double check the

14   citation, Your Honor.  I could --

15             THE COURT:  Is it in your brief?

16             MR. MARSHALL:  No, this I believe came out after

17   the brief, Your Honor.

18             THE COURT:  Okay.  But Second Circuit case that

19   says the NYPD is -- continues to be authorized to make

20   arrests for violations.

21             MR. MARSHALL:  It's in the case, Your Honor.  But

22   this is an issue, obviously, that was brought up in the

23   defenses's reply for the first time.  And we'd obviously be

24   happy to brief it if you would like further submissions on

25   it.

1          THE COURT:   I mean, I think everybody's going to

2    put in some submission after this hearing today.  And you'll

3    be able to address it there.

4          Okay.  Did Officer Modesto -- he didn't testify as

5    to whether rolling papers were recovered or not from the

6    vehicle, did he?

7          MR. MARSHALL:  He did not testify on that.

8          THE COURT:  Okay.  Do you expect such testimony?

9          MR. MARSHALL:  Yes, Your Honor.

10         THE COURT:  And it will indicate what?

11         MR. MARSHALL:  Your Honor, so the officer I expect

12   would testify that the rolling papers that were on the

13   defendant's lap were not additionally -- not initially

14   recovered.  But that on a subsequent inventory search of the

15   vehicle a portion of them was recovered.

16         In addition, Your Honor, I expect that the officer

17   would testify that other rolling papers were found in the

18   defendant's book bag.

19         THE COURT:  Book bag.  The same backpack that was -

20   -

21         MR. MARSHALL:  The backpack in the back seat, along

22   with a scale and four cell phones, Your Honor.

23         THE COURT:  Okay.  I think that's all the questions

24   I have at this point. Obviously, we're going to have argument

25   after the fact on what reaching distance means and doesn't

1    mean. I'm not sure that was covered comprehensively in the

2    briefs.

3              It might help to have some indication of the

4    records of how long this car is. Maybe that's a fact of which

5    I can take judicial notice.  Maybe not.  But I put that

6    question to the parties. And with that I'll leave it with

7    you.

8              If the government can go through its direct

9    testimony for the two remaining officers and try to restrict

10   it as much as possible to testimony on what we think are the

11   three disputed issues of fact here.

12             Namely, whether the car was initially in the

13   crosswalk.  Whether the defendant was engaged in rolling a

14   marijuana cigarette in his lap on the NYPD's initial approach

15   and whether he was in reaching distance of the back seat of

16   the car, whatever reaching distance means at the time.

17             I'd appreciate your just going through and excising

18   matters beyond the scope of those three things.  And then to

19   the extent you think they're relevant in redirect, or to the

20   extent you think I'm missing something about what facts are

21   disputed, feel free to include them.

22             MR. MARSHALL:  Your Honor, just one issue that I'd

23   like to raise.

24             You know, we've discussed that the defense isn't

25   disputing that there was a bag of marijuana in the center

1        console.

2                THE COURT:  Right.

3                MR. MARSHALL:  But it seems that they dispute, one,

4        whether the defendant had rolling papers on his lap or was in

5        the act of rolling.

6                But I believe that they also likely dispute that

7        the officers all smelled marijuana as they approached the

8        vehicle.

9                And for that I think we've got all these other

10       indications that I'd like to bring out on the testimony

11       regarding the ashes that were in the center console and the

12       other rolling papers in the back seat and the scale --

13               THE COURT:  Yeah, I mean, that's fine.

14               If they're going to testify to things that we can

15       see in the photos.  Like I think one of the cups in the

16       center console you actually see ashes in the photo. So I'm

17       not sure that the presence of marijuana ash is disputed.

18               But I do just want to make this effiicient as

19       possible.  So you think about it.  Maybe the parties can talk

20       to one another if they think it would be fruitful to do so.

21       I'm not going to force that.   And we will see you at 1

22       o'clock.

23               MR. MARSHALL:  Thank you, Your Honor.

24               THE COURT:  Thank you, everyone.

25               MS. EISNER-GRYNBERG:   I have a status conference

1    by video at 2 o'clock.  Can we take a short break for that or

2    would you prefer I have somebody else cover it?

3              THE COURT:  You tell me if it's important that you

4    be there in person and we'll take a break. But if it's not,

5    then -- and somebody can cover it.  Then obviously it would

6    be good to power through here.

7              MS. EISNER-GRYNBERG:   I'll figure that out.  Thank

8    you.

9              THE COURT:  Okay.

10        (Recess form 12:16 p.m. until 1:11 p.m.)

11   THE COURT:  Okay.  Are we ready for the government's next

12   witness?

13             MR. MARSHALL:  Yes, Your Honor.  The government

14   calls Police Officer Haroon Hassan.

15             HAROON HASSAN, GOVERNMENT'S WITNESS, SWORN

16             THE WITNESS:  Good afternoon.  Officer Hassan, H-A-

17   S-S-A-N.

18             THE COURT:  Would you state your full first name as

19   well.

20             THE WITNESS:  First name Haroon, H-A-R-O-O-N.

21             THE COURT:  Thank you.

22                     DIRECT  EXAMINATION

23   BY MR. MARSHALL:

24   Q    Good afternoon.

25   A    Good afternoon.

Hassan - Direct - Marshall                           102

1    Q    Are you employed?

2    A    Yes.

3    Q    Who do you work for?

4    A    The NYPD.

5    Q    How long have you worked for the NYPD?

6    A    Now, approximately four years.

7              MS. EISNER-GRYNBERG:  Could I ask you just to move

8    the microphone closer?  Thank you.

9    Q    What is your title?

10   A    Police Officer.

11   Q    What is your current assignment?

12   A    Right now, public safety.

13   Q    Which precinct?

14   A    The 67th precinct.

15   Q    Does the area you patrol include the area around the

16   intersection of Cortelyou Road and East 34th Street?

17   A    Yes, it does.

18   Q    During the course of your employment with the NYPD, have

19   you been involved in car stops?

20   A    Yes, I have.

21   Q    Approximately how many?

22   A    Approximately over a hundred.

23   Q    During the course of you employment with the NYPD, have

24   you also been involved in arrests involving marijuana?

25   A    Yes.

Hassan - Direct - Marshall                     103

1     Q     Approximately how many?

2     A     Approximately over 50.

3     Q     Have you received training related to car stops?

4     A     Yes, I have.

5     Q     In the course of your employment have you also received

6     training related to narcotics including marijuana?

7     A     Yes.

8     Q     Turning your attention to the late evening of February

9     6, 2021, into the early morning of February 7, 2021, did you

10    make an arrest?

11    A     Yes, I did.

12    Q     Who did you arrest?

13    A     Kyle Balkissoon.

14    Q     Do you see Mr. Balkissoon in the courtroom?

15    A     Yes, I do.

16    Q     Can you please identify him by an article of clothing

17    he's wearing?

18    A     He's wearing a light brown tee shirt.

19          MR. MARSHALL:  Your Honor, I ask that the record

20    reflect that the witness has identified the defendant.

21          THE COURT:  It shall so reflect.

22    Q     In the early morning of February 7, 2021, were you in a

23    police car?

24    A     Yes, I was.

25    Q     Was anyone else in your car?

1    A    Yes.

2    Q    Who was that?

3    A    Officer Gomez and Sergeant Whiteman.

4    Q    Who was driving the car you were in?

5    A    I was.

6    Q    Were there any other officers with you?

7    A    Yes.

8    Q    Where were they?

9    A    They were in another police car ahead of us.

10   Q    And which officers were those?

11   A    Officer Modesto, Officer Martinez and Officer Blum.

12   Q    Drawing your attention to the approximately 1:15 a.m. on

13   February 7, 2021, while you were on patrol, which car was in

14   front?

15   A    Officer Modesto's, Martinez and Officer Blum's car.

16   Q    And as you approached the intersection of East 34th

17   Street and Cortelyou Road, approximately how far behind the

18   lead vehicle was your vehicle?

19   A    Approximately one car length.

20   Q    And what were you doing at that time?

21   A    Just routine patrol.

22   Q    As you drove toward that intersection and approached

23   Cortelyou Road, what happened?

24   A    As we approached the intersection, I observed a black

25   vehicle parked on the northeast corner of East 34th Street

1    and Cortelyou Road, blocking the pedestrian ramp diagonally.

2    Q    And the pedestrian ramp, did that lead to a crosswalk?

3    A    Yes, it did.

4    Q    And was the vehicle also parked on the -- stopped on the

5    crosswalk?

6    A    Yes.  It was covering it partially, yeah.

7    Q    And what happened next?

8    A    Next, the car in front of us, Officer Modesto's car,

9    went up Cortelyou Road in front of the parked vehicle and he

10   radioed to me in sum and substance, check out the vehicle

11   that's blocking the pedestrian ramp.

12   Q    What happened next?

13   A    Next, I exited my vehicle and I approached the vehicle

14   on the driver's side.

15   Q    And the vehicle that you approached and that you saw,

16   that was the same vehicle that you saw parked on -- stopped

17   on the crosswalk, is that correct?

18   A    Yes, it is.

19   Q    What type of vehicle was it, do you recall?

20   A    A black Mercedes Benz.

21   Q    And when you approached the vehicle, did anyone else

22   approach with you?

23   A    Yes.

24   Q    Who was that?

25   A    Officer Martinez.

Hassan - Direct - Marshall                    106

1    Q    Okay.  And why were you approaching the Mercedes?

2    A    To inquire about the violation, traffic infraction that

3    I saw him performing.

4    Q    Were you aware of -- withdrawn.  Were the windows on the

5    Mercedes open when you approached it?

6    A    The driver's side was.

7    Q    Are you aware of whether any other windows were open?

8    A    I don't recall.

9    Q    What was the weather like at the time?

10   A    It was cold.

11   Q    And yet the driver's window was open as he sat there?

12   A    Yes, it was.

13   Q    What if anything did you observe at that point?

14   A    As I approached the vehicle, I smelled an odor of

15   marijuana coming from the vehicle.

16   Q    And did you see anything at that point?

17   A    I saw a person in the driver's seat, no other occupants

18   in the vehicle and it looked like he was -- he had a rolling

19   paper on his lap.

20   Q    And when you say rolling paper on his lap, what did that

21   look like?

22   A    It looked like a brown -- like a brown leaf, like a

23   really big brown leaf.  That's the best I can describe it.

24            MS. EISNER-GRYNBERG:  I'm sorry, I didn't hear

25   that?

Hassan - Direct - Marshall                    107

1    A    Like a brown leaf.

2    Q    And do you recall seeing anything else at that point?

3    A    Yes.  In the center console I observed a package that --

4    commercial packaging that in my experience normally contains

5    marijuana in the center console, and a clear plastic cup in

6    the cup holder.

7    Q    And at that point did you believe that that packaging

8    you were referring to in the center console was in fact a bag

9    of marijuana?

10   A    Yes.

11   Q    Now, as far as the odor of marijuana you said was coming

12   from the car, approximately how far from the car were you

13   when you first smelled that odor?

14   A    I was by the rear passenger door on the driver's side.

15   Q    How did you know that was the smell of marijuana?

16   A    In my experience as a police officer and training, I've

17   come across the smell of marijuana numerous times.

18   Q    And did you later come to learn who the driver of that

19   vehicle was?

20   A    Yes.

21   Q    Who was that?

22   A    Kyle Balkissoon.

23   Q    And as you were standing at the driver's door, where was

24   Officer Martinez?

25   A    He was across from me on the passenger side.

1    Q    Officer Hassan, you have a binder next to you with

2    several documents in it, I'll ask that you please look at

3    Government Exhibit 4 in evidence.  What's shown in this

4    image?

5    A    It is a still image of me on the driver's side of the

6    vehicle in question, Officer Blum on the right side of the

7    image, Officer Martinez on the passenger side and the vehicle

8    blocking the pedestrian ramp and also the crosswalk.

9    Q    And is this vehicle as you've identified as the

10   defendant's vehicle?

11   A    Yes, it is.

12   Q    And that position where the vehicle is situated blocking

13   the crosswalk, is that where the defendant's Mercedes was

14   when you arrived on the scene?

15   A    Yes, it is.

16   Q    Did the defendant move the Mercedes at any point?

17   A    No, he did not.

18   Q    Did you tell the defendant to move the Mercedes at any

19   point?

20   A    No, I did not.

21   Q    Officer Hassan, were you wearing a bodycam on that

22   night?

23   A    Yes, I was.

24   Q    Are you required by the NYPD to wear a body camera?

25   A    Yes, I am.

1    Q    As the arresting officer, were you required to review

2    the body camera footage from other officers at the incident?

3    A    Yes.

4    Q    Who was the first officer on scene to activate his body

5    camera?

6    A    Officer Martinez.

7    Q    And how do you know if you're on scene, if at all, when

8    someone else turns on their body camera?

9    A    You have two beeps and it's relatively very loud.

10   Q    Do you sometimes turn on your body camera after hearing

11   other officers body cameras beep?

12   A    Yes.

13   Q    Why is that?

14   A    Well, we work as a team and we trust each other that if

15   the other officer turns on his body camera it's because he

16   sees something that's worth recording and should get on

17   camera.

18   Q    Officer Hassan, I have a CD here which I'll hand to you.

19   The CD has been marked for identification as Government

20   Exhibit 8.  Do you recognize it?

21   A    Yes, I do.

22   Q    How do you recognize it?

23   A    I signed and dated it.

24   Q    Are you aware of what's on that CD?

25   A    Yes, I am.

Hassan - Direct - Marshall                    110

1    Q    And what is that?

2    A    The video from my body one camera.

3    Q    And that's video from your body one camera is from what

4    incident?

5    A    From the arrest date.

6    Q    Okay.  Does Government Exhibit 8 fairly and accurately

7    depict the February 7, 2021 incident involving the defendant?

8    A    Yes, it does.

9    Q    And if you would just set that aside for a minute, the

10   CD aside for a minute, Officer Hassan.  You have in front of

11   you documents in that binder which have been marked for

12   identification as Government Exhibits 9, 10, and 11.  Do you

13   recognize them?

14   A    Yes, I do.

15   Q    What are they?

16   A    Still images from my body one camera of Kyle Balkissoon

17   in the driver's seat of the vehicle.  Exhibit 9, I was

18   pointing to the marijuana package that was in the center

19   console.  Exhibit 10 is the same thing showing the -- Kyle

20   Balkissoon in the driver's seat with Officer Martinez on the

21   passenger side across there and the rolling paper on his lap

22   of the driver.  And Exhibit 11 is the black and green book

23   bag with the butt of the firearm sticking out of it.

24   Q    Officer Hassan, do Government Exhibits 9, 10, and 11,

25   fairly and accurately depict the February 7, 2021 incident

1   involving the stop and arrest of the defendant?

2   A    Yes, it does.

3   Q    You have in front of you for additional documents, which

4   have been marked for identification as Government Exhibits

5   12, 13, 14, and 15.  Do you recognize these documents?

6   A    Yes, I do.

7   Q    What are they?

8   A    They are pictures taken by ETC.  Exhibit 12 is the

9   marijuana packaging that was in the center console with the

10  clear plastic cup container, containing ashes.  Thirteen is

11  the black and green book bag with the firearm sticking out in

12  the dust bag from the rear of the vehicle.  Fourteen is the

13  firearm, the magazine and the five rounds of ammunition that

14  was recovered.  And 15 were the contents of the black and

15  green book bag with the red arrow pointing to the firearm and

16  the green arrow pointing to the scale.

17  Q    Officer Hassan, do Government Exhibits 12 through 15,

18  fairly and accurately depict the items seized from the

19  defendant on February 7, 2021?

20  A    Yes, they do.

21  Q    And you mentioned ETC.  What does ECT stand for?

22  A    That is evidence collection team.

23       MR. MARSHALL:  Your Honor, the government offers

24  Government Exhibits 8 through 15 into evidence.

25       MS. EISNER-GRYNBERG:  May I voir dire the witness?

1    THE COURT:  Yes.

2                        VOIR DIRE

3    BY MS. EISNER-GRYNBERG:

4    Q    Officer Hassan, if you could take a look at Government

5    Exhibit 11, would you mind pulling that up?  You indicated

6    that this is a photograph of the gun sticking up out of the

7    backpack, right?

8    A    Yes.

9    Q    This photograph was taken after your partner, Officer

10   Martinez went through the contents of the backpack, right?

11   A    Yes.

12   Q    This is not how the backpack appeared when it was

13   sitting on the back seat when your first approached the car,

14   correct?

15   A    Can you rephrase the question, please?

16   Q    When you first approached Mr. Balkissoon in the driver's

17   seat of his car, this is not how the backpack appeared when

18   it was on the back seat, correct?

19   A    I don't recall how the backpack was positioned in the

20   back seat when I first approached.

21   Q    Okay.  So you know that this photograph was taken after

22   Officer Martinez rifled through it, correct?

23   A    Yes.  This is from the body one -- my body one camera.

24   Q    I'm asking if it was later in time than when Officer

25   Martinez moved the contents around, and it is, right?

1    A    Yes.

2    Q    Okay.  Can you take a look at Government Exhibit 13,

3    please?  This photograph was taken you said by the evidence

4    collection team, correct?

5    A    Yes, it was.

6    Q    That's after the arrest of Mr. Balkissoon, right?

7    A    Yes.

8    Q    So then necessarily that's also after Officer Martinez

9    went through the contents of the bag?

10   A    Yes.

11          MS. EISNER-GRYNBERG:  Nothing else.  No objection.

12          THE COURT:  Okay.  So GX 8 is the CD, right?

13          MR. MARSHALL:  Yes, Your Honor.

14          THE COURT:  And then GX 9 through 15 are also

15   admitted.  So 8 through 15 inclusive of every number in

16   between, we are admitting.

17          MR. MARSHALL:  Thank you, Your Honor.

18          THE COURT:  Okay.

19   BY MR. MARSHALL:

20   Q    Officer, back to the stop.  Once you approached the

21   driver's door, what happened?

22   A    Once I approached the driver's door, I asked Kyle

23   Balkissoon to provide me his driver's license, registration,

24   and insurance, which he provided me and I also in sum and

25   substance mentioned to him that the smell of marijuana -- I

Hassan - Direct - Marshall                    114

1    smelled marijuana coming from the vehicle and he then picked

2    up the package on the center console, he waived it at me and

3    in sum and substance, he stated this is all I have.

4    Q    After the defendant showed you the bag of marijuana and

5    told you that it was all he had, what happened next?

6    A    Next, I proceeded to tell him that because I smelled

7    weed, we're going to talk to him at the back of the vehicle.

8    I then proceeded to take him out of the vehicle, give him a

9    pat down of his person and Officer Modesto escorted him to

10   the back of the vehicle.

11   Q    Officer Hassan, I'm now going to play a clip, and if you

12   would like to set the binder aside for now, I'm not going to

13   play a clip from Government Exhibit 8 in evidence.  Are you

14   aware of whether the time stamps on your body cam are

15   generally accurate?

16   A    Yes, they are.

17   Q    And how do you know that?

18   A    Oh, I wear a watch when I'm on patrol and I'm aware of

19   the time while I'm patrolling and it's the same time as the

20   body one camera.  They're matching.

21   Q    The first clip that I'm going to play from your body one

22   camera, footage from Government Exhibit 8, is from time stamp

23   01:24:20 to 01:26 and zero seconds.

24        (Body cam footage played.)

25   Q    Officer Hassan, what was depicted in that video?

Hassan - Direct - Marshall                    115

1   A    In the video that was me telling Kyle Balkissoon that --

2   because he was waiting in the car, we're going to talk to him

3   at the back, I asked him to step out of the vehicle,

4   proceeded to pat down on his person, and then he was escorted

5   to the back by Officer Modesto.

6   Q    Were you able to see Officer Martinez at the start of

7   that video?

8   A    Yes.  He was on the passenger side of the vehicle.

9   Q    And are you able to see rolling papers on the

10  defendant's lap in that video?

11  A    Yes.

12  Q    And what about marijuana -- the marijuana bag in the

13  center console?

14  A    Yes.

15  Q    Officer Hassan, please take a look at Government Exhibit

16  9 in evidence.  This is one of the images in the binder.

17  Officer Hassan, what's shown in this image?

18  A    It is showing Kyle Balkissoon in the driver's side of

19  the vehicle, Officer Martinez on the passenger side of the

20  vehicle and the marijuana packaging that the red arrow is

21  pointing to in the center console of the vehicle.

22  Q    And this is before you had the defendant step out of the

23  vehicle, correct?

24  A    Yes.

25  Q    Now please take a look at Government Exhibit 12 in

1    evidence.  What's shown in this image?

2    A    It is the image of the marijuana packaging in the center

3    console, the clear cup in the cup holder with the ashes --

4    remnants of ashes inside and the zip lock back containing

5    remnants of the rolling paper.

6    Q    Can you explain that about the contents of that clear

7    zip lock back?  What do you mean remnants of the rolling

8    paper?

9    A    Those are the stems of the rolling paper which is

10   essentially a leaf that is used to commonly roll marijuana

11   in.

12   Q    Are you aware of why those stems would have been taken

13   out of the leaf?

14   A    Yes.

15   Q    And why is that?

16   A    If you leave the stems in when you roll it, the stems

17   could break, thus, you know, breaking the marijuana leaf -- I

18   mean the rolling paper leaf.

19   Q    So at what point when you were going to smoke marijuana,

20   would you take those stems out of the leaf, if you're aware,

21   based on your experience?

22   A    Before you would start rolling -- putting together the

23   marijuana cigarette.

24   Q    Would you take the stems out a long time before you were

25   going to smoke marijuana?

1              MS. EISNER-GRYNBERG:  Objection.  Objection, Judge.

2     Beyond the scope of his knowledge unless he has personal

3     knowledge.

4              THE COURT:  Do you have personal knowledge?

5     A    No.

6              THE COURT:  Okay.  Let's move on.

7     BY MR. MARSHALL:

8     Q    All right.  Officer Hassan, please take a look at

9     Government Exhibit 10 in evidence.  What's shown in this

10    image?

11    A    It is showing Karl Balkissoon in the driver's side of

12    the vehicle, the rolling paper on his lap and Officer

13    Martinez on the other side of the vehicle, the passenger

14    side.

15    Q    Again, this was before you had the defendant step out of

16    the vehicle, correct?

17    A    Yes, it is.

18    Q    Do you recall whether you were able to see that rolling

19    paper on the defendant's lap at that point?

20    A    Yes, I was.

21    Q    Officer Hassan, why did you have the defendant step out

22    of the car?

23              THE COURT:  Sorry, before we leave Exhibit 10, can

24    you just tell us where the rolling paper is in that picture

25    and what color it is?

1    A    It's right there on his lap, it is the brown paper, the

2    brown color.

3              THE COURT:  Okay.

4    Q    Officer Hassan, why did you have the defendant step out

5    of the car?

6    A    Because I was going to search the vehicle?

7    Q    Why were you going to search the vehicle?

8    A    For more marijuana or marijuana paraphernalia.

9    Q    And why did you believe there might be more marijuana or

10   paraphernalia in the vehicle?

11   A    Kyle Balkissoon had already showed me the marijuana that

12   he had in the packaging, the rolling paper that is commonly

13   used to roll marijuana cigarettes, the smell of marijuana

14   coming from the vehicle.

15   Q    Did you know at that time where the smell of marijuana

16   was coming from exactly?

17   A    Exactly, no.

18   Q    But it was coming from the car, correct?

19   A    Yes.

20   Q    And so what were you actually going to search for?

21   A    For mor marijuana or marijuana paraphernalia.

22   Q    Now aside from that marijuana in the center console and

23   the rolling papers on the defendant's lap, what other

24   marijuana paraphernalia did you find in the car later?

25   A    I later found a scale.

1          MS. EISNER-GRYNBERG:  Objection.  Beyond the scope

2     of the hearing.  The contents of the search make it the

3     legality of the search that proceeded what was found, no more

4     or less --

5          MR. MARSHALL:  Your Honor, this goes to whether

6     there was -- whether the officers actually smelled the odor

7     of marijuana.

8          These other paraphernalia that they later found,

9     show there was more than likely that defendant either smoked

10    marijuana in the car earlier in the day and so the car

11    smelled of marijuana or that he had possessed more marijuana

12    at some point in the past, for example, with the scale where

13    he might have used to weigh marijuana.  So this all goes to

14    whether the officers were able to actually smell marijuana

15    from outside the vehicle.

16         THE COURT:  Okay.  I mean, let's -- you can ask a

17    question about whether there was a scale, but it's either

18    relevant to this -- the aroma of marijuana in the car or it's

19    not and we'll give you a second question to establish that.

20    BY MR. MARSHALL:

21    Q    Officer Hassan, you indicated that there was a scale

22    that you found in the car.  Are you aware of what that scale,

23    based on your training and experience, are you aware of what

24    a scale like that is commonly used for?

25    A    Yes.  Based on my experience, a scale of that size is

1    commonly used to weigh marijuana.

2    Q    And Officer Hassan, did you also find -- did you find

3    any other indications in the car that there had been at some

4    point more marijuana in the vehicle?

5    A    Yes.  There was a small pack of rolling paper that was

6    later seized.

7              THE COURT:  And can I just understand better, what

8    is in the front seat that is visible at this time?  There's

9    the package of marijuana in the center console.  Refresh my

10   memory, has there been testimony from this witness about

11   whether that package was open or closed?

12             MR. MARSHALL:  No there has not, Your Honor.

13             THE COURT:  Okay.  I mean, did you have any reason

14   to believe that the aroma of marijuana you were smelling was

15   coming from something else apart from the marijuana you'd

16   already seen in the center console?

17   A    I had reason to believe that there was possibly more

18   marijuana inside the vehicle because of the other things I

19   observed first hand such as the rolling paper and the

20   marijuana packaging that he showed me and stated that, that's

21   all he had.

22             THE COURT:  Okay.

23   BY MR. MARSHALL:

24   Q    Officer Hassan, you also mentioned that you saw a cup in

25   the center console, correct?

1   A    Yes.

2   Q    Did you come to learn what was in that cup?

3   A    Yes.  It was remnants of ashes.

4   Q    Do you have reason to believe that those ashes were from

5   marijuana?

6   A    Yes, I do.

7   Q    And what reason do you have for that?

8   A    I did not discover any cigarettes from the vehicle, so I

9   did not believe that they were remnants of cigarette ashes.

10  Q    So for all you know, could the marijuana smell -- the

11  odor of marijuana that you were smelling from outside the

12  vehicle, could that have come from the ashes in the center

13  console?

14  A    Yes, it could have.

15  Q    Officer Hassan, the rolling papers that you saw in the

16  defendant's lap, did you seize those initially?

17  A    Initially, no.

18  Q    Why not?

19  A    At the time I did not believe it to be something that I

20  would need to seize.

21  Q    And why was that?

22  A    Because Kyle Balkissoon already showed me a package of

23  marijuana that was in the center console.

24  Q    And after the fact, what had -- what else had

25  transpired?

Hassan - Direct - Marshall                    122

1    A    After the fact, they found and recovered the scale

2    that's commonly used to weigh marijuana.

3    Q    Did you later recover any remnants of that rolling paper

4    from his lap?

5    A    Yes, I did.

6    Q    When did you do that?

7    A    Later on from that day I realized that rolling paper was

8    important to the case because it's commonly used to roll

9    marijuana cigarettes.

10   Q    And when you went back and attempted to recover those

11   rolling papers that were on the defendant's lap, did you

12   recover the full piece of rolling paper that you see in the

13   video?

14   A    No.  I recovered parts of it.

15   Q    And you mentioned other rolling papers that you found,

16   correct?

17   A    Yes.

18   Q    Did you recover those -- did you seize those rolling

19   papers at the time of the arrest?

20   A    Can you repeat the question?

21   Q    Did you seize those other rolling papers that you found

22   on February 7, 2021?

23   A    Yes.

24   Q    Officer Hassan, I'm going to hand you an item that's

25   been marked as Government Exhibit 21.  Your Honor, this is a

1   new exhibit that we're adding to the original list.

2            THE COURT:  Exhibit 21 you said?

3            MR. MARSHALL:  Yes.

4            THE COURT:  Okay.  I don't think I have a copy, but

5   if you'll put it up on the screen that will be fine.

6            MS. EISNER-GRYNBERG:  I think that it's physical

7   evidence -- I don't -- I saw it --

8            THE COURT:  Oh, I'm sorry.

9            MR. MARSHALL:  Yes, I apologize, Your Honor.  This

10  is physical evidence.

11  BY MR. MARSHALL:

12  Q    Officer Hassan, do you recognize the item that I've

13  handed to you?

14  A    Yes.

15  Q    How do you recognize it?

16  A    I recovered and vouchered it.

17  Q    And what is it?

18  A    This is a piece of the rolling paper that was on his lap

19  the day of.

20           MR. MARSHALL:  Your Honor, the government offers

21  Government Exhibit 21 into evidence?

22           MS. EISNER-GRYNBERG:  May I voir dire the witness?

23           THE COURT:  Yes.

24                    VOIR DIRE EXAMINATION

25  BY MS. EISNER-GRYNBERG:

Hassan - Voir Dire - Eisner-Grynberg                124

1   Q    What you have in front of you, is you said a remnant of

2   the rolling papers that you recovered on February 7th, 2021,

3   right?

4   A    Well, I didn't say I recovered it that date.

5   Q    You vouchered it on August 31st, 2021, right?

6   A    Yes.

7   Q    When did you recover it?

8   A    August 31st.

9   Q    From where?

10  A    From the vehicle.

11  Q    So your testimony is that seven months after the arrest

12  of Mr. Balkissoon, you went back to his vehicle and found

13  that inside of it?

14  A    Yes.

15  Q    Where?

16  A    In the vehicle.

17  Q    Where?

18  A    In the driver's seat, on the floorboard.

19          MS. EISNER-GRYNBERG:  No objection.

20          THE COURT:  It's admitted with no objection.

21          MR. MARSHALL:  Your Honor, would you like to see

22  this exhibit?

23          THE COURT:  Yes, please.  The defense has seen

24  that?

25          MS. EISNER-GRYNBERG:  Yes.

Hassan - Direct - Marshall                    125

1           THE COURT:  Okay.

2    BY MR. MARSHALL:

3    Q    Officer Hassan, I'm going to hand you one more document

4    here.  Your Honor, this is another new one.  It's being

5    marked as Government Exhibit 22.  You should have a copy of

6    it in front of you.  Officer Hassan, do you recognize this

7    item that's been marked as Government Exhibit 22?

8    A    Yes.

9    Q    How do you recognize it?

10   A    It is the rolling paper that was seized.

11   Q    Okay.  Does this -- does Government Exhibit 22 fairly

12   and accurately depict the other rolling paper that you seized

13   from the defendant on February 7, 2021?

14   A    Can you rephrase that, please?

15   Q    Does this image in front of you that's marked as

16   Government Exhibit 22, fairly and accurately depict the

17   rolling paper that you recovered from the defendant's

18   backpack on February 7, 2021?

19   A    Yes, it is.

20           MR. MARSHALL:  Your Honor, the government offers

21   Government Exhibit 22 into evidence.

22           MS. EISNER-GRYNBERG:  No objection.

23           THE COURT:  Admitted.

24           MR. MARSHALL:  You can just set that aside.

25           THE COURT:  Just so I'm clear, the rolling paper

Hassan - Direct - Marshall                    126

1    that you saw in the physical specimen here today, I think it

2    was GX 21, do you believe that's the same type of rolling

3    paper different that we see on the defendant's lap in Exhibit

4    10, the photo?

5    A    Sorry, Your Honor.  Can you --

6         THE COURT:  I just wasn't sure if you had said

7    whether or not you believe the rolling paper that we just saw

8    in person, in Exhibit 21, is the same rolling paper that you

9    remember seeing on the defendant's lap or not?

10   A    Yes, I believe it is the same.

11        THE COURT:  Okay.

12   BY MR. MARSHALL:

13   Q    Officer Hassan, why was it important to search the car

14   for additional marijuana and paraphernalia?

15   A    It was important because it could be evidence could be

16   discovered or more marijuana or paraphernalia and it could

17   lead from what we have at the point to something else.

18   Q    Are you aware of, at the time -- withdrawn.  At the time

19   of the arrest, are you aware of whether based off of the bag

20   of marijuana that you found in the center console and the

21   scene of the defendant blocking the crosswalk, whether you

22   could have taken the defendant into custody at that point?

23   A    Yes, I could have.

24   Q    And are you aware of whether you could have done a desk

25   appearance ticket investigation?

1        THE COURT:  Is this -- does the witnesses

2    subjective understanding of the state of the law matter here?

3        MR. MARSHALL:  Your Honor, I'd say that it's not

4    his subjective understanding of the law, but just his

5    familiarity with the procedures involved in doing a desk

6    appearance ticket investigation that would inform the court's

7    analysis of like how that process is done and what it

8    involves.

9        THE COURT:  Okay.

10   Q    So Officer Hassan, I believe I asked are you aware of

11   whether you could have done a desk appearance ticket

12   investigation at that point?

13   A    Yes, I could have.

14   Q    And what exactly would be involved in doing a desk

15   appearance ticket investigation?

16   A    It would involve taking the person in custody, which

17   means, you know, putting hand cuffs on them, taking them back

18   to the precinct and started the lodging them into the

19   precinct cells and then started the proper paperwork.

20   Q    And when you take them into custody, would you put them

21   in hand cuffs?

22   A    Yes.

23   Q    And how would they -- would you then put the person into

24   a police vehicle?

25   A    Yes.  They would be transported back to the precinct.

Hassan - Direct - Marshall                    128

1    Q    And then they'd be put in a holding cell, correct?

2    A    Yes, they would.

3    Q    And what about their vehicle, would it be transported

4    somewhere?

5    A    It would be transported back to the precinct as well.

6    Q    Okay.  By who?

7    A    A police officer.

8    Q    Officer Hassan, back to the stop.  Once you had the

9    defendant proceed to the back of the car, what happened next?

10   A    Once he was at the rear of the vehicle, I then proceeded

11   to search the vehicle.

12   Q    Okay.  And where did you start the search?

13   A    I started at the driver's side where the defendant was

14   sitting.

15   Q    And what did you find up there?

16   A    Up there I found the rolling paper that was on his lap,

17   and center console, the clear cup and the marijuana

18   packaging.

19   Q    And what happened next?

20   A    Next I proceeded to go to the rear of the vehicle on the

21   same driver's side, but in the back of the vehicle, the rear

22   seats.

23   Q    And why did you search the rear of the passenger

24   compartment?

25   A    Just part of the search of the vehicle.

Hassan - Direct - Marshall                               129

1    Q    What were you searching for back there?

2    A    More marijuana, marijuana paraphernalia.

3    Q    Why did you think there might be more marijuana or

4    paraphernalia back there?

5    A    I just thought that would be somewhere -- that would be

6    a place where marijuana could be stored or put.

7    Q    And did you in fact find any paraphernalia in the back

8    of the passenger compartment?

9    A    Yes.

10   Q    What was that?

11   A    I later found a scale.

12   Q    And anything else?

13   A    And a firearm.

14   Q    Any other -- withdrawn.  Is the back seat also where you

15   found the other package of rolling paper?

16   A    Yes, it is.

17   Q    Was there anything else in the back seat at that point?

18   A    A black and green book bag.

19   Q    And by book bag you're also referring to a backpack,

20   correct?

21   A    Yes.

22   Q    Okay.  Once you and Officer Martinez began searching the

23   back seat, what happened next?

24   A    Next Officer Martinez looked up at me and said, 92.

25   Q    What had Officer Martinez been doing before he did that?

Hassan - Direct - Marshall                    130

1    A    He was searching the book bag.

2    Q    So had he moved anything in the backpack?

3    A    I don't recall if he had moved anything.

4    Q    Did he move the backpack itself?

5    A    Yes, he did.

6    Q    And when Officer Martinez said, 92, what did you

7    understand that to mean?

8              THE COURT:  I think we have this covered.

9    Q    Okay.  All right.  And where was the defendant while all

10   this was gong on?

11   A    He as in the rear of the vehicle with the other

12   officers.

13   Q    Okay.  And what happened next?

14   A    Next after Officer Martinez said 92, Kyle Balkissoon,

15   then proceeded to run away from the officers he was with at

16   the back of the vehicle and away from the vehicle.

17        Officer Martinez just then came out of the vehicle and

18   went after him as well.  He was apprehended after a very

19   brief foot pursuit.

20        I went around the vehicle to the passenger side to

21   assist my partners at which point, in sum and substance,

22   Officer Martinez stated to me the backpack -- excuse me, the

23   gun, the gun, and looked at the car.  That's when I went back

24   to the vehicle and in the rear seat I opened the backpack and

25   I saw the butt of the firearm sticking out.

Fiore Transcription Service, Inc.    203-929-9992

1    Q    Officer Hassan, please take a look at Government Exhibit

2    5 in evidence.  What is shown here?

3    A    It is showing the inside compartment of the vehicle.

4    Officer Martinez on the passenger side, Kyle Balkissoon's

5    hands on the top of the vehicle and the green and black book

6    bag that the green arrow is pointing to.

7    Q    And how long before this had the defendant been in the

8    driver's seat?

9    A    How long before?

10   Q    How long before this image was taken had the defendant

11   been in the driver's seat of the car?

12   A    A very short time period.

13   Q    Seconds, minutes?

14   A    Say a couple of seconds, yeah.

15   Q    And can you describe where exactly the backpack is

16   situated in relation to the driver's seat?

17   A    It's directly behind the driver's seat.

18   Q    Was the main compartment of the backpack -- withdrawn.

19   Do you recall whether the main compartment of the backpack

20   was open the whole time?

21   A    Yes, it was.

22   Q    And was that main compartment of the backpack where

23   Officer Martinez found the gun?

24   A    Yes, it is.

25   Q    Officer Hassan, I'm now going to play another clip from

Hassan - Direct - Marshall                          132

1    Government Exhibit 8 in evidence.  This is your body camera

2    footage.  The clip is from 01:26 and zero seconds to 01:28

3    and 45 seconds.

4         (Body camera footage played.)

5    Q    Officer Hassan, what was depicted in that clip?

6    A    That clip it was showing me searching the driver's side

7    of the vehicle and then proceeding to the back of the

8    vehicle.  Officer Martinez was searching the book bag, that's

9    when he alerted me to 92 at the same time Kyle Balkissoon

10   made a run from the officers in the back and away from the

11   vehicle.  He was apprehended.

12        I went around the vehicle to assist my officer -- my

13   partners and at which point in sum and substance, Officer

14   Martinez stated the gun, the gun, and pointed to the vehicle.

15   I then went back, looked inside the book bag and that's when

16   I saw the butt of the firearm sticking out.  Then I took off

17   my body one camera to get a better view of what I saw.

18   Q    And just to confirm, the location that you saw the

19   vehicle in at that point, where it was on the crosswalk, was

20   that the same exact location that the vehicle was when you

21   first arrived on the scene?

22   A    Yes, it never moved.

23   Q    Officer Hassan, please look at Government Exhibit 11 in

24   evidence.

25             THE COURT:  Before we move on from that, when you

Hassan - Direct - Marshall                    133

1   were first looking in the front seat in that excerpt we just

2   saw, can you tell me what it was we're looking at on the

3   front passenger seat, if you remember?

4   A    The front passenger seat?

5           THE COURT:  Sorry.  The driver's seat in the front.

6   A    Oh, that was the marijuana -- sorry, the rolling paper

7   that was on his lap that was on the seat.

8           THE COURT:  Okay.

9   A    Brown rolling paper.

10          THE COURT:  Thank you.

11  Q    Officer Hassan, do you recall whether the rolling papers

12  fell out of the car at any point?

13  A    No, they did not.

14  Q    All right.  And the -- all right.  Officer Hassan,

15  please take a look at Government Exhibit 11 in evidence.  All

16  right.  What's showing here?

17  A    It is the green and black book bag that was in the rear

18  seat of the vehicle and the butt of the firearm that the red

19  arrow is pointing to.

20  Q    All right.  After you secured the vehicle, secured the

21  gun, what happened next?

22  A    Next, Kyle Balkissoon was taken into custody,

23  transported to the 67 precinct along with the vehicle was

24  also taken back to the 67 precinct.

25          THE COURT:  How does the vehicle get back?

Hassan - Direct - Marshall                        134

1   A    How does it get back?

2        THE COURT:  Yeah.

3   A    Oh, I drove it back.

4   Q    And what about the firearm and marijuana, what happened

5   with them?

6   A    They stayed in the vehicle until -- while I was driving

7   it back to the precinct.

8   Q    And what happened with the firearm once you were back at

9   the precinct?

10  A    Evidence collection team came, processed, took pictures,

11  and it was then removed by them to further process.

12  Q    Once you were back at the station, what did you do?

13  A    Once I was back at the station, Kyle Balkissoon was

14  lodged in the cell.

15       I then went to voucher the firearm which was removed by

16  the evidence collection team, after they were done processing

17  and the marijuana was also field tested in the precinct and I

18  began the proper paperwork for the arrest.

19  Q    And the marijuana field test, do you recall the results?

20  A    Yes, it field tested positive.

21  Q    I have two items which have been marked for

22  identification as Government Exhibit 18 and I'm going to hand

23  those to you.  Do you recognize these items?

24  A    Yes, I do.

25  Q    How do you recognize them?

Hassan - Direct - Marshall                135

1    A    It is the marijuana packaging, the marijuana that was

2    inside the packaging, and the scale that was in the book bag.

3    Q    And how do you know those are those items that the bag

4    of marijuana and marijuana and the scale?

5    A    I recovered and vouchered them.

6         MR. MARSHALL:  Your Honor, the government offers

7    Government Exhibit 18 into evidence.

8         MS. EISNER-GRYNBERG:  No objection.

9         THE COURT:  Admitted.

10   Q    Officer Hassan, did you eventually learn whether the gun

11   was loaded?

12   A    Yes, I did.

13   Q    Do you recall how -- well, was it loaded?

14   A    Yes, it was.

15   Q    Do you recall how many rounds of ammunition it was

16   loaded with?

17   A    In the magazine you had five rounds.

18   Q    Do you recall the manufacturer of the gun?

19   A    Yes.

20        THE COURT:  What's the relevance here for today's

21   purposes?

22        MR. MARSHALL:  I'm just going to the ultimate issue

23   that they did actually find the gun, Your Honor, but I

24   understand that it's not central to the evidentiary issue.

25   If the court would allow, I'd just introduce the ammunition

1    and the firearm as evidence for the record.

2              THE COURT:  Is there any objection?

3              MS. EISNER-GRYNBERG:  I agree that it is not

4    relevant to the hearing.  We don't contest that a firearm was

5    actually recovered.

6              THE COURT:  Or ammunition?

7              MS. EISNER-GRYNBERG:  No.

8              THE COURT:  All right.  Let's move on then.

9    MR. MARSHALL:

10   Q    Officer Hassan, please look at Government Exhibit 13 in

11   evidence.  What does this show?

12   A    This is the book bag which contained the dust bag, which

13   contained the firearm in the rear seat of the vehicle.

14   Q    And Officer Hassan --

15             THE COURT:  You said book back which contained a --

16   A    Dust bag.

17             THE COURT:  You're saying D-U-S-T?

18   A    Yes, D-U-S-T.

19             THE COURT:  Okay.  What is that?

20   A    Dust bag, like you know, when you buy like a hand bag,

21   it comes with like --

22             THE COURT:  Oh, okay.  Thank you.

23   Q    Officer Hassan, please look at the next image Government

24   Exhibit 14 in evidence.  What's shown here?

25   A    This is the firearm that we recovered as well as a

Hassan - Direct - Marshall                    137

1    magazine and the ammunition inside the magazine.

2    Q    And then Officer Hassan, please look at Government

3    Exhibit 15 in evidence.  What's shown in this image?

4    A    It is showing the green and black book bag and the

5    contents that was in the book bag, including the firearm

6    which the red arrow points to and the scale which the green

7    arrow points to.

8              MR. MARSHALL:  Your Honor, may I have just one

9    moment?

10             THE COURT:  Yes.  All right.  Your Honor, I'm just

11   going to show a brief portion of Government Exhibit 8 in

12   evidence of Officer Hassan's body cam footage.

13             THE COURT:  Yes.

14   (Body camera footage played.)

15   Q    Officer Hassan, just for the record, I just showed from

16   just before two minutes into the video, so just before 01:26

17   until 01:26:03 in the video.  Did you see in that video you

18   placed something onto the defendant's driver's seat?

19   A    Yes.

20   Q    And what was that?

21   A    The rolling paper that was on his lap.

22   Q    Okay.  And just to clarify your previous testimony, do

23   you recall whether you placed that rolling paper on the seat?

24   A    Yes, I did.

25   Q    Are you aware of why you might have placed that there?

1    A    It fell on the floor outside the vehicle.

2              MR. MARSHALL:  All right.  Thank you, Officer

3    Hassan.  Nothing further, Your Honor.

4              THE COURT:  Cross examination?

5              MS. EISNER-GRYNBERG:  Mr. Balkissoon is asking to

6    use the restroom.  Could we take a quick break?

7              THE COURT:  Oh, yes, absolutely.  All right.  Let's

8    reconvene at 2:20.

9         (Recess from 2:12 p.m. until 2:25 p.m.)

10             THE COURT:  Are we back on the record?

11             THE CLERK:  Yes, Judge.

12             THE COURT:  Okay.  Your witness.

13             MS. EISNER-GRYNBERG:  Thank you, Judge.

14                     CROSS EXAMINATION

15   BY MS. EISNER GRYNBERG:

16   Q    Good afternoon, Officer Hassan.

17   A    Good afternoon.

18   Q    You mentioned that you are employed by the NYPD, right?

19   A    Yes.

20   Q    In the 67th Precinct?

21   A    Yes.

22   Q    And that at the time of this arrest, you were in the

23   Public Safety Unit, right?

24   A    Yes.

25   Q    That's the unit that until very recently was called the

1    Anti-Crime Unit, right?

2    A    Yes.

3    Q    And what the Anti-Crime Unit -- when did that change, by

4    the way?

5    A    A couple months ago.

6    Q    So at the time of this arrest, you were in the

7    Anti-Crime Unit, right?

8    A    No.

9    Q    In February?

10   A    No.  It was still Public Safety.

11   Q    In February of this year, you were in a unit that was a

12   specialized unit looking for violent crimes, right?

13   A    Yes.

14   Q    And especially, you were trained to be looking for guns,

15   correct?

16   A    Yes.

17   Q    You were not on conditions patrol, right?

18   A    It's still part of conditions.  Yes.

19   Q    But your assignment was in Anti-Crime or Public Safety,

20   right?

21   A    Public Safety.

22   Q    Right.  So your job at that point was focused on violent

23   crime.  Is that right?

24   A    Yes.  But not just violent crimes.

25   Q    Your focus on the job was not handing out summonses,

Hassan - Cross - Eisner-Grynberg                    140

1    correct?

2    A    Yes, it is.

3    Q    What is the purpose of being assigned to the Public

4    Safety Unit?

5    A    Address all conditions, mainly violent crimes but still

6    all conditions.

7    Q    Okay.  But your direction is to find guns in the area

8    where you're looking, right?  That's what you're trying to

9    do --

10   A    I --

11   Q    -- correct?

12   A    I was never directed to do that.

13   Q    Okay.  When you were out on patrol on the night of

14   February 6th, was your focus to find people in possession of

15   marijuana?  Was that what you were trying to do out in the

16   streets in East Flatbush?

17   A    My focus was to address conditions.

18   Q    I'm asking you if when you set out from the precinct

19   that night, your intention, your mental state was we need to

20   find people who are in possession of small bags of marijuana.

21   Is that what you were looking for?

22   A    That wasn't my intention when I went out that night.

23   No.

24   Q    It was not, right?

25   A    No.

Hassan - Cross - Eisner-Grynberg                    141

1    Q    Your intention that night was to find violent crime,

2    correct?

3              MR. MARSHALL:  Your Honor, objection.  Asked and

4    answered.

5              THE COURT:  You can answer the question.

6              THE WITNESS:  Can you repeat it, please?

7    BY MS. EISNER GRYNBERG:

8    Q    Your intention when you set out on patrol that night was

9    to try to find and root out violent crime, right?

10   A    Yes.

11   Q    And you did that on patrol with two other officers in

12   your car and three officers in a different car, correct?

13   A    Yes.

14   Q    And you communicated with each other via radio, right?

15   A    Yes.

16   Q    Those radio communications between the two of you, were

17   they recorded in this case?

18   A    I don't understand the question.

19   Q    Were the communications between yourself and the other

20   vehicle over the radio recorded?

21   A    Yes, I believe so.

22   Q    Has anybody at any point played them for you in the

23   course of this case?

24   A    No.

25   Q    You did see in testimony today your body-worn camera

Hassan - Cross - Eisner-Grynberg                    142

1    footage, right?

2    A    Yes.

3    Q    And just to quickly recap, the way the body camera works

4    is you have to actually turn it on, right?

5    A    Yes.

6    Q    And when you activate it, that's when the sound begins

7    recording, correct?

8    A    Yes.

9    Q    But meanwhile, it's running in the background all the

10   time video footage, correct?

11   A    Yes.

12   Q    When you press go, it retains, though, only the one

13   minute before you press go.  Is that right?

14   A    Yes.

15   Q    We can't go back any further and see what happened

16   before the one minute before you press to activate, correct?

17   A    Yes.

18   Q    So let's go to this arrest, the early morning hours of

19   February 7, 2021.  Okay?  You told us that you received a

20   radio transmission from Officer Modesto in the lead car.  Is

21   that right?

22   A    Yes.

23   Q    And Officer Modesto told you that he had seen two

24   things, correct?  The first being that Mr. Balkissoon's car

25   was blocking a crosswalk.  Is that accurate?

Hassan - Cross - Eisner-Grynberg                  143

1    A    I don't recall exactly what he told me.

2    Q    Do you recall him telling you that the driver appeared

3    to be rolling a marijuana cigarette?

4    A    I don't recall that.  No.

5    Q    Do you recall meeting with AUSA Marshall in this case on

6    August 4, 2021?

7    A    Yes.

8    Q    That was by a conference call between himself, yourself

9    and Detective Debra Lawson, correct?

10   A    Yes.

11   Q    And do you recall that at the time of that conference

12   call, one of the participants on the call was taking notes of

13   what was discussed?

14   A    Yes.

15   Q    And the purpose of that call was for you to advise AUSA

16   Marshall of what had occurred, correct?

17   A    Yes.

18           MS. EISNER GRYNBERG:  Could you flip to the ELMO,

19   please?

20           THE CLERK:  Oh, sorry.

21           MS. EISNER GRYNBERG:  That's all right.

22   BY MS. EISNER GRYNBERG:

23   Q    Can you see this document on the screen in front of you?

24   A    No.  There's nothing here.

25   Q    Is there now?

1    A    Yes.

2    Q    I'm going to direct you to the third bullet point on

3    this document and ask you to read that to yourself.  Are you

4    there?

5    A    Yes.

6    Q    Do you recall Officer Modesto telling you that he had

7    observed -- excuse me, Officer Martinez telling you that he

8    had observed a black Mercedes parked blocking the pedestrian

9    walkway and the driver rolling a marijuana cigarette?

10   A    I don't recall who told me.

11   Q    Do you recall hearing that over the radio from the lead

12   car?

13   A    Honestly, at this point, I don't recall hearing --

14   exactly what was said.

15   Q    Okay.  When you were meeting with AUSA Marshall, you

16   told him all that you could remember at that point in August,

17   right?

18   A    Uh-huh.

19   Q    So in August, is it fair to say that that's what you

20   told him at that time?

21   A    Yes.  In August.

22   Q    Here today on October 6th, you don't remember hearing --

23   what you heard over the radio?

24   A    I don't remember exactly what was said.

25   Q    Do you recall somebody indicating to you that they

1    believed there to be marijuana in that car?

2    A    All I remember is them transmitting over the radio about

3    the vehicle.  I don't remember exactly what was said.

4    Q    Okay.  So you then went and parked your car in the

5    middle of the street on East 34th Street, right?

6    A    Yes.

7    Q    By the way, we can't listen to whatever was said to you

8    at the time, because you didn't turn on your body camera

9    while you were still in the car, right?

10   A    Yes.

11   Q    And we don't have -- at least the Government has not

12   produced any recorded radio of what was said to you.  Is that

13   right?

14   A    Yes.

15   Q    Okay.  So you decided to park your car in the middle of

16   East 34th Street and approach the driver.  Is that right?

17   A    Yes.

18   Q    And you went over to the driver, correct?

19   A    Yes.

20   Q    And when you looked down, you were able to observe that

21   he was not, in fact, rolling a marijuana cigarette, right?

22   A    Yes.

23   Q    Yes, he was rolling one, or he was not?

24   A    From what I saw, no, he was --

25   Q    He was --

Hassan - Cross - Eisner-Grynberg                146

1    A    -- not rolling a --

2    Q    He was not.  In his lap, you saw this brown paper,

3    right?

4    A    Yes.

5    Q    You did not see a marijuana cigarette, correct?

6    A    No.

7    Q    Throughout the entirety of this search of the vehicle,

8    you never found a marijuana cigarette, right?

9    A    No.

10   Q    You didn't have one -- he didn't have one on his lap,

11   correct?

12   A    No.

13   Q    There wasn't one on the seat?

14   A    No.

15   Q    All right.  There was actually no loose marijuana

16   recovered in the vehicle whatsoever, correct?

17   A    Can you rephrase that, please?

18   Q    There was no loose marijuana found in that vehicle,

19   right?

20   A    No.

21   Q    The only marijuana that you recovered was with -- was

22   inside of the commercial package, correct?

23   A    Yes.

24        MS. EISNER GRYNBERG:  Let's take a look at

25   Government 12 in evidence.  And we're back on the computer,

1    please.

2    BY MS. EISNER GRYNBERG:

3    Q    Government Exhibit 12 shows the center console of

4    Mr. Balkissoon's vehicle as you saw it when you approached

5    him.  Is that right?

6    A    Yes.

7    Q    So when you were standing there at his driver's side

8    window and he was sitting in the front seat, this is what you

9    saw on the center console, what's depicted in Government

10   Exhibit 12, correct?

11   A    Yes.

12   Q    It was a package of marijuana that says Goonies Guava

13   Cake, right?

14   A    Yes.

15   Q    And if you look at the top right-hand corner, you can

16   see that this bag is sealed, right?

17   A    Yes.

18   Q    And it appears to be a commercial package.  This isn't a

19   Ziploc bag, right?

20   A    Yes.

21   Q    So you could see that it has not been ripped open,

22   right?

23   A    Yes.

24   Q    This marijuana was the only marijuana that you actually

25   found in the car, correct?

Hassan - Cross - Eisner-Grynberg                    148

1    A    Yes.

2    Q    You testified on direct examination that in this plastic

3    cup that's also in Government Exhibit 12, you saw some ashes,

4    correct?

5    A    Yes.

6    Q    When you say ashes, you're referring to burnt dust that

7    would come after smoking marijuana, correct?

8    A    Yes.

9    Q    You did not find any burning marijuana in the car at

10   all, right?

11   A    No.

12   Q    And you did not find any burnt marijuana in the car?

13   A    No.

14   Q    You testified that you thought that the smell of

15   marijuana that you had smelled could have been coming from

16   those ashes.  Did I hear you right?

17   A    Yes.

18   Q    Isn't it true, though, that the smell that you smelled

19   in Mr. Balkissoon's car when you approached the driver's side

20   was the smell of raw marijuana?

21   A    I don't remember what kind of smell.  I just know it was

22   marijuana.

23   Q    You don't recall believing at that time that it was raw?

24   A    No.

25   Q    You testified in the state grand jury in this case,

Hassan - Cross - Eisner-Grynberg                    149

1    right?

2    A    Yes.

3    Q    That was very close in time to the incident, right?

4    A    Yes.

5    Q    Mr. Balkissoon was arrested on February 7th of 2020,

6    right?

7    A    Yes.

8    Q    At that point, he was taken to the Brooklyn -- the Kings

9    County District Attorney's Office for prosecution, right?

10   A    Yes.

11   Q    And you testified in the Kings County Supreme Court

12   grand jury about what you observed, right?

13   A    Yes.

14   Q    You were under oath at that time?

15   A    Yes.

16   Q    Just like today.  I'm going to direct your attention to

17   what's been marked for identification as 3500HH23.

18           MS. EISNER GRYNBERG:  I could do it on the screen.

19   Can we switch to the ELMO?

20   BY MS. EISNER GRYNBERG:

21   Q    What I'm showing you that's marked by that number says

22   People of the State of New York against Kyle Balkissoon.

23   That's the defendant in this case, correct?

24   A    Yes.

25   Q    And that's from February 11, 2021?

Hassan - Cross - Eisner-Grynberg                    150

1    A    Yes.

2    Q    I'm going to show you the top of page 5.  At the top

3    there, it says Police Officer Haroonul Hassan.  That's you,

4    right?

5    A    Yes.

6              THE CLERK:  Counsel, can you just move your

7    microphone closer to you?

8              MS. EISNER GRYNBERG:  Yes.  I'm sorry.

9              THE CLERK:  That's okay.  Thanks.

10   BY MS. EISNER GRYNBERG:

11   Q    I'm going to direct your attention to page 7.  And I'm

12   on line 14.  Isn't it true that when you were asked by the

13   prosecutor in the state grand jury on February 11, 2021 --

14   you were asked the following question: "What, if anything,

15   did you notice about the defendant or the car when you were

16   at the driver's side window?"

17        And you gave this answer: "I observed an odor of

18   marijuana."  Is that right?

19   A    Yes.

20   Q    And then you were asked, line 18 "Could you describe

21   that odor to the members of the grand jury?"

22        And your answer, Line 20, was "It was raw."  Did I read

23   that correctly?

24   A    Yes.

25   Q    So tell me if I'm missing something here.  You arrived

1    at the car, and you smelled the odor of marijuana, right?

2    A    Yes.

3    Q    You saw rolling paper, you say, on Mr. Balkissoon's lap,

4    right?

5    A    Yes.

6    Q    And you saw a bag of marijuana, right?

7    A    Yes.

8    Q    And you said to him, I smell marijuana, true?

9    A    Yes.

10   Q    And he said, here's the bag of marijuana, right?

11   A    Yes.

12   Q    And then he said, this is the only marijuana that I

13   have, correct?

14   A    Yes.  In some substance, yes, that's what he said.

15   Q    And that led you to believe that there was more

16   marijuana somewhere else?

17   A    Yes.

18   Q    Why?

19   A    Because the smell of marijuana, the rolling paper, the

20   packaging of marijuana, there could possibly be marijuana in

21   the -- more marijuana in the vehicle or marijuana

22   paraphernalia.

23   Q    You had one sheet of rolling paper, right?

24   A    Yes.

25   Q    One bag with marijuana, right?

1   A    Yes.

2   Q    And he told you this is all that I have?

3   A    Yes.

4   Q    Okay.  By the way, that whole conversation between you

5   and him and holding up the bag of marijuana and talking about

6   it, we don't have that on video, right?

7   A    Yes.

8   Q    The reason we don't have that on video is because you

9   did not activate your body camera when you began the car

10  stop, correct?

11  A    Yes.

12  Q    And we know that you did not activate it for at least a

13  minute into the car stop, because we see where your body

14  camera footage began, right?

15  A    Yes.

16  Q    And nowhere in that body camera footage is

17  Mr. Balkissoon holding up a bag of marijuana, correct?

18  A    Yes.

19  Q    Nowhere in that footage is him even handing you his

20  driver's license, right?

21  A    Yes.

22  Q    There's no video of how his car was -- where his car was

23  located at the time that you approached his vehicle, correct?

24  A    Correct.

25  Q    There's no video of you actually approaching the

1    vehicle, right?

2    A    Correct.

3    Q    There's no video of you asking him for his license and

4    registration and insurance, right?

5    A    Correct.

6    Q    And the reason that there's no video for all of these

7    things is because you did not turn it on, correct?

8    A    Yes.

9    Q    Okay.  So at this point, you've approached the car,

10   because you said that it was blocking a crosswalk, right?

11   A    Pedestrian ramp and crosswalk.  Yes.

12   Q    And then when you got to the car, you observed the one

13   sealed commercially packaged bag of marijuana, right?

14   A    Yes.

15   Q    You had your partner run Mr. Balkissoon's license and

16   registration and insurance, right?

17   A    I don't understand the question.

18   Q    You asked him for his license, registration and

19   insurance, right?

20   A    Yes.

21   Q    And all of those things came back valid, right?

22   A    At the time from -- I wasn't sure.  I wasn't in the back

23   running his name.

24   Q    Nobody told you there's something wrong with any of

25   those things, correct?

1    A    No.

2    Q    Now, part of your job as a police officer is to know the

3    state of the law -- the criminal law in the State of New

4    York, right?

5    A    Yes.

6    Q    So that you know how to enforce the laws correctly,

7    correct?

8    A    Yes.

9    Q    So for the infraction of blocking a pedestrian ramp, a

10   thing that you can do is issue a summons for a traffic

11   infraction, right?

12   A    Yes.

13   Q    You also knew that on that day on February 7, 2021, for

14   the possession of the one sealed small commercial bag of

15   marijuana, the thing that you could do is give a summons for

16   a $50 fine, right?

17   A    Yes.

18   Q    That had changed in August of 2019, correct?

19   A    Can you say that again?

20   Q    Marijuana was decriminalized in New York in August of

21   2019, right?

22   A    Yes.

23   Q    That's when it became just an infraction just like the

24   being in the crosswalk, correct?

25   A    Yes.

1    Q    So at this point, you didn't actually write him a

2    summons for the crosswalk or the pedestrian ramp, right?

3    A    No, I did not.

4    Q    And you didn't write him a summons for the one sealed

5    small bag of marijuana?

6    A    No, I did not.

7    Q    What you did is, you decided to get him out of the car

8    and keep going, right?

9    A    Yes.  I took him out of the vehicle to search the

10   vehicle for more marijuana.

11   Q    So by the way, earlier in that same tour, you made a

12   previous car stop, right?

13   A    I don't recall if I did.

14   Q    You keep track of what you do every day in what's called

15   an activity log, right?

16   A    Yes.

17   Q    And that used to be in like a little notebook, but now

18   it's on an app on your phone, correct?

19   A    Yes.

20   Q    And the purpose of the activity log is so that you can

21   refresh your recollection to see what you did when a case

22   eventually gets to court, right?

23   A    Yes.

24        MS. EISNER GRYNBERG:  This is just for the witness.

25   BY MS. EISNER GRYNBERG:

1    Q    I'm showing you your -- is it on there?

2    A    No.

3              THE CLERK:  No.  Because of the way the courtroom

4    is wired, it is --

5              MS. EISNER GRYNBERG:  Oh, it can stay.

6              THE COURT:  There's no jury.

7              THE CLERK:  Right.

8    BY MS. EISNER GRYNBERG:

9    Q    What I'm showing you is your -- Officer Hassan's

10   activity log report from this tour that we're talking about,

11   right?

12   A    Yes.

13   Q    Okay.  And if you take a look, it has your name on the

14   top?

15   A    Yes.

16   Q    And it indicates that you went to roll call for the

17   shift and so on, right?

18   A    Yes.

19   Q    Okay.  I'm on the second page, and I'm going to ask you

20   to look at the bottom of that page and see if that refreshes

21   your recollection.

22   A    Yes.

23   Q    So at 2134 hours on February 6th of 2021, you made a car

24   stop at Tilden and New York Avenue, correct?

25   A    Yes.

Hassan - Cross - Eisner-Grynberg                    157

1    Q    And you stopped that car, because it was double parked,

2    right?

3    A    Yes.

4    Q    That's a traffic infraction?

5    A    Yes, it is.

6    Q    Just like blocking a pedestrian ramp, right?

7    A    Yes.

8    Q    And in that case, you smelled the odor of marijuana,

9    right?

10   A    Yes.

11   Q    And you saw visible marijuana, right?

12   A    Yes.

13   Q    So exactly the same as this case.  A traffic infraction,

14   an odor of marijuana and then visible marijuana, right?

15   A    Yes.

16   Q    And in that case, you ruled what you found 91, right?

17   A    Yes.

18   Q    What's 91?

19   A    Non-crime corrected.

20   Q    No crime, right?

21   A    Non-crime corrected.

22   Q    What does that mean?

23   A    That means there was just -- they didn't force

24   anything --

25   Q    So --

Hassan - Cross - Eisner-Grynberg                158

1    A    -- pretty much.

2    Q    -- you had a traffic infraction, the smell of marijuana

3    and visible marijuana, and you did not even give a summons,

4    right?

5    A    Yes.  I used discretion to not.

6    Q    And you did not make an arrest?

7    A    No, because I used discretion.  There was no arrest to

8    be made for a traffic infraction or a summons for marijuana.

9    Q    But there was a traffic infraction, right?

10   A    Yes, there was.

11   Q    And there was marijuana, right?

12   A    Yes.

13   Q    But there was no arrest to be made, right?

14   A    No.

15   Q    Okay.  When it came to Mr. Balkissoon, you decided you

16   were going to first search him and then search his car and

17   everything in it, right?

18   A    Can you rephrase the question?

19   Q    When it came to Mr. Balkissoon, you did not 91 the

20   arrest, right?

21   A    No.

22   Q    You decided to take him out of the car and keep going,

23   correct?

24   A    Yes.

25   Q    The first thing you decided to do is you decided to

1    frisk him, right?

2    A    Yes.

3    Q    When you did that, when you told him to get out of the

4    car, that's when you turned on your camera, correct?

5    A    I turned it on before I told him to get out.

6         MS. EISNER GRYNBERG:  Okay.  Let's start Government

7    Exhibit 8 at 58 seconds then.

8    BY MS. EISNER GRYNBERG:

9    Q    You said one minute -- there's one minute of buffer

10   before you turn it on, right?

11   A    Yes.

12        MS. EISNER GRYNBERG:  Okay.  So we're on the

13   computer now, please.  So let's play from 58 seconds to 1

14   minute and 12 seconds on the counter.

15        (Body cam footage played)

16        MS. EISNER GRYNBERG:  Can we stop there for a

17   second?  I'm starting Government Exhibit 8 at 1 minute 24

18   seconds -- 1:24:56.  Go ahead.

19        (Body cam footage played)

20        MS. EISNER GRYNBERG:  I'm sorry.  I'm not getting

21   any sound.  Is our sound on?  Try that again then.

22        (Body cam footage played)

23        MS. EISNER GRYNBERG:  Okay.  We're stopping at

24   1:25:11 on Government Exhibit 8.

25   BY MS. EISNER GRYNBERG:

Hassan - Cross - Eisner-Grynberg                    160

1    Q    So we know exactly when your -- when you turned on your

2    camera, because that's when we hear the beep beep, and we

3    hear you start talking, right?

4    A    Yes.

5    Q    And what we hear you say, the first thing you say once

6    you turn on the camera, is listen, man, because there's weed

7    in the car, we're going to talk to you in the back, okay?

8    Right?

9    A    Yes.

10   Q    And you asked him, in fact, to step out of the car,

11   right?

12   A    Yes.

13   Q    Let's play now --

14            THE COURT:  Sorry.  Can I just -- that happens a

15   bit after the 1:00 -- or the one-minute mark on the counter.

16            MS. EISNER GRYNBERG:  I don't think so.  Let's play

17   it again.

18            THE COURT:  Is that --

19            MS. EISNER GRYNBERG:  Can we start at 58 seconds?

20            THE COURT:  Okay.

21        (Body cam footage played)

22            THE COURT:  Oh, okay.  Yep.  I stand corrected.

23            MS. EISNER GRYNBERG:  That's fine.  We'll keep --

24   I'm playing it more anyway.

25        (Body cam footage played)

Hassan - Cross - Eisner-Grynberg                    161

1    MS. EISNER GRYNBERG:  This is at 1 minute 25 --

2    1:25:23.  Excuse me.

3    BY MS. EISNER GRYNBERG:

4    Q    At this point, you asked Mr. Balkissoon to put his hands

5    on top of the car.  That's what we saw, right?

6    A    Yes.

7    Q    And you decided to frisk his body, correct?

8    A    Yes.

9    Q    At this point, the criminal suspicion that you -- the

10   suspicion that you had was that he was blocking a pedestrian

11   ramp, right?

12   A    Yes.

13   Q    And that he had one bag of marijuana in the car,

14   correct?

15   A    Yes.

16   Q    But you decided to pat down his body anyway, right?

17   A    Yes.

18   Q    Why?

19   A    To my understanding, in the case at that point in time,

20   marijuana was decriminalized.  We -- if we see marijuana or

21   we smell marijuana, we're allowed to search a person or a

22   vehicle, so --

23              MS. EISNER GRYNBERG:  Okay.  Let's keep playing

24   from here.

25              (Body cam footage played)

Hassan - Cross - Eisner-Grynberg                    162

1           MS. EISNER GRYNBERG:  I'm sorry.  Can we back it up

2      just a -- two minutes on the counter?

3           (Body cam footage played)

4           MS. EISNER GRYNBERG:  I'm at 1:25:57.

5      BY MS. EISNER GRYNBERG:

6      Q    So we can see at this point that you sent Mr. Balkissoon

7      to the back of the car, right?

8      A    Yes.

9      Q    At this point, you had not found anything on his person,

10     correct?

11     A    No.  Just the keys.

12     Q    You sent him to your partners who were at the back of

13     the car for him to be detained while you did your search,

14     right?

15     A    Yes.

16     Q    And you decided that you were going to search the

17     driver's side of the car, correct?

18     A    Yes.

19     Q    And your partner, Officer Martinez, was going to search

20     the passenger side, right?

21     A    Yes.

22     Q    Okay.  Let's continue the video until 2:07, please.

23          (Body cam footage played)

24          MS. EISNER GRYNBERG:  Maybe one more second.

25          (Body cam footage played)

1    BY MS. EISNER GRYNBERG:

2    Q    Okay.  So the very first thing that you did, as you

3    discussed on direct examination, is you picked up the

4    crumpled piece of paper that was -- that had fallen on the

5    floor, right?

6    A    Yes.

7    Q    And that's what you're saying is the rolling paper,

8    right?

9    A    Yes.

10   Q    And this was, in your mind, important evidence in the

11   case at this point, correct?

12   A    Can you rephrase that, please?

13   Q    At this point, the presence of rolling papers on his lap

14   was something that was important to you about this case,

15   right?

16   A    At that point, right at that moment?

17   Q    Yes.

18   A    No, not right at that moment.

19   Q    When you approached his car, the fact that he had

20   rolling papers on his lap is something that you took notice

21   of, correct?

22   A    It's what I observed.  Yes.

23   Q    Okay.  And you decided that you needed to keep it.  You

24   took it from the street and put it back into the car, right?

25   A    Yes.

1    Q    Let's take a look at what it looks like here.

2              MS. EISNER GRYNBERG:  Let's back it up a tiny bit

3    so we can actually see the -- see what it looks like better.

4    Maybe 2:06 or so.  Go from there.  Yeah.  That's perfect.

5    Right there.

6    BY MS. EISNER GRYNBERG:

7    Q    Okay.  I'm at 1:26:02 on Government Exhibit 8.  We have

8    a clear view here of what -- what you're saying is rolling

9    paper looked like at the time when it was on Mr. Balkissoon's

10   lap, right?

11   A    Yes.

12   Q    It looks to me like it's at least, I don't know, about

13   two feet long if it was not folded over.  Is that right?

14   A    I can't tell the measurements just by looking at it.

15   Q    Okay.  So it's on top of a driver's seat in a regular

16   sedan, right?

17   A    Yeah.

18   Q    A person sits in a driver's seat, right?

19   A    Yes.

20   Q    Most people are at least a foot or so wide, right?

21   A    I don't know that.

22   Q    Well, you're a person, and we're all adults, right?

23   A    Yes.

24   Q    So you could roughly estimate by looking at this image

25   that the piece of paper that's on the driver's seat is more

Hassan - Cross - Eisner-Grynberg                    165

1    than a foot long, right?

2    A    Like I said, I can't tell measurements just by looking

3    at it.  I don't measure myself from one leg to another to

4    tell you how much an average person's --

5    Q    Okay.

6    A    -- length is.

7    Q    I'm asking you just to look at it right now on the

8    screen and see its perspective up against the driver's seat.

9    You see it on the screen, right?

10   A    Yes.

11   Q    And it appears to be folded, doubled over essentially,

12   right?

13   A    Yes.

14   Q    And it appears to be more than a foot long.  Is that

15   right?

16   A    I don't know.

17   Q    Okay.

18            THE COURT:  I mean, I'll just observe for myself --

19   you know, this video is in evidence now -- that what I think

20   I'm looking at is a shriveled item that at one end starts at

21   the left side of the driver's seat around the same horizontal

22   position as the bolster of the seat that would be some -- by

23   somebody's left side.

24            It crosses almost all the way to the right bolster.

25   It looks like that may be a seatbelt.  Then it runs until at

Hassan - Cross - Eisner-Grynberg                    166

1    the other end of the seat, and then it, as counsel indicated,

2    doubles back a bit and, you know, seems to run, you know,

3    half or three-quarters as long as the part before the bend.

4             MS. EISNER GRYNBERG:  Thanks, Judge.

5             THE COURT:  Am I describing that relatively fairly?

6             THE WITNESS:  Yes, Your Honor.

7             THE COURT:  Okay.

8    BY MS. EISNER GRYNBERG:

9    Q    So one of your responsibilities as the arresting officer

10   in this case was to voucher the physical evidence.  Is that

11   right?

12   A    Yes.

13   Q    And you did that in this case?

14   A    Yes.

15   Q    Right?  You vouchered the gun and the ammunition --

16   A    Yes.

17   Q    -- correct?

18   A    Yes.

19   Q    And you vouchered the marijuana?

20   A    Yes.

21   Q    And you vouchered the backpack?

22   A    Yes.

23   Q    And you vouchered those things, because you thought they

24   were important in the case, right?

25   A    Yes.

Hassan - Cross - Eisner-Grynberg                167

1    Q    You also vouchered every single thing that was inside of
2    the backpack, correct?
3    A    Yes.
4    Q    And when you voucher things, you have to make a
5    determination as to whether you're vouchering them for
6    safekeeping or for arrest evidence, correct?
7    A    Yes.
8    Q    When something is for safekeeping, it means that it's
9    literally to keep it safe until somebody can come pick it up
10   from the precinct, right?
11   A    Yes.
12   Q    Whereas arrest evidence is that evidence that you as a
13   police officer think is important for coming to court to
14   prove the case, correct?
15   A    Yes.
16   Q    In this case, you vouchered all of the contents of the
17   backpack as arrest evidence, right?
18   A    Yes.
19   Q    That included Mr. Balkissoon's phones, correct?
20   A    Yes.
21   Q    And even his phone chargers?
22   A    I don't recall what I vouchered his phone chargers as.
23            MS. EISNER GRYNBERG:  I'm on the ELMO, please.
24            THE CLERK:  Adjust it by that thing on top.
25   BY MS. EISNER GRYNBERG:

1    Q    I'm showing you what's marked for identification as

2    3500HH7.  This is one of the vouchers from this case, right?

3    A    Yes.

4    Q    And does it refresh your recollection as to how you

5    vouchered this phone and charging cables?

6    A    Yes.

7    Q    And that was as arrest evidence, right?

8    A    Yes.

9    Q    That means that right now, seven months later,

10   Mr. Balkissoon still can't get back his phone charging cables

11   in this case, right?

12   A    Yes.

13   Q    Because you vouchered it as arrest evidence, because it

14   was that important, correct?

15   A    Yes.

16           MS. EISNER GRYNBERG:  If we can go back to the

17   laptop.

18   BY MS. EISNER GRYNBERG:

19   Q    What we see depicted in Government Exhibit 8 at 1:26:02

20   that you say is the rolling papers, that you never vouchered,

21   right?

22   A    At that time, no.

23   Q    At any time?  You never vouchered this one-to-two-foot,

24   crinkled, brown paper ever, right?

25   A    A piece of it.  Yes, I did.

1    Q    Well, I'm not asking about a piece of paper.  I'm asking

2    you about this long, crinkled, brown piece of paper that was

3    in the car.  Did you ever voucher that?

4    A    No.

5    Q    You went through and you took things out of the car in

6    order to voucher them on that night of February 7th, correct?

7    A    Yes.

8    Q    But not this?

9    A    No.

10   Q    Seven months later on August 31, 2021, you told me

11   during your direct examination that you went back to the car

12   to look for it, right?

13   A    Yes.

14   Q    And you didn't find it in the car, correct, this long,

15   crinkled, folded over piece of paper, right?

16   A    Found a piece of it.

17   Q    But you didn't find this, this long, doubled over,

18   crinkled piece of paper, correct?

19   A    Correct.

20   Q    I'm showing you what's in evidence as Government Exhibit

21   21.  It's on the ELMO.  This is what is in evidence as

22   Government Exhibit 21, right?

23   A    Yes.

24   Q    This thing is about two inches long by one inch wide.

25   Is that accurate, if you're taking a look at it?

1   A    I believe so.  Looks like it.

2   Q    And you said you found it not on the driver's seat but

3   on the floor of the car, right?

4   A    I said the floorboard of the driver's seat.

5   Q    Right.  So what is it about this two-inch thing on the

6   driver's seat floorboard that led you to believe that it was

7   the same paper that was on his lap that day?

8   A    It was in the same area where it was, where the other

9   piece was.

10  Q    So the long piece, though, had disappeared at this

11  point, correct?

12  A    Yes.

13  Q    And isn't it possible that this piece was on the floor

14  from some prior use?

15  A    The floor of what?

16  Q    The floorboard of the driver's side?

17  A    I'm not sure.

18  Q    There's nothing --

19          THE COURT:  I mean, sir?  Sir, can you just say

20  more about what this is that we're looking at now as you

21  understand it?

22          THE WITNESS:  As I understand it, this is a piece

23  of the rolling paper that was on his lap.

24          THE COURT:  What makes you think that this is

25  rolling paper?  Like, you know, I look at Government Exhibit

1    22 --

2                THE WITNESS:  Yes.

3                THE COURT:  -- and it seems eminently obvious to me

4    that that's rolling paper.  And you may have to excuse my

5    lack of familiarity with the world of rolling papers, but how

6    do we know looking at Government Exhibit 21 that rolling

7    paper is what we're -- sorry, that -- yeah.  This is 21.

8    That rolling paper is what we are looking at?

9                THE WITNESS:  In my experience as a police officer,

10   this is very commonly used to roll marijuana cigarettes.

11   There's different types of rolling papers.  There's the one

12   that you just saw the picture of.

13               There's also a clear white one.  Also, a lot of

14   people use cigarette filters.  This is just one of the many

15   different types of rolling papers.  This is a piece of the

16   many different types.  And you can tell it is the same,

17   because this has little tiny stems on it, if you look at it

18   closely.

19               THE COURT:  Where do you see that?

20               THE WITNESS:  If you look at it physically in

21   person, you can see it.

22               THE COURT:  Okay.  Can you just describe the type

23   of rolling paper that we're looking at here?  What does it

24   look like in person?  How is it used?  Where does it come

25   from?  What's it made of?

Hassan - Cross - Eisner-Grynberg                    172

1        THE WITNESS:  From my knowledge, it's -- looks like

2   a tobacco leaf, essentially.  It's used to just roll the

3   marijuana.

4        THE COURT:  And --

5        THE WITNESS:  Marijuana is put inside, and it's

6   rolled into a cigarette form.

7        THE COURT:  And does it typically get sold in a

8   form like what we were looking at moments ago on the driver's

9   seat in the video?

10        THE WITNESS:  Yes.

11        THE COURT:  So how is that?  You just -- you walk

12   into a store and buy a large, loose leaf?

13        THE WITNESS:  I'm not sure where you would get it,

14   but I've seen the same form many different times.  It's

15   literally in the same form, same color.

16        THE COURT:  Okay.  All right.  Thank you.

17   BY MS. EISNER GRYNBERG:

18   Q    I'm going to show you Government Exhibit 22 and

19   Government Exhibit 21 at the same time.  Can you see them

20   both?

21   A    Yes.

22   Q    I think we have no disagreement that Government 21 is

23   not the same thing as Government Exhibit 22, right?

24   A    Yeah.  They're not the same.

25   Q    Okay.  So the thing that we see in Government Exhibit 22

1    is not what was on Mr. Balkissoon's lap or in the driver's

2    seat on February 6th -- February 7th of 2021.  Accurate?

3    A    22 is the one on the right?

4    Q    Yes.  That was not what he had on his lap that day?

5    A    Yes.  Not.

6    Q    It's not?  You testified that Government Exhibit 22 was

7    found in Mr. Balkissoon's backpack, right?

8    A    Yes.

9    Q    But you did not voucher this bag of rolling papers on

10   February 7th, did you?

11   A    I don't recall if I did or did not.

12   Q    When you vouchered the phone charging cables and the

13   notebooks and the stuff like that, do you recall vouchering

14   the rolling papers?

15   A    I don't recall vouchering that.

16   Q    You do not recall vouchering them?

17   A    I don't recall if I vouchered it or I did not.

18   Q    Okay.  I'm going to show you your vouchers from this

19   case.  You're looking at a voucher for a black cloth bag,

20   right?

21   A    Yes.

22   Q    You had a voucher for the Mercedes Benz itself, correct?

23   A    Yes.

24             THE COURT:  We may be in the realm of facts not in

25   dispute here.

Hassan - Cross - Eisner-Grynberg                    174

1    BY MS. EISNER GRYNBERG:

2    Q    There's no voucher for rolling papers, right?  For raw,

3    packaged rolling papers.  Is that right?

4    A    I don't recall if I did or did not.

5    Q    Turn your attention to Government Exhibit 15.

6              THE CLERK:  You want to go back to the computer?

7              MS. EISNER GRYNBERG:  Yes, please.

8              THE CLERK:  Okay.

9    BY MS. EISNER GRYNBERG:

10   Q    Government Exhibit 15 shows the contents of the backpack

11   at the time that you were in the precinct on February 7,

12   2021.  Is that right?

13   A    Yes.

14   Q    And this photograph was taken by ECT, the Evidence

15   Collection Team, when they came to document the evidence,

16   right?

17   A    Yes.

18   Q    Was that before or after you vouchered the evidence?

19   A    Before.

20   Q    Could you show us in this picture where there is a

21   package of raw rolling papers?

22   A    Oh, I don't see it.

23             MS. EISNER GRYNBERG:  Okay.  We'll go back to

24   Government Exhibit 8.  We're going to start right where we

25   left off and play, please, until 2 minutes and 15 seconds.

1    So we're starting at 1:26:02.  Go ahead.

2         (Body cam footage played)

3              MS. EISNER GRYNBERG:  We're stopping at 1:26:12.

4    BY MS. EISNER GRYNBERG:

5    Q    After you put the paper back on the seat, you decided to

6    search under the seat, right?

7    A    Yes.

8    Q    You searched the compartments within the seat, right?

9    A    Yes.

10   Q    You indicated to Officer Martinez -- I think you said,

11   yo, make sure you search in here, right?

12   A    Yes.

13   Q    And what you were referring to was a piece underneath

14   the seat that actually pops out where you could put something

15   inside underneath the seat itself, right?

16   A    Yes.

17   Q    You searched behind the seat cushions, correct?

18   A    Yes.

19   Q    You searched behind the padding that he had on the seat,

20   right?

21   A    Yes.

22   Q    You searched inside of the door?

23   A    Yes.

24   Q    Officer Martinez, meanwhile, was searching the passenger

25   side?

Hassan - Cross - Eisner-Grynberg                    176

1    A    Yes.

2    Q    Okay.  You moved to the back seat, and so did he,

3    correct?

4    A    Yes.

5    Q    You saw him grab the backpack, right?

6    A    Yes.

7    Q    You saw him going through the contents of the backpack,

8    right?

9    A    Yes.

10   Q    And you heard him say 92?

11   A    Yes.

12   Q    Which indicates to you that he was making an arrest?

13   A    Indicates that we have an arrest situation.  Yes.

14   Q    Okay.  At the time when you first started looking

15   through the car, what we just saw when you opened up the

16   compartment and you told your partner make sure you look in

17   here -- you saw that part, right?

18   A    Yes.

19   Q    We all know that what you were looking for was a gun,

20   right?

21   A    No.

22   Q    Why is it that it was so critical that your partner look

23   inside of secret, hidden compartments to find non-criminal,

24   infraction-level marijuana?

25             MR. MARSHALL:  Your Honor, objection.  She's asked

1    this several times, and he's answered it.

2          THE COURT:  I'm not sure his subjective motivations

3    are relevant, are they?

4          MS. EISNER GRYNBERG:  I think they are, because it

5    goes to the credibility of whether he actually had probable

6    cause to be searching for more marijuana if, in fact, he

7    believed he was searching for something else entirely.  Your

8    Honor has indicated, I think correctly --

9          THE COURT:  Okay.

10         MS. EISNER GRYNBERG:  -- that the real issue here

11   is whether the presence of one bag of marijuana gives rise to

12   probable cause that there's more marijuana elsewhere.  So

13   what he is looking for helps us understand if he's telling

14   the truth about whether he had probable cause that there was

15   more marijuana or whether he was just, in fact, searching for

16   something else.

17         THE COURT:  So I did kick us off with that question

18   this morning, and I still have it, but I think of it more as

19   a legal question about what inferences certain facts support

20   in the nature of probable cause or not rather than a question

21   about his subjective motivation.  You can ask one more

22   question along these lines, and then let's move on.

23   BY MS. EISNER GRYNBERG:

24   Q    If you had found additional marijuana in that secret --

25   or enclosed compartment underneath his seat, that would still

1    be the $50 fine, right?

2    A    Depending on how much we found.

3    Q    If you found a quantity similar to what you found sealed

4    on the center console, right?

5    A    Yes.

6    Q    So you're asking this Court to believe that you were

7    poking through every compartment and every seat and

8    underneath the back cushions and all throughout that car in

9    order to find decriminalized marijuana?  That's what you're

10   asking us to believe, right?

11   A    Yes.

12   Q    While you were out on the streets searching for violent

13   crime?

14   A    Well, I was -- as a police officer, my job is to enforce

15   all kinds of conditions regardless of what unit I'm in.

16   Q    Isn't it true, though, that you're trained -- or at that

17   time, you were trained by the NYPD that one way that you

18   could look for guns is if you have a basis to search for

19   marijuana?  Is that right?

20   A    No.

21   Q    They never told you that if you smell weed, you could

22   search the whole car?

23   A    I was told if I search --

24   Q    Right.

25   A    -- smell weed or --

1    Q    And that that might be a way that you might come across

2    guns?

3    A    No, I was not told that.

4    Q    No one ever told you that?

5    A    No.

6              THE COURT:  Yeah.  Let's move on from here.

7              MS. EISNER GRYNBERG:  Thank you.  I have nothing

8    else.

9              THE COURT:  Can we go back to GX12 for just a

10   minute?  I just had a question about that.

11        (Counsel confer)

12             THE COURT:  I just want to make sure I understand

13   what I'm looking at here.  So I think you indicated that if

14   you look at the top right of the package, you see a little

15   tab in the foil where a person might tear the package open.

16             THE WITNESS:  Yes.

17             THE COURT:  It's been sort of precut on the right

18   side.  And I think there's one of those tabs on the left as

19   well.  And you indicated the package had not been torn open

20   along the top part of it.  But you see how there was silver

21   foil running all the way around the package at the outside?

22             THE WITNESS:  Yes.

23             THE COURT:  And you see how at the bottom of the

24   package, in the silver foil, at least in this photograph,

25   there appears to be a black line kind of bisecting the silver

1    foil where the arrow is pointing right now -- or was?

2            THE WITNESS:  Yes.

3            THE COURT:  Do you know what I'm looking at there

4    in that black -- I'll call it a line in the middle of the

5    silver foil on the bottom of the package.

6            THE WITNESS:  I'll be honest.  I don't know what

7    that is.  My experience, packages like this, they don't have

8    to be ripped open from the top to access the marijuana.

9            THE COURT:  Where else could you access it from?

10           THE WITNESS:  In the back.  There's like a Ziploc

11   seal that you just pull apart.

12           THE COURT:  Oh.  Do you know who -- tell me again,

13   do you know who took this picture?

14           THE WITNESS:  A evidence collection team.

15           THE COURT:  Okay.  And do you know when they took

16   it?

17           THE WITNESS:  When I transported the vehicle back

18   to the precinct, they arrived to the precinct and did their

19   process.

20           THE COURT:  Okay.  All right.  Thank you.

21           Any redirect?

22           And I just wanted --

23           MR. MARSHALL:  Yeah.

24           THE COURT:  -- to note for the parties that I need

25   to break at 3:45 today.  And I am hoping that we are done or

1    very largely done by that point.

2              MR. MARSHALL:  I can keep this quick, Your Honor.

3         (Pause)

4                      REDIRECT EXAMINATION

5    BY MR. MARSHALL:

6    Q    Officer Hassan, going back to the notes that you

7    reviewed regarding the August -- I believe it was the August

8    4, 2021, conversation that we had.  Do you recall exactly

9    what you disclosed to me during that conversation?

10   A    Exactly?  No, I don't recall.

11   Q    Did you review the notes from that call?

12   A    No.

13   Q    Did you write those notes?

14   A    From that call?

15   Q    Yeah.

16   A    Like did I write notes from the call?

17   Q    The notes that defense counsel showed you from that

18   call.  Did you write those notes?

19   A    No.

20   Q    Did you confirm after the call that they were complete

21   and accurate?

22   A    I don't remember if I did.

23   Q    Did you ever discuss what notes were taken after --

24   A    No.

25   Q    -- that call?  So did you have any way of knowing what

1    was written in those notes?

2    A    No.

3    Q    So did you have any knowledge regarding the accuracy of

4    the notes?

5    A    No.

6    Q    Officer Hassan, regarding the call -- the way that you

7    communicate between the cars, so when one of the two cars on

8    the scene would relay a message to the other car, would you

9    use a point-to-point radio for that?

10   A    Yes.

11   Q    And so are those -- communications on those

12   point-to-point radios, are they recorded?

13   A    I'm not a hundred percent sure, but I do know all radio

14   transmissions at the NYPD are somehow recorded.  Yes.

15   Q    Are those -- communications on the point-to-point

16   radios, are those the communications that go out to everyone

17   in the area?

18   A    I don't recall at the time what channel we were on.

19   Q    When you walked up to the defendant's car at -- during

20   the time of the stop, you said the defendant had the rolling

21   papers on his lap, right?

22   A    Yes.

23   Q    Was he currently smoking at that point?

24   A    No.

25   Q    But based on your training and experience, would you say

1  that laying the rolling papers out like that was a necessary

2  step in preparation to smoke marijuana?

3  A    Yes.

4  Q    Based on your experience, when you see some drugs in a

5  car during a car stop, is there often -- is it often the case

6  that there are more drugs in the car?

7  A    Yes.

8  Q    Based on your experience when people have drugs in their

9  car and you stop them, do they often lie to you?

10  A    Yes.

11  Q    At the time of the arrest, you said you didn't voucher

12  the rolling papers that were on the defendant's lap, right?

13  A    Yes.

14  Q    How did the car get back to the precinct?

15  A    I drove it back.

16  Q    And when you saw in that video, where were the rolling

17  papers during -- after the defendant stepped out of the car?

18  A    Immediately after he stepped out?  It was on the ground.

19  Q    And where did he place them?

20  A    On the driver's seat.

21  Q    Is that the same driver's seat that you sat in to drive

22  the car?

23  A    Yes.

24  Q    So might you have sat on those rolling papers when you

25  drove the car back?

Hassan - Redirect - Marshall                    184

1    A    Yes.

2    Q    In your experience, are rolling papers of that sort

3    brittle?

4    A    Yes, they are.

5    Q    So in your experience, would you sitting on those

6    rolling papers potentially break them up into smaller pieces?

7    A    Yes, they are fragile.

8    Q    Why didn't you voucher the rolling papers at the time of

9    the arrest?  The -- well, I -- withdrawn.  Specifically, the

10   rolling papers that were on the defendant's lap, why didn't

11   you voucher those at the time of the arrest?

12   A    I just didn't feel it was necessary, because I had

13   already seized the marijuana, the firearm in the book bag,

14   the marijuana paraphernalia.

15   Q    Those rolling papers that were on the defendant's lap,

16   are they sometimes referred to as Fronto leaves?

17   A    Yes, that's what they're commonly referred to as.

18            THE COURT:  Sorry.  Can you spell that for the

19   record?

20            MR. MARSHALL:  Yes, Your Honor.  That's

21   F-R-O-N-T-O.

22   BY MR. MARSHALL:

23   Q    Okay.  And these images here -- I've Googled the term

24   "Fronto leaf."  Do these look like -- do these appear similar

25   to the rolling papers that you saw that night?

Hassan - Redirect - Marshall                    185

1    A    Yes, it is.

2    Q    And so this image I've displayed here on the right from

3    Google for Fronto leaf, is this similar, in your

4    understanding, to what the defendant had on his lap that

5    night?

6    A    Yes.

7    Q    And are these the types of leaves that, as you

8    described, you pull the stems out of?

9    A    Yes.

10   Q    All right.  And that -- those are the stems that you

11   believe were in the Ziploc bag in the center console of the

12   car.  Is that correct?

13   A    Yes.

14   Q    Okay.  And are these types of leaves -- is it your

15   understanding that the remnants that you recovered from the

16   car later in August, that those are -- that that's remnants

17   of one of these types of leaves, the front leaves?

18   A    Yes, they are.

19   Q    And the other rolling papers, the raw rolling papers in

20   Government Exhibit 22, do you recall whether you vouchered

21   them?

22   A    I don't recall if I did or did not.

23   Q    How do you know that those were the rolling papers that

24   you recovered from the defendant's car, though?

25   A    Everything in the book bag was seized, vouchered and

Hassan - Recross - Eisner Grynberg                    186

1     sealed.

2     Q    And so how do you specifically know that those rolling

3     papers -- the raw rolling papers were in the book bag?

4     A    Can you rephrase that, please?

5     Q    Did you take everything out of the book bag and seal it

6     into an evidence bag?

7     A    Yes.  That's how it gets vouchered.

8     Q    Okay.  And when you went back more recently to review

9     that evidence bag, were -- was it still sealed?

10    A    Yes.

11    Q    And were those raw rolling papers inside of the sealed

12    evidence bag?

13    A    Yes, they were.

14           MR. MARSHALL:  Thank you, Your Honor.  Nothing

15    further.

16                     RECROSS EXAMINATION

17    BY MS. EISNER GRYNBERG:

18    Q    Did anybody hand you those raw rolling papers in the

19    courtroom today?  Have you seen them?

20    A    Like physically?

21    Q    Yeah.  Like not in a picture.  Has anybody handed you

22    the actual papers from this sealed bag?

23    A    No.

24           MS. EISNER GRYNBERG:  Nothing else.  Thank you.

25           THE COURT:  Okay.  Does the Government have a third

Martinez - Direct - Marshall                187

1    witness ready to go?

2           MR. MARSHALL:  Yes, Your Honor.

3           THE COURT:  Okay.  I want to be very scrupulous to

4    call this witness for anything that may be unique to their

5    knowledge but to make sure we're not retreading the same

6    ground we've discussed with other witnesses.

7           MR. MARSHALL:  Okay.  Thank you, Your Honor.  Could

8    I just have one moment?

9           THE COURT:  Yes.  Please.

10        (Pause)

11          THE COURT:  Could I ask the defense, while we're

12   waiting for the next witness -- well, I'll hold the question.

13        (Pause)

14          MR. MARSHALL:  Your Honor, the Government calls

15   Police Officer Julio Martinez.

16          THE CLERK:  Please raise your right hand.

17        JULIO MARTINEZ, GOVERNMENTS'S WITNESS, SWORN

18          THE CLERK:  Okay.  Lean into the microphone and

19   tell us your name and spell it for the record.

20          MR. MARTINEZ:  It's Officer Martinez.

21   M-A-R-T-I-N-E-Z.

22          THE COURT:  Please spell your first name as well,

23   please.

24          MR. MARTINEZ:  Julio, J-U-L-I-O.

25          THE COURT:  Thank you.

```
 1                      DIRECT EXAMINATION
 2      BY MR. MARSHALL:
 3      Q     Good afternoon.
 4      A     Good afternoon.
 5      Q     Are you employed?
 6      A     Yes.
 7      Q     Who do you work for?
 8      A     The NYPD.
 9      Q     How long have you worked for the NYPD?
10      A     Six years.
11      Q     What's your title?
12      A     I'm a Public Safety Officer.
13      Q     And what is your current assignment?
14      A     Public Safety.
15      Q     With which precinct?
16      A     With the 67th Precinct.
17      Q     During the course of your employment, have you been
18      involved in car stops?
19      A     Yes.
20      Q     Approximately how many?
21      A     More than a hundred.
22      Q     During the course of your employment, have you also been
23      involved in arrests involving marijuana?
24      A     Yes.
25      Q     Approximately how many?
```

Martinez - Direct - Marshall                189

1   A    More than 50.

2   Q    Have you received training related to car stops?

3   A    Yes.

4   Q    Have you received training related to narcotics,

5   including marijuana?

6   A    Yes.

7   Q    Okay.  Turning your attention to the morning of February

8   7, 2021.  Did you make an arrest?

9   A    Yes, we did.

10  Q    Who did you arrest?

11  A    Defendant, Kyle Balkissoon.

12  Q    Do you see Mr. Balkissoon in the courtroom today?

13  A    Yes.

14  Q    Can you please identify him by an article of clothing

15  he's wearing?

16  A    He's wearing like a dark -- like a green shirt with

17  glasses, straight ahead.

18       THE COURT:  I don't think we have an identification

19  issue here.

20  BY MR. MARSHALL:

21  Q    All right.  Officer Martinez, we're going to jump a

22  little bit ahead on a few of these questions.  So we're not

23  going to go through the entire incident that night, but we're

24  going to focus on once you were on the scene.  So when you

25  arrived on the scene at the corner of East 34th Street and

```
                    Martinez - Direct - Marshall              190
```

1   Cortelyou Road, what did you see?

2   A    There was a vehicle blocking the pedestrian crosswalk.

3   Q    Do you recall what type of vehicle?

4   A    It was a black Mercedes.

5   Q    And that black Mercedes that was blocking the pedestrian

6   crosswalk, was it blocking the crosswalk when you arrived on

7   the scene?

8   A    Yes.

9   Q    Did you arrive on the scene at the same time as all the

10  other officers you were with?

11  A    Yes.

12  Q    Was that vehicle moved at any point while you were on

13  the scene?

14  A    No.

15  Q    Did you direct the defendant to move the vehicle -- or

16  did you direct anyone to move the vehicle at any point?

17  A    No.

18  Q    Okay.  And what did -- what else did you see once you

19  arrived on the scene?

20  A    The vehicle was on the pedestrian crosswalk.  There was

21  also a male driver inside.

22  Q    And which of the police vehicles were you in?

23  A    I was in the front, the first car.

24  Q    Okay.  And who were you seated next to?

25  A    I was with Officer Modesto and Officer Bloom.

Martinez - Direct - Marshall                    191

1   Q    Okay.  And during that incident, did you approach the

2   Mercedes?

3   A    Yes.

4   Q    And what did you observe when you approached the

5   Mercedes?

6   A    I observed a driver on the driver's side.  I also

7   observed a Ziploc bag on his center console along with a

8   plastic -- a clear plastic cup with ashes in it.  And the

9   driver had a rolling paper on his lap.

10  Q    And when you say the driver had rolling paper on his

11  lap, can you describe what that looked like?

12  A    It's a brown rolling paper, typically used.

13  Q    Okay.  Are you aware of what that rolling paper is made

14  from?

15  A    Fonto (sic passim) leaf, I believe.

16          THE COURT:  I'm sorry.  I didn't hear that answer.

17          THE WITNESS:  Fonto leaf.

18          THE COURT:  Can you spell the name of the plant

19  you're saying?

20          THE WITNESS:  Spell the name of the plant?

21          THE COURT:  You said something leaf, but I --

22          THE WITNESS:  It's a -- it's made out of -- I

23  believe it's Fonto leaf.

24          THE COURT:  Fonto?

25          THE WITNESS:  Fonto leaf.  Uh-huh.

Martinez - Direct - Marshall                    192

1           THE COURT:  Okay.  Is that F-O-N-T-O or something

2     like that?

3           THE WITNESS:  I believe so.

4           THE COURT:  Okay.

5           THE WITNESS:  I can't --

6     BY MR. MARSHALL:

7     Q    And were the windows of the Mercedes open when you

8     arrived?

9     A    At the time I approached it, yes.

10    Q    Okay.  Which windows?

11    A    My side was the front passenger side.

12    Q    Okay.  All right.  And then what happened next?

13    A    I observed the Ziploc bag on the center console along

14    with the clear plastic cup and the rolling paper on his lap.

15    We then -- I think Officer Hassan asked him for his pedigree

16    information.  We then afterwards asked him to step out of the

17    vehicle.

18    Q    Did you at any point smell the odor of marijuana?

19    A    Yes.

20    Q    When was that?

21    A    As soon as I approached the car.

22    Q    Okay.  Are you aware of where that smell was coming

23    from?

24    A    From inside the car.

25    Q    All right.  Did you believe that's where it was coming

Martinez - Direct - Marshall                    193

1    from at the time?

2    A    Yes.

3    Q    Okay.  Officer Martinez, you have a binder there next to

4    you.  I'll just ask that you take a look at Government

5    Exhibit 4 in evidence.  What's shown in this image?

6    A    It's a still picture of the vehicle in the pedestrian

7    crosswalk.

8    Q    And is that the vehicle -- withdrawn.  Is that the

9    location where the vehicle was when you arrived on the scene?

10   A    Yes.

11   Q    Okay.  And the vehicle was never moved while you were on

12   the scene, correct?

13   A    No.

14   Q    Officer Martinez, I have a CD here which I'll hand to

15   you.  The CD has been marked for identification as Government

16   Exhibit 16.  Do you recognize it?

17   A    Yes.

18   Q    How?

19   A    This is the video containing my body cam footage.

20   Q    Okay.  And it's your body cam footage from what?

21   A    From February 7th.

22   Q    Okay.  Does Government Exhibit 16 fairly and accurately

23   depict the February 7, 2021, incident involving the

24   defendant?

25   A    Yes.

Martinez - Direct - Marshall                    194

1    Q    Okay.  Are you aware of whether the time stamps on your

2    body cam footage from the February 7th incident are generally

3    accurate?

4    A    Yes.

5    Q    Okay.  Officer Martinez, I'll ask you to look back in

6    the binder.  You have in front of you a document which has

7    been marked for identification as Government Exhibit 17.  Do

8    you recognize it?

9    A    Yes.

10   Q    What is it?

11   A    A still image of my body cam showing the Ziploc bag on

12   the center console along with the clear plastic cup and the

13   rolling paper on the driver's lap.

14   Q    Does Government Exhibit 17 fairly and accurately depict

15   the February 7, 2021, incident involving the stop and arrest

16   of the defendant?

17   A    Yes.

18          MR. MARSHALL:  Your Honor, the Government offers

19   Government Exhibits 16 and 17 into evidence.

20          MS. EISNER GRYNBERG:  No objection.

21     (Government Exhibits 16 and 17 received into evidence)

22          THE COURT:  Okay.  I hear you.  You're kind of

23   speeding up the pace of the questions.  If you're not going

24   to finish in the next, you know, five minutes -- and maybe

25   even if you are -- we probably still need to schedule a

1   continuation of this hearing.  But if you're -- you know, if

2   all you're doing is putting in evidence, let me know.  Maybe

3   it's evidence the defense does not object to --

4              MR. MARSHALL:  I --

5              THE COURT:  -- admitting.

6              MR. MARSHALL:  I think that's largely it, Your

7   Honor.  I have maybe two or three more questions.

8              THE COURT:  Okay.  Then please.  And if you want to

9   reschedule it, like if we need to carry this over to another

10  day, I'm not saying that we shouldn't do that.  I'm just

11  saying --

12             MR. MARSHALL:  All right.

13             THE COURT:  -- I don't need you to rush through it

14  today.

15             MR. MARSHALL:  I appreciate that, Your Honor.  I

16  think we could wrap it up quick.

17             THE COURT:  Okay.

18  BY MR. MARSHALL:

19  Q    Officer Hassan (sic), I'm showing you here Government

20  Exhibit 17, what's in front of you.  Can you identify what

21  the right arrow points to?

22  A    I'm sorry.  Could you say that again?

23  Q    The red arrow in Government Exhibit 17, what is that

24  pointing to?

25  A    That is pointing toward -- to the wrapping paper.

Martinez - Direct - Marshall                    196

1    Q    Okay.  And the green arrow, what is that pointing to?

2    A    That's the Ziploc bag on the center console.

3    Q    And you observed these things when you were standing

4    outside the car, correct?

5    A    Correct.

6    Q    Was there anything else in the center console at the

7    time?

8    A    Yes.  There was also the clear cup containing ashes.

9    Q    Okay.  Okay.  Please take a look at Government Exhibit

10   12 in evidence.  Is that the clear cup you're referring to?

11   A    Yes.

12   Q    And those are the ashes?

13   A    Correct.

14   Q    Okay.  And is this where the cup and the marijuana bag

15   were at the time of the stop?

16   A    Yes.

17   Q    Officer Martinez, did you have any reason to believe

18   that those ashes were from marijuana?

19   A    Could be.

20   Q    Okay.  Did you have any reason to believe that they were

21   from cigarettes?

22   A    Based on the odor of -- the strong odor of marijuana, I

23   wouldn't think it would be cigarettes.

24   Q    Okay.  Did you find cigarettes in the car?

25   A    No.

Martinez - Direct - Marshall                          197

1    Q    Okay.  But did you find marijuana in the car?

2    A    Yes.

3    Q    Okay.  All right.  Officer Martinez, if you could just

4    run us through what happened next after that?

5    A    We asked him to step out of the vehicle.  We then

6    proceeded to escort him to the rear of the vehicle.  And

7    that's when me and Officer Hassan conducted the search of the

8    vehicle.  I started with the front passenger side and then

9    made my way to the back, to the rear passenger side.

10   Q    And then what happened?

11   A    That's when they came across a book bag.  I moved the

12   book bag towards my way.  I removed a Febreze container out

13   the way.  And that's when I saw the firearm.

14   Q    Okay.  The Febreze container, are you aware of why that

15   was -- withdrawn.  Where was the Febreze container?

16   A    It was inside the book bag.

17   Q    Okay.  And then what happened after that?

18   A    I saw the firearm.  I advised my partner, Officer

19   Hassan, 92, which means an arrest situation.  I then heard

20   like a scuffle in the back.  I came out the vehicle, and I

21   saw Kyle Balkissoon attempting to flee.

22   Q    Did you -- were you aware of what the defendant was

23   doing as you went to search the back seat of the car?

24   A    No.

25   Q    Okay.  Did you -- where was he?

1   A    He was in the back, the rear.

2   Q    Okay.  And did you see at any point what he was doing?

3   A    He was facing my way at the time I made my way to the

4   back.

5   Q    Okay.  And after you found the gun and defendant was

6   caught, what happened with the vehicle?

7   A    The vehicle was taken to the 67th Precinct.

8   Q    Okay.  What about the gun?

9   A    It was also taken to the 67th Precinct.

10  Q    And the marijuana?

11  A    It was also taken to the 67th Precinct.

12  Q    Are you aware of who took all of those items to the 67th

13  Precinct?

14  A    Officer Hassan.

15  Q    One last question.  Officer Martinez, do you typically

16  patrol with your windows open?

17  A    Yes.

18  Q    Are you aware of whether you had your windows open on

19  that night?

20  A    Yes, they were open.

21          MR. MARSHALL:  All right.  Nothing further, Your

22  Honor.

23          THE COURT:  Thank you.

24          MS. EISNER GRYNBERG:  This will be very brief.  I

25  think we can get it in.

Martinez - Cross - Eisner Grynberg                    199

1          THE COURT:  Okay.  Let's do it.

2                     CROSS EXAMINATION

3     BY MS. EISNER GRYNBERG:

4     Q    Officer Martinez, on February 7th, you were assigned to

5     do what's called specialized enforcement, right?

6     A    Yes.

7     Q    What was the specialized enforcement that you were

8     doing?

9     A    We just usually patrol for violent crimes, violent

10    offenders, gang members --

11    Q    That's what made it -- that's what made it specialized,

12    right?  That's what you were looking for?

13    A    Yeah, you could say that.

14    Q    Your job that day was as the recorder, right?

15    A    Yes.

16    Q    That means you're the one that's documenting what's

17    happening as it happens, correct?

18    A    Yes.

19    Q    And one of the ways that you do that is in your activity

20    log, correct?

21    A    Correct.

22    Q    And you also do that through the use of your body

23    camera?

24    A    Correct.

25    Q    You said that you were driving in Officer -- Modesto was

1    driving, and you were in the front passenger seat, right?

2    A    Yes.

3    Q    And that's when you approached, and you saw

4    Mr. Balkissoon's Mercedes, you say, in the crosswalk,

5    correct?

6    A    Yes.

7    Q    At that time when you were still in your police car, you

8    didn't turn on your body camera, correct?

9    A    Correct.

10   Q    So we can't see from your body camera footage where his

11   car was at the time you approached, correct?

12   A    You could see it in the crosswalk as I'm --

13   Q    While you were still in the -- while you were still

14   inside the police car?

15   A    While I was still inside the vehicle?  No.

16   Q    While you were still inside the police car, you looked

17   through Officer Modesto's driver's side window, and you

18   looked inside to see Mr. Balkissoon, correct?

19   A    Yes.

20   Q    You saw that he had no passenger.  It was only him,

21   right?

22   A    Yeah.

23   Q    And when you were looking from your vantage point as the

24   recorder into his car, you did not see him rolling a

25   marijuana cigarette, correct?

Martinez - Cross - Eisner Grynberg          201

1    A    Could not see it from my point.

2    Q    Okay.  Eventually when you got up to the car, you found

3    that factory sealed package of marijuana you said, right?

4    A    Yes.

5    Q    And no marijuana cigarette?

6    A    No.  No marijuana cigarette.

7    Q    You decided to turn on your body camera at the point

8    when Officer Hassan was taking Mr. Balkissoon out of the

9    vehicle.  Is that fair?

10   A    No.  He was still in the vehicle.

11        MS. EISNER GRYNBERG:  Let's go to Government

12   Exhibit 16, please.

13        THE CLERK:  On your --

14        MS. EISNER GRYNBERG:  On the computer.  And let's

15   put it at approximately 58 seconds.  Before you start playing

16   it --

17   BY MS. EISNER GRYNBERG:

18   Q    I'm right that the way a body camera works is when you

19   press go, it captures the one minute that happened before you

20   activate it, correct?

21   A    Yes.

22        MS. EISNER GRYNBERG:  Okay.  So let's play from

23   1:24:53.

24        (Body camera footage played)

25        MS. EISNER GRYNBERG:  We're at 1:25:11.

1    BY MS. EISNER GRYNBERG:

2    Q    So you're right.  You decided to turn on your body

3    camera about 15 seconds before Mr. Balkissoon got out of the

4    car, correct?

5    A    Uh-huh.  Yes.

6    Q    After you guys were already conducting the car stop,

7    right?

8    A    Yes.

9    Q    At this point when Mr. Balkissoon gets out of the car,

10   you began, you said, to search the inside of the car, right?

11   A    Correct.

12   Q    And your job was to search the passenger side?

13   A    Correct.

14   Q    You first searched the front passenger seat and found

15   nothing, right?

16   A    Yeah.

17   Q    You then decided to move to the back?

18   A    Correct.

19   Q    I'm going to play for you Government Exhibit 16 from

20   2:47 on the counter to 3:06.  This is the same exhibit that

21   we have open.  So we're starting at 1:26:42.

22        (Body camera footage played)

23        MS. EISNER GRYNBERG:  Let's go back to 2:47.

24   BY MS. EISNER GRYNBERG:

25   Q    Okay.  So I'm at 1:26:42 on Government Exhibit 16.  This

Martinez - Cross - Eisner Grynberg                203

1    is your body camera, right?

2    A    Yes.

3    Q    So the hand that we see in the bottom left foreground of

4    the image, that's you and your flashlight, correct?

5    A    Yes.

6    Q    And behind the car, we can see your partners and

7    Mr. Balkissoon behind the car, right?

8    A    Yes.

9    Q    So this is the point when you are approaching, we saw,

10   the back seat in order to search, correct?

11   A    Yes.

12   Q    And it's fair to say that at this point, Mr. Balkissoon

13   was behind the trunk of the vehicle, correct?

14   A    Yes.

15   Q    Where you're standing right here, where you're searching

16   his back seat, you were not able to reach out and touch

17   Mr. Balkissoon from where your feet were at that point,

18   right?

19   A    No.

20   Q    And from where he was standing, while you were

21   searching, he was not able to reach into the car, right?

22   A    No.

23   Q    Where he's detained at the back of the car there, he's

24   not able to reach the backpack, right?

25   A    No, not from where he's at right there.  No.

Martinez - Cross - Eisner Grynberg                204

1          MS. EISNER GRYNBERG:  Okay.  Let's play it again.

2    We're at 1:26:42.

3          (Body cam footage played)

4          MS. EISNER GRYNBERG:  We're at 1:26:57.

5    BY MS. EISNER GRYNBERG:

6    Q    What we saw you do here is grab the backpack, right?

7    A    Yes.

8    Q    The backpack had been on the driver's side rear seat,

9    right?

10   A    Yeah.

11   Q    And you moved it over towards yourself on the passenger

12   side, correct?

13   A    Yes.

14   Q    And you started taking things out of it, right?

15   A    Yeah.  I took the Febreze.

16   Q    And it was after you took the Febreze out of it that you

17   began moving things around inside of the backpack, right?

18   A    Yeah.

19   Q    It was only after you took out the Febreze and began

20   moving things around inside of the backpack that you first

21   observed the gun, right?

22   A    Yes.

23          MS. EISNER GRYNBERG:  That's it.  Thank you.

24          THE COURT:  Government has no further questions?

25          MR. MARSHALL:  No, Your Honor.

1          THE COURT:  Okay.  Can I ask two questions?  Can

2     you estimate -- maybe we can pull up the part of the video

3     that we were looking at moments ago where your body camera is

4     facing the back bumper of the car.  I don't know who's in

5     control of the --

6          MS. EISNER GRYNBERG:  Yes.

7          THE COURT:  Thank you.

8          MS. EISNER GRYNBERG:  Is this the image you're

9     looking for, Judge?

10          THE COURT:  Yeah, I think so.  It may be that he

11     sort of turns a little bit to his left either before or after

12     that.  Well, maybe that -- yeah.

13          (Body cam footage played)

14          THE COURT:  There you go.  Perfect.  Thank you.

15          If I were interested in the question of what is the

16     approximate distance from the back of the back passenger side

17     door on the one hand to the rear of the car, meaning the back

18     corner where the side meets the back bumper, could you

19     estimate that distance?

20          THE WITNESS:  I would say -- estimate two feet

21     maybe.

22          THE COURT:  Yeah.  I'll say, just from my -- that

23     it -- that -- I might have guessed a somewhat higher number

24     than that.  But I will just observe from the video, and the

25     parties will correct me in their submissions if I'm wrong,

1    that we're looking at a front engine car where the passenger

2    compartment is -- I think the middle of the passenger

3    compartment is behind the middle of the car's full length.

4              And the distance from the back of the back doors to

5    the back corner of the car does seem relatively abbreviated

6    to me.  This is not an SUV.  It's a sedan which does not

7    appear to have the world's largest trunk, although I'm

8    getting, you know, obviously, beyond the scope of my ability

9    to ascertain things just from eyeballing the video at this

10   point.

11             But, you know, we can, by the way, dismiss the

12   witness.  I'm sorry.

13             You can step down, and thank you.

14             You know, at some point, we're going to have to

15   decide what the legal definition of reaching distance is and

16   apply that to whatever we believe to be the distance here.

17   And I leave it to the parties.  You know, I think there

18   probably is not going to be that much dispute about distances

19   on a 2015 -- what model year did we say this car was?

20             MS. EISNER GRYNBERG:  Yes, Judge.

21             THE COURT:  E Class Mercedes?  This may be the kind

22   of thing the parties can actually agree on as we go forward.

23   So that was question one.

24             And then I am interested in the question of whether

25   this team, the Public Safety Unit of the 67 Precinct, has

1    made either arrests or issued desk tickets to defendants who

2    are being brought in for possession of marijuana and nothing

3    else or driving under the influence of marijuana and nothing

4    else.  In other words, is that number zero or non-zero

5    positive?

6              And just to frame the other issues that are of

7    interest to me for the parties, you know, I posed this

8    question about whether and to what extent the presence of

9    contraband of Type A quantity X gives rise to a reasonable

10   inference that there is additional contraband beyond X in the

11   car.

12             And I think it might, just from a common sense

13   perspective, depend a little bit on the type of contraband at

14   issue.  Right?

15             If somebody's got one image of child pornography, I

16   would wager that that person's more likely than not to have

17   additional images on their computer.  But I might be less

18   willing to wager that somebody driving with a bottle of Vodka

19   on their lap has an additional bottle of Vodka in the glove

20   compartment.

21             And so I'm just interested in the -- in what the

22   courts have had to say about this question, if the scope of

23   the search that's authorized, either under the automobile

24   exception or the search incident to arrest doctrine, is the

25   right to search additional areas of the car and containers as

208

1    to which the officers have probable cause to believe

2    additional contraband may be located.

3            Again, I can't believe we're the first court to be

4    taking up the question of whether that inference is

5    reasonable or unreasonable in circumstances, I would assume,

6    almost identical to the ones we're dealing with here today.

7            And then my last question is, to what extent do the

8    police officers' subjective intentions matter?  And I can be

9    even more specific as to what subjective intentions I'm

10   talking about.

11           The defense, I think, is pressing the argument, if

12   I understand correctly, that these police officers had no

13   intention of arresting Mr. Balkins -- Balkissoon if all they

14   found was marijuana in approximately they quantity they had

15   discovered.

16           And indeed, we might be even more likely to agree

17   with that argument in light of the evidence that, you know,

18   earlier in the same evening, they had encountered another

19   driver who had also been committing a traffic infraction,

20   also sitting in a car from which the odor of marijuana was

21   emanating, also found marijuana in that person's car and,

22   yet, they chose to just move on with their life and not

23   arrest that person.

24           So if we assume -- I'm not saying this is the case.

25   But if we assume that if the police officers have a

1    subjective intention to move on with -- without making any

2    arrest if all they find is marijuana, what is the legal

3    relevance of that subjective intention, if any, under the

4    legal doctrines we're talking about?

5                Is that clear enough?

6                MS. EISNER GRYNBERG:  Yes.

7                MR. MARSHALL:  Yes.  Thank you, Your Honor.

8                THE COURT:  Okay.  I think that's all my questions.

9                No.  The only other question I had was, it's

10   unclear to me at this point where the defense is taking the

11   position that one or more of the officers we heard from today

12   violated a policy of the NYPD by turning the body camera on

13   later than you suggest they otherwise should have.

14               Are you just saying we don't have this evidence,

15   and that was because you exercised your discretion to turn on

16   the body camera late?  Or are you saying we don't have this

17   evidence, and it's because you violated your training or

18   other obligations as a NYPD officer?

19               MS. EISNER GRYNBERG:  I think it's both.

20               THE COURT:  Okay.  Okay.  Anything else?

21               MR. MARSHALL:  Your Honor?

22               THE COURT:  Yeah?

23               MR. MARSHALL:  Can I just -- on that point as far

24   as, you know, whether they were following the policy or

25   whether them turning it on at that point violated the policy,

1    would you just clarify what -- why, in the Court's view, that

2    particular issue is relevant?

3              THE COURT:  I mean, look, I think we're going to

4    hear the argument from the defense -- and, you know, they may

5    need to put in some affirmative evidence of this to support

6    it.  But if -- you know, the defense is not conceding that

7    the car was parked in the crosswalk, right?  We heard that at

8    the outset tonight.

9              And it may be -- maybe not -- that they're going to

10   argue that the Court should not conclude that the car was,

11   indeed, parked in the crosswalk before the body cameras get

12   turned on.

13             And maybe I would conclude that anyway.  Maybe I

14   would adopt the defense's argument.  I don't know.  But, you

15   know, in that determination, it might or might not be

16   relevant that -- you know, the Government has the burden of

17   proving by a preponderance, I think, that the car was in the

18   crosswalk if they're going to rely on that as the basis for

19   some subsequent process.

20             And, you know, in considering whether you've

21   carried your burden on that, it may or may not be relevant

22   that the officers violated a policy by turning their body

23   cameras on later than required, if, indeed, that's what's

24   required.  It may not be relevant, but I don't -- as I sit

25   here today, I don't know.

1          MR. MARSHALL:  Thank you, Your Honor.

2          THE COURT:  And it just was unclear to me what

3     position the defense was taking.  Okay.

4          THE CLERK:  Do you want to set a deadline for the

5     submissions?

6          THE COURT:  I do.  Thank you.

7          MR. MARSHALL:  Yeah.  Your Honor, just one

8     additional point.  To my knowledge, the defense hasn't put in

9     any -- in the form of an affidavit, any information

10    supporting the idea that the car was not parked in the

11    crosswalk.  In fact --

12         THE COURT:  Right.

13         MR. MARSHALL:  -- it seemed that they said that it

14    was, in fact, parked in the crosswalk according to the

15    defendant's declaration.  And so I just ask whether the Court

16    would require that at this point.

17         THE COURT:  Well, it's -- you know, if there's no

18    evidence on the defense side of the equation on one or more

19    of these questions, then, you know, that's going to be the

20    defense's problem.  I'm not going to require them to put in

21    evidence that they don't feel inclined to put in.

22         But let me just check again.  So the motion to

23    suppress -- did you just say that the brief affidavit we do

24    have from Mr. Balkissoon actually concedes that he's in the

25    crosswalk?  He says, "It had been snowing, so I pulled over

1    as close to the curb as I could."

2              MR. MARSHALL:  Your Honor, I think the issue here

3    is that the defense needs to create a -- has the burden of

4    creating a factual -- a dispute as to a factual -- material

5    issue of fact regarding whether the defendant was, in fact,

6    parked in the crosswalk.

7              THE COURT:  Yeah.  I agree with you.

8              MR. MARSHALL:  All right?

9              THE COURT:  I agree.  And we have three officers'

10   testimony now that he was, that he was at the beginning, that

11   the car never moved from there.

12             And all we have on the other side of the equation

13   is, you know -- well, is, you know, cross-examination

14   designed to undermine their credibility.

15             And you could imagine a situation where somebody's

16   credibility is so sufficiently undermined that, you know, you

17   don't have a prima facie case or a preponderance of the

18   evidence.  I'm not suggesting this is that case.

19             MR. MARSHALL:  Right, Your Honor.

20             THE COURT:  Like --

21             MR. MARSHALL:  I just -- it's my understanding that

22   the defense has the burden to -- you know, even to get a

23   hearing on the issue to put forward evidence creating a

24   factual --

25             THE COURT:  Oh, I see what you're saying.

1          MR. MARSHALL:  -- dispute as to fact -- as to a

2     factual -- or creating a factual dispute.

3          So as -- whereas here where the defense hasn't

4     actually put in any affidavit regarding -- or disputing the

5     fact that the defendant actually parked on the crosswalk or

6     was standing on the crosswalk, it doesn't seem that they've

7     created a -- or pointed to a factual dispute on that issue.

8          MS. EISNER GRYNBERG:  May I respond, Judge?

9          THE COURT:  I mean, we -- we've had a fact hearing

10    now.  So, you know, it may be that I offer them an

11    opportunity to put in evidence through cross-examination that

12    they might not otherwise have had.

13          I do think we had disputes of fact, at least, about

14    whether he was rolling marijuana in his lap.  There were

15    other disputes of fact: you know, where he was standing

16    exactly in relation to the car at what time.

17          Yeah.  You may be right that no matter what they

18    say about the obligation to turn the body cameras on at a

19    previous time, it doesn't affect the outcome here.  I just

20    wanted to know what the defense was arguing and what they're

21    not arguing.  Does that --

22          MS. EISNER GRYNBERG:  I think that's --

23          THE COURT:  -- wrap things up on this issue?

24          MS. EISNER GRYNBERG:  Yes.  That's right.

25          THE COURT:  Okay.  And, you know, and they'll tell

1    us.  And if you think it's irrelevant, you'll tell me why

2    it's irrelevant.  But at least I'll know what argument I'm

3    hearing from the defense.

4              MR. MARSHALL:  Thank you, Your Honor.

5              THE COURT:  All right.  Thank you, all.  I

6    appreciate you wrapping this up as quickly as we did.

7              We should set a schedule for the parties to brief

8    the issue.  When should the defense submission be due from

9    here?

10             MS. EISNER GRYNBERG:  Are you looking for me to

11   file and the Government to respond?

12             THE COURT:  Yes.

13             MS. EISNER GRYNBERG:  Can I have until the 27th?

14             THE COURT:  That's fine.  I'm going to say two or

15   three weeks for the Government to respond.

16             MR. MARSHALL:  Your Honor, if it would be

17   acceptable to the Court, three weeks would be great.

18             THE COURT:  Remind me, Ms. Guy, do we have a trial

19   date in this case?

20             THE CLERK:  We do not.

21             THE COURT:  Okay.  Three weeks is fine.

22             THE CLERK:  November 17th.

23             THE COURT:  And do we have a status conference?

24             THE CLERK:  We do not.

25             THE COURT:  Let's put this case on for a status

1      conference in -- if the Government's response is due November

2      17th, in the first half of December, please.

3              MS. EISNER GRYNBERG:  And, Judge, if there's a

4      reason to reply to the Government's brief, should I just do

5      that sometime between, or will there be a deadline?

6              THE COURT:  Do that within seven days, let's say.

7              MS. EISNER GRYNBERG:  Okay.

8              THE COURT:  Thank you.

9              THE CLERK:  Let's do Monday, December 13th at -- do

10     you want to do this in person, by phone?

11             THE COURT:  Let's do it in person.

12             THE CLERK:  In person?

13             THE COURT:  Because we'll be talking about these

14     issues.

15             THE CLERK:  Okay.  So then let's do it Monday,

16     December 13th at 9:30.

17             MS. EISNER GRYNBERG:  If we're going to be in

18     person, can we do 10:00?  Is that possible?

19             THE CLERK:  Yes, we can.

20             MS. EISNER GRYNBERG:  Thank you.

21             THE COURT:  All right.  Are we all set?

22             THE CLERK:  Yes, Judge.

23             THE COURT:  All right.  Thank you, all.  We're

24     adjourned.

25             MS. EISNER GRYNBERG:  Thank you.

216

1          MR. MARSHALL:  Thank you, Judge.

2     (Proceedings concluded at 4:03 p.m.)

3

4               I, CHRISTINE FIORE, Certified Electronic

5    Court Reporter and Transcriber, certify that the foregoing is

6    a correct transcript from the official electronic sound

7    recording of the proceedings in the above-entitled matter.

8

9

10          *Christine Fiore*

11    _____          October 14, 2021

12         Christine Fiore, CERT

13

14

15

16

17

18

19

20

21

22

23

24

25

217

INDEX

WITNESSES

FOR THE

| GOVERNMENT: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Fabian Modesto | 19 | 58 | 84 | 88 |
| (Voir Dire) | 27 | | | |
| Haroonul Hassan | 101 | 138 | 181 | 186 |
| (Voir Dire) | 112/124 | | | |
| Julio Martinez | 188 | 199 | | |

GOVERNMENT'S

EXHIBITS:                                                    Received

| 1 | Google map of E. 34th and Cortelyou | 28 |
|---|---|---|
| 1A | Markup E. 34th and Corelyou map | 31 |
| 2 | Google map of E. 34th and Cortelyou | 28 |
| 3 | Markup E. 34th and Corelyou map | 31 |
| 4 | Modesto Body camera footage | 38 |
| 5 | Modesto Body camera footage | 38 |
| 6 | Modesto Body camera footage | 38 |
| 7 | Modesto Body camera footage | 38 |
| 16 | Martinez body camera footage | 194 |
| 17 | Photo of Martinez body camera footage | 194 |