**Federal Defenders**
OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and
Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

October 27, 2021

**Via Email and ECF**
The Honorable Eric Komitee
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

        Re:    <u>**United States v. Kyle Balkissoon, 21-CR-186 (EK)**</u>

Dear Judge Komitee,

On October 6, 2021, this Court held a suppression hearing in the above-captioned case. At the outset, the Court framed for the parties the question that resolves this case: "The officers obviously have probable cause to believe that there's marijuana in the vehicle because they see it right in the center console. But then they continue to search the vehicle for more evidence. And the question is what is the source of their legal authorization to open the backpack and dig through it?" Transcript of Criminal Cause for Suppression Hearing ("Hrg. Tr.") at 6:16-22 (attached for the Court's reference as Ex. A.). The answer is none. On the specific facts of this case, the police lacked any legal authorization for the warrantless search of Balkissoon's backpack, on the back seat of his car. The gun found there must be suppressed.

**I.**    **Facts Adduced at Suppression Hearing**

The government called three New York City Police Department ("NYPD") officers, Officers Fabian Modesto, Haroon Hassan, and Julio Martinez, all of whom worked at the time of the arrest in the 67th Precinct. Each were assigned together to the public safety unit, a specialized unit focused on violent crimes, and specifically, looking for firearms. Hrg. Tr. at

1

20:3-7; 59:3-7; 139:11-16; 199:7-13.  The majority of arrests made by their team were gun arrests.  *Id*. at 59:16-18.

On the evening of February 6, 2021, the testifying officers travelled in two unmarked police vehicles, one driven by Modesto, with Martinez beside him; Hassan drove the second unmarked car.  *Id*. at 21:19-23; 104:1-5.  The officers' unmarked cars did not contain dashboard cameras, but each police officer was equipped with a body-worn camera on his chest.  *Id*. at 61:12-16.  NYPD body-worn cameras record video at all times.  *Id*. at 50:1-9.  To activate the camera, the officer taps the camera twice.  *Id*.  Activating the camera does two things: it preserves one minute of video footage preceding the tap, and moving forward, and it begins to record and preserve audio.  *Id*.  Any footage prior to the one-minute buffer period before activation is not retained.  *Id*. at 62:25; 63:1-2.

While on routine patrol in the 67th Precinct, the officers came upon Balkissoon in the driver's seat of a black Mercedes near the northeast corner of East 34th Street and Cortelyou Road, in Brooklyn.  *Id*. at 104:22-25.  The officers testified that they observed Balkissoon's vehicle blocking the pedestrian ramp on the northeast corner diagonally, and partially covering the crosswalk.  *Id*. at 24:9-14; 105:1-6; 190:2.  Behind his car, half of the crosswalk was accessible.  *Id*. at 32:6-9; 67:15-17.  The lead car radioed the rear car to conduct a car stop.  *Id*. at 38:23-25; 39:1-2; 105:8-14.

None of the three police officers activated his body camera prior to effectuating the car stop.  *Id*. at 49:14-18; 145:7-10; 200:7-15; 202:2-8.  None of the three police officers activated his body camera until at least several minutes into the car stop, and at least one minute after asking Balkissoon for his license and registration.  *Id*. at 152:19-25; 153:1-8.  The officers did not retain any video footage of where Balkissoon's car was located when police initially

2

approached. *Id*. at 72:4-6. The officers did not retain any video footage of whether Balkissoon's vehicle was moving or parked, or how it ended up on half of the crosswalk, in front of the pedestrian ramp. *Id*. at 72:7-18; 74:6-10. Modesto testified that he had been trained that he is supposed to activate the body camera when he observes a potential crime in progress. *Id*. at 62:9-12. The Civil Complaint Review Board had previously determined that he activated his camera late in a different case. *Id*. at 25:12-15. Here, he "kind of got distracted a little bit" and did not activate his camera until the team had already determined that they were going to ask Balkissoon to step out. *Id*. at 49:19-23.

There was a significant quantity of snow on the ground, on the sidewalk, and on the sides of the road where it had been plowed. *Id*. at 28:13-17; 63:23-25. The snow covered the entire width of the crosswalk, and was several feet high at certain points. *Id*. at 66:17-25. It was not possible to cross the street, from end-to-end, via that crosswalk. *Id*. at 67:1-6. When they eventually stopped their police vehicles, each officer parked in the middle of the street, as there was nowhere else to park. *Id*. at 64:3-7, 17-24-25; 65:1.

The driver of the lead vehicle, Modesto drove up next to Balkissoon, placing his unmarked police car parallel to him. *Id*. at 25:9-13. He observed Balkissoon in the driver's seat, with his head down and his hands in front of him. *Id*. at 25:23-25. It appeared to him that Balkissoon was rolling a marijuana cigarette; there was rolling paper on his lap. *Id*. at 26:2-4; 39:13-15. In Modesto's passenger seat, Martinez did not see Balkissoon rolling a marijuana cigarette. *Id*. at 200:23-25; 201:1. Before exiting the police car, Modesto testified that there was a slight smell of marijuana in the air that he believed was coming from the Mercedes. *Id*. at 41:7-18. Modesto testified that Balkissoon's front passenger window was open. *Id*. at 42:13-16. Hassan testified that Balkissoon's front driver's side window was open. *Id*. at 106:4-8.

3

Hassan approached Balkissoon in the driver's seat to inquire about how he was parked. *Id*. at 106:1-3. As he approached, he testified that he smelled an odor of marijuana from the vehicle. *Id*. at 106:13-15. Martinez approached the front passenger seat. *Id*. at 197:8-9. He too testified that he smelled marijuana. *Id*. at 192:18-21. Hassan and Martinez observed on Balkissoon's lap what looked like a brown leaf, referred to as fronto leaf, but he was not rolling a marijuana cigarette. *Id*. at 106:16-23; 145:20-25; 146:1-4; 184:15-17; 191:4-9. The fronto leaf appeared like a long, crinkled piece of paper, running across the length of the driver's seat, before doubling back about half to three-quarters of the way. *Id*. at 165:18-25; 166:1-6; 169:1-4. In the center console, Hassan and Martinez observed one small, factory-sealed, commercial package of marijuana. *Id*. at 107:2-10; 191:4-9; 201:2-6. No officer found any marijuana cigarette, or any loose, burning, or burnt marijuana in the vehicle at any point. *Id*. at 146:7-9, 18-23; 147:15-23; 148:9-13. The center console held a clear cup containing ashes. *Id*. at 111:8-10; 191:4-9. There was also a Ziploc bag containing stems, which Hassan identified as pieces of the fronto leaf, which are removed so as not to break the leaf. *Id*. at 116:2-23.

Officers did not voucher, or retain, the long, crinkled fronto leaf, the plastic cup, or the Ziploc bag. *Id*. at 169:1-4. Seven months after the car stop and arrest, Hassan returned to the vehicle, and found on the driver's side floorboard an item approximately two inches long by one inch wide, which he believed to be a remnant of the fronto leaf. *Id*. at 121:15-23; 122:3-14; 124:2-18; 169:24-25; 170:1. The government admitted this bit of material as Government Exhibit 13.

When Hassan reached Balkissoon, he asked for his license, registration, and proof of insurance, all of which Balkissoon provided. *Id*. at 113:22-24. He testified that at least one minute before activating his body worn camera, he had mentioned the smell of marijuana to the

4

driver. *Id*. at 113:24-25; 152:4-18.  Hassan testified that Balkissoon picked up the package on the center console, waved it at the officer, and stated, "this is all I have." *Id*. at 113:24-25; 114:1-3.

Because there was marijuana in the car, Hassan directed Balkissoon to step out of the car. *Id*. at 114:6-10.  First, he conducted a pat-down of Balkissoon's person, finding only keys. *Id*. at 162:9-11.  Balkisoon was escorted to the rear of the vehicle by Modesto. *Id*. at 79:3-13.  Modesto stood directly in front of him, with Officer Gomez and another officer on his sides. *Id*.; *id.* at 88:20-25; 89:1-6.  Balkisson was detained, and was not allowed to leave the car stop. *Id*.  The officers decided not to place handcuffs on him, but rather to surround him with officers. *Id*. at 89:7-24.  Modesto testified that this was the mechanism the team used to detain an individual for every car stop. *Id*. at 89:13-18.

While officers detained Balkissoon at the rear of the vehicle, Hassan searched the driver's side of the vehicle, first the front, then the rear. *Id*. at 45:9-12; 128:8-25.  Martinez searched the passenger side of the vehicle in the same order. *Id*. at 197:5-13.  The officers searched under the seats, compartments within the seats, behind the seat cushions, behind padding on the seats, and inside of the doors. *Id*. at 175:5-23.  Hassan found nothing additional on the driver's side.  Martinez found a book bag on the backseat, on the driver's side. *Id*. at 54:16-22.  He moved the bag towards him, on the passenger side. *Id*. at 197:5-13.  He removed a Febreze container and began moving items around inside the backpack. *Id*.; *id*. at 204:14-22.  It was only after taking out the Febreze and moving items around that Martinez first observed a gun in the backpack. *Id*.

While Hassan and Martinez searched the car, Balkissoon was in front of the trunk. *Id.* at 203:9-14.  Modesto testified that from where Balkissoon was standing, he could not reach into the backpack in the back seat. *Id*. at 79:23-25; 80:1-3.  His left arm could not reach into the back

5

seat; neither could his right arm. *Id*. at 80:4-8. "At the time of the search by Officer Martinez of the back seat, Mr. Balkissoon was not in reaching distance of whatever was in the back seat." *Id*. at 80:9-12. Martinez agreed that from where he was searching, he was not able to reach out and touch Balkissoon, and Balkissoon was not able to reach into the car from where he was standing at the time of the search. *Id*. at 203:12-25. Where he was detained at the at the back of the car, he was not able to reach the backpack. *Id*. The overall width of a 2015 Mercedes-Benz E 350 is 73 inches; the length is 191 inches. *Used 2015 Mercedes-Benz E-Class E 350 Luxury 4MATIC Sedan Specs & Features*, Edmunds (Oct. 27, 2021), at https://edmu.in/3jHiSUo. After Martinez began searching the backpack, Balkissoon ran from the officers, but was quickly apprehended. *Id*. at 47:10-13.

The officers were aware at the time of the arrest that New York's marijuana laws had changed in August of 2019. *Id*. at 82:8-11; 154:20-25. They understood that marijuana possession was decriminalized, and was now an infraction, akin to blocking a crosswalk. *Id*. The officers knew that possession of small quantities of marijuana was now a summonsable offense, punishable only by a fifty-dollar fine. *Id*. Earlier in the evening of Balkissoon's arrest, the same team made a car stop at Tilden and New York Avenue, in Brooklyn. *Id*. at 156:23-25. The car was double parked, a traffic infraction. *Id*. at 157:1-7. The officers smelled marijuana, and saw visible marijuana. *Id*. at 157:8-12. Hassan agreed that it was "exactly like this case: a traffic infraction, an odor of marijuana, and then visible marijuana." *Id*. at 157:13-15. But "there was no arrest to be made," and the officers did not make one. *Id*. at 158:6-14. Nonetheless, the officers believed that at that time they stopped Balkissoon, if they saw one bag of marijuana, they were permitted to search the entire car, and even bags within that car, for additional marijuana. *Id*. at 44:5-12; 59:21-25; 60:1-11; 76:25; 77:1-3, 14-18; 78:3-10.

6

**II.      Legal Analysis**

This case presents two issues. First, has the government met its burden to prove that officers had reasonable suspicion when they stopped Balkissoon's car? If not, all evidence gathered subsequently must be suppressed as fruit of the poisonous tree. *Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963). If so, did officers have a lawful basis to search the contents of a backpack on the back seat of his car? If not, the firearm must be suppressed.

    a.   <u>The Government Has Failed to Establish Reasonable Suspicion Justifying the Stop of Balkissoon's Vehicle</u>

The Court need not reach the search of the vehicle, because the government has failed to sufficiently establish that the officers had a basis to stop his car in the first place. Though each officer testified to his alleged observations of Balkissoon's vehicle, each violated the plain terms of the NYPD Patrol Guide in failing to record the initial car stop. NYPD Patrol Guide Procedure No. 212-123, available at https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/212-123.pdf, clearly requires the "mandatory activation of Body-Worn Camera (BWC) for all uniformed members of the service" in certain circumstances. At the time of Balkissoon's arrest, all three testifying officers were uniformed officers subject to this policy. Accordingly, they were required—it was "mandatory"—to activate their BWC "<u>prior to engaging in, or assisting another uniformed member of the service with</u>, the following police actions" which occurred here: "interactions with persons suspected of criminal activity," NYPD P.G. 212-123 (4)(e); and "vehicle stops," *id*. at 4(g). Officers are required to "begin recording prior to arrival at incident location when mandatory activation is required." *Id*. at 8.

It is beyond dispute that all three officers failed to comply with the mandatory activation policy, as, at a bare minimum, they each failed to activate their cameras prior to the vehicle stop. In so doing, the officers simultaneously deprived this Court of the best evidence of the location

7

of Balkissoon's vehicle at the time of the stop, and call into question the credibility of their testimony.  The government has the burden of establishing the legality of the stop of Balkissoon's vehicle.  Aware of this policy, as at least Officer Modesto was—and had been disciplined for violating it in the past—none of the officers opted to take the simple step of tapping their camera to record the alleged located of Balkissoon's vehicle.  As a result, that footage, which would have clearly resolved the matter, is lost.  The Court should take a negative inference from the officers' collective and individual unwillingness to follow the mandatory activation requirements.  If they so flagrantly violate the rules of the body camera policy, which exists to police the police, their uncorroborated testimony that Balkissoon was blocking the pedestrian ramp upon their initial approach is incredible.

    Further, under the unique circumstances present on the northeast corner of East 34th Street and Cortelyou Road on the winter night in question, the government has not proven that Balkisoon's car, even if parked as depicted on the belated body-worn footage, was not parked as "necessary to avoid conflict with other traffic."  N.Y.V.T.L. § 1202(a)(d).  Given the feet-high and feet-wide snow drifts secondary to a snowstorm and plowing, the crosswalk the officers allege Balkissoon to have blocked was fully impassable.  Neither was there any space for them to park their own vehicles.  Given these unusual winter road conditions, Balkissoon's placement of his car, ensuring that half of the crosswalk was accessible, was not reasonably suspected to be a traffic infraction.  Accordingly, the government has failed to sufficiently establish that the officers had reasonable suspicion to stop Balkissoon for a traffic infraction.

    b. <u>The Government Has Failed to Establish Any Lawful Basis for Officers' Warrantless Search of the Backpack in the Back Seat of His Car</u>

    Regardless of whether the officers had reasonable suspicion to stop Balkissoon's vehicle, the firearm they found inside of a backpack inside his car must be suppressed.  "Searches

8

conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). The government has failed to establish any such exception.

The government's failure rests on the core assumption it makes, as distilled by the Court: "Why is it, and do the cases support the notion, that seeing marijuana in the open, in the center console, gives rise to probable cause to believe that the backpack will contain additional evidence of that same crime[1]?" Hrg. Tr. at 11:21-25; 12:1. Under the fact-specific circumstances of this case, and under the changed law at the time of the arrest, there was and is no lawful basis for such an assumption. Neither the automobile exception nor the search incident to arrest doctrine adopt a *per se* rule that the odor of marijuana or the observation of a single sealed bag of the same permits a warrantless search of the passenger compartment or its containers. Rather, courts evaluate the totality of the circumstances to determine whether there was a "fair probability" to conduct the search. *United States v. Howard*, 489 F.3d 484, 492 (2d Cir. 2007).

The government proposes two exceptions to the warrant requirement: the automobile exception and the search incident to arrest doctrine. The automobile exception and one prong of the two-pronged search incident to arrest doctrine share a common underpinning.[2] They both

---

[1] The Court misspoke: the marijuana possessed in the center console of Balkissoon's vehicle was no crime at all.

[2] The alternative prong of the search incident to arrest doctrine is readily dispensed with. *Gant* permits officers to search vehicles where the defendant is within reach of the area within which he might gain possession of a weapon or destructible evidence. 556 U.S. at 339. "If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications (officer safety and prevention of evidence destruction) for the search-incident-to-arrest exception are absent and the rule does not apply." *Id*.

9

permit the search of the passenger compartment of an automobile upon probable cause (or, in the latter, when it is "reasonable to believe") that evidence relevant to the crime of arrest might be found in the vehicle. *United States v. Ross*, 456 U.S. 798, 820-821 (1982); *Arizona v. Gant*, 556 U.S. 332, 343 (2009). *Gant* informs that in "many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence." *Gant*, 556 U.S. at 343. Applied here, there is no reason to believe that Balkissoon's vehicle would contain relevant evidence of blocking a pedestrian ramp. Thus, for both the automobile exception and search incident to arrest analyses, the relevant question is whether the officers, upon their sight and smell of one rolling paper, and one factory-sealed bag of marijuana, had a fair probability to believe Balkissoon's vehicle would contain more marijuana.

In the light most favorable to the officers, the entirety of their suspicion of Balkissoon at the time they began to search the passenger compartment of his car was as follows: his car was parked on half of a crosswalk. He had one fronto leaf on his lap and its stems in a Ziploc bag.

---

*Gant* further informs that "because officers have many means of ensuring the safe arrest of vehicle occupants, it will be the <u>rare case</u> in which an officer is unable to fully effectuate an arrest so that a real possibility of access to the arrestee's vehicle remains" and the justification applies. *Id*. at 343 n.4. Ours was hardly the rare case: Modesto testified that they detained Balkissoon away from the search the same way he does "for every car stop." Hrg. Tr. 89:13-18. The opted not to handcuff him, but rather to surround him with officers. *Id*. at 89:7-24. To be sure, police officers cannot gain an "entitlement" "anathema to the Fourth Amendment" by choosing to leave arrestees unsecured. *Gant*, 556 U.S. at 347 (2009).

In any event, the officers testified unequivocally that while Balkissoon was secured at the trunk, he was not within reach of the backpack in the back seat. Modesto testified that from where Balkissoon was standing, he could not reach into the backpack in the back seat. Hrg. Tr. at 79:23-25; 80:1-3. His left arm could not reach into the back seat; neither could his right arm. *Id*. at 80:4-8. This is corroborated by the 73-inch width of the vehicle. As he explicitly stated, "at the time of the search by Officer Martinez of the back seat, Mr. Balkissoon was not in reaching distance of whatever was in the back seat." *Id*. at 80:9-12. Martinez agreed: while searching the car, he was unable to reach Balkissoon, and Balkissoon was unable to reach the backpack. *Id*. at 203:12-25.

10

He had one factory-sealed, personal use quantity commercial package of marijuana on the center console. He had a cup containing old ashes. And the officers had, at most, an odor of raw marijuana once they approached the vehicle containing the single bag. Balkissoon indicated that the sole bag was all that he had. A frisk of his person revealed only keys. The officers testified to no evidence whatsoever that Balkissoon was smoking marijuana, had smoked marijuana, was driving under the influence of marijuana, or was committing any crime at all. Simply put, the officers' observations, on their face, did not give rise to the necessary factual nexus between a personal use quantity of marijuana and probable cause justifying a search for contraband elsewhere in the car. *See People v. Ponder*, 146 N.Y.S.3d 628, 630 (N.Y. App. Div. 1st Dept. 2021).

The applicability of either exception to the warrant requirement requires a step back. The Supreme Court has squarely held that the automobile exception permits a warrantless search "if there is probable cause to believe a vehicle contains evidence of criminal activity." *United States v. Ross*, 456 U.S. 798, 820–821 (1982) (emphasis added). "[P]robable cause exists where the facts and circumstances within…[the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a [person] of reasonable caution in the belief that evidence of a crime will be found in the place to be searched." *United States v. Gaskin*, 364 F.3d 438, 456-57 (2d Cir. 2004) (emphasis added). Likewise, the search incident to arrest doctrine permits a search when it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Arizona v. Gant*, 556 U.S. 332, 343 (2009) (emphasis added). Evidence of criminal activity requires evidence of a crime, not a non-crime.

"Context matters." *United States v. Maffei*, 417 F. Supp. 3d 1212, 1226 (N.D. Cal. 2019), *aff'd*, 827 Fed. Appx. 760 (9th Cir. 2020) (unpublished). In determining both the

applicability of precedent, and evaluating whether the officers here had probable cause to search Balkissoon's backpack, it matters that his possession of marijuana had been decriminalized a year and a half earlier. In "removing criminal penalties for possession of any amount of marijuana under two ounces," New York State told Balkissoon that when he possessed the one bag on the center console, he was subjecting himself to a fifty-dollar ticket, and nothing more. New York State, "Governor Cuomo Signs Legislation Decriminalizing Marijuana Use," (July 29, 2019), *at* https://web.archive.org/web/20210730013010/https://www.governor.ny.gov/news/governor-cuomo-signs-legislation-decriminalizing-marijuana-use. In signing the decriminalization bill, Governor Cuomo told Balkissoon and all New Yorkers, "Communities of color have been disproportionately impacted by laws governing marijuana for far too long, and today we are ending this injustice once and for all." *Id*. Senate Majority Leader Andrea Stewart-Cousins said, "Decriminalizing marijuana is an essential part of reforming our state's broken justice system. For too long, communities of color have been disproportionately targeted and negatively impacted." *Id*. Yet the police officers who stopped Balkissoon in February 2021, and the prosecutors here, act as though nothing changed. That cannot be, when every New Yorker knows that following the decriminalization law, the odor of marijuana became commonplace on city streets. Residents were told by their government that the "injustice" of the criminal marijuana laws had "ended" "once and for all," and many readily accepted the fifty-dollar surcharge attendant to smoking marijuana (lawfully sold, as with the package in Balkissoon's car, in many American states). By its own terms, when a person engages in activity that has been decriminalized, he does not provide the police evidence that he has committed a crime.

Under the same circumstances, the Supreme Judicial Court of Massachusetts held that the change in law impacts the analysis in cases such as this one. "By mandating that possession of

such a small quantity of marijuana become a civil violation, not a crime, the voters intended to treat offenders who possess one ounce or less of marijuana differently from perpetrators of drug crimes." *Com. v. Cruz*, 945 N.E.2d 899, 909-10 (Mass. 2011). Because the Massachusetts decriminalization law changed the status of de minimis possession from a crime to a civil violation, the Court held that the odor of marijuana alone became insufficient absent "at least some other additional fact to bolster a reasonable suspicion of actual *criminal* activity." *Id*. "Our conclusion is in accord with our oft-repeated principle of proportionality. In these circumstances, without probable cause that a crime is being committed, we cannot condone such an intrusive measure as a warrantless search." *Id.* (internal citations omitted).

Federal cases out of California are likewise instructive. In *United States v. Martinez*, the Ninth Circuit reversed and remanded a district court's denial of a motion to suppress evidence found during a vehicle search, holding that "the district court erred by relying on pre-Proposition 64 cases that held that the odor of marijuana alone provides probable cause to search for violations of state marijuana laws." 811 Fed. Appx. 396, 397 (9th Cir. 2020) (unpublished), *cert. denied*, 141 S. Ct. 2526 (2021). In *United States v. Maffei*, the district court agreed, finding that "much of the relevant Ninth Circuit case law dates from the 1970s." 417 F. Supp. 3d 1212, 1226 (N.D. Cal. 2019), *aff'd*, 827 Fed. Appx. 760 (9th Cir. 2020) (unpublished). "To determine whether the odor of marijuana alone supports probable cause to search the vehicle, the Court evaluates whether under the totality of the circumstances presented there was 'a fair probability that contraband or evidence of a crime' existed to justify the warrantless search." *Id*. Where a police officer smelled unburnt marijuana, the driver indicated that there was marijuana inside the car, and that he had a medical marijuana card, "there was not a fair probability that contraband or evidence of a crime would be found in the vehicle." *Id*. at 1228. *See also United State v. Jones*,

13

438 F. Supp. 3d 1039, 1054 (N.D. Cal. 2020), *appeal dismissed sub nom. U.S. v. Walker*, 20-10099, 2020 WL 3067525 (9th Cir. Mar. 18, 2020) (absent any other objective, specific facts, the smell of unburnt marijuana, emanating from the Ford Fusion did not provide either reasonable suspicion or probable cause to believe that there was contraband in the Ford Fusion); *United States v. Talley*, 467 F. Supp. 3d 832, 836 (N.D. Cal. 2020), *appeal dismissed*, 20-10229, 2020 WL 6075668 (9th Cir. Aug. 17, 2020) ("It's 2019 California…possession of a recreational amount of marijuana, without more, no longer justifies sweeping inferences of criminality to support probable cause."); *United States v. Stokes*, 19-CR-00697-VC-1, 2021 WL 388837, at *2 (N.D. Cal. Feb. 4, 2021) ("the mere presence of marijuana…in a state where adults may legally possess and transport it does not give officers probable cause to suspect that a vehicle contains contraband.").

Given the change in law, federal cases in the Second Circuit, and the federal district courts of New York, ascertaining whether the odor of marijuana or the possession of a personal use quantity of marijuana provide probable cause for pre-August 2019 vehicle stops are inapposite. *E.g.*, *United States v. Faison*, 15-CR-186 (PGG), 2015 WL 5915964, at *5 (S.D.N.Y. Oct. 8, 2015) (finding probable cause to search where, in addition to the odor and observation of then-criminal marijuana, officers found the driver under its apparent influence). At the time of those cases, marijuana possession was a crime—so it was reasonable that indications of its presence suggested criminal activity. That is no longer true. Since August 2019, the Second Circuit has not defined contraband, or criminal activity, to include decriminalized marijuana. This is a case of first impression.

Accordingly, decriminalized marijuana—punishable only by a fine—is legally distinct from pre-August 2019, unlawful marijuana, and more analogous to other non-criminal violations.

New York law is ripe with such offenses. It is a traffic infraction to possess an open container of an alcoholic beverage in a motor vehicle upon a public highway. N.Y.V.T.L. § 1227. Neither shall a driver possess any object, such as an air freshener, "hung upon the vehicle in such a manner as to obstruct…the windshield." N.Y.V.T.L. § 375. The New York City Administrative Code proscribes littering, penalizing violators with a fine of "not less than fifty and not more than two-hundred fifty dollars for a first violation." NY.C. Admin. Code 16-118. Likewise, the same code prohibits the dumping of dirt, sand, gravel, rocks, or sawdust on any sidewalk, street, lot, or park, punishable by a $4000 fine. *Id*. at 16-119. No person shall transport in her vehicle raw, unpasteurized milk for sale without a permit, or she risks a fine of not more than $600 for her first violation. N.Y. Agr. and Markets L. 71-N.

But courts do not permit searches of the passenger compartment—let alone backpacks therein—when police officers observe these non-criminal, civil infractions. "[A]llow[ing] vehicle searches incident to any arrest would serve no purpose except to provide a police entitlement, and it is anathema to the Fourth Amendment to permit a warrantless search on that basis." *Gant*, 556 U.S. at 347 (2009). "A rule that gives police the power to conduct such a search whenever an individual is caught committing a traffic offense, when there is no basis for believing evidence of the offense might be found in the vehicle, creates a serious and recurring threat to the privacy of countless individuals. Indeed, the character of that threat implicates the central concern underlying the Fourth Amendment—the concern about giving police officers unbridled discretion to rummage at will among a person's private effects." *Id.* at 344-45.

Following *Gant*, numerous federal courts have held that observations of non-criminal open containers in cars fail to provide probable cause or reasonable suspicion that additional evidence will be found in a vehicle, under either the automobile exception or the search incident

15

to arrest doctrine. *United States v. Thomas*, 434 F. Supp. 576 (W.D.Ky. 2020) presents a legally identical fact pattern. Officers pulled over a driver who they observed failing to wear a seatbelt. After he is asked to step out of the car, the officer observes a corked bottle of alcohol in plain view. In Kentucky, such a container is prohibited by a non-criminal fine of between thirty-five and one hundred dollars. Upon that suspicion, he searches the backseat, lifting up a vest, in which he finds a .380 caliber firearm. "In light of *Gant* and the lower court interpretations thereof, the Court now believes that application of such a *per se* rule"—that "once an officer views an open container of alcohol in a vehicle, he or she automatically has probable cause to search the vehicle"—"is violative of the Fourth Amendment." *Id*. at 584. "Instead, courts considering whether an officer has probable cause to believe that evidence of a crime or other contraband might be found in a vehicle must perform a case-specific inquiry taking into account the particular circumstances." *Id*. at 585. The Court concluded that no probable cause existed to believe that additional open containers would be found after spotting the initial bottle on the front passenger seat. The alcohol was not found in another cup or container, and the officer "did not point to any specific and articulable facts which would warrant the conclusion that additional open containers of alcohol might be found in the vehicle." *Id*. *C.f. United States v. Washington*, 670 F.3d 1321, 1325 (D.C. Cir. 2012) (upholding search where officer saw cup with small amount of red liquid, finding it objectively reasonable to believe they might find the original container of alcohol elsewhere in the car).

Likewise, in *United States v. Pena-Armenta*, the district court agreed that a *per se* rule that an open container violation gives rise to a search for more open containers "would violate the Fourth Amendment." 19-CR-348 (DAK), 2020 WL 7645443, at *13 (D. Utah Dec. 23, 2020). "The court finds that the government has not shown that the officers reasonably believed

16

the BMW would contain further evidence of an open container. In fact, an open container violation would typically not provide probable cause to search because an open container violation is self-contained—meaning the entirety of the violation is typically discovered upon finding the container." *Id*. *See also United States v. Graham*, 686 Fed. Appx 166, 167 (4th Cir. 2017) (unpublished) (holding that the automobile exception does not apply to open containers in plain view; "we decline to read this rule to say that *any* source of probable cause cures a warrantless search and seizure"); *United States v. Taylor*, 49 A.3d 818, 826 (D.C. App. 2012) ("It was, of course, *possible* that evidence of drinking—such as empty or partially full containers of alcohol—would be found in the vehicle, just as it is possible that such evidence may be found in any vehicle driven by an intoxicated individual. But the question under the second prong of *Gant* is whether it is reasonable to believe that such evidence might be found in this specific vehicle.")

      The Supreme Court's warning in *Gant* is squarely applied here. When officers observed Balkissoon in possession of one sealed, decriminalized package of marijuana, they observed a completed, non-criminal infraction. That such possession, equivalent in the vehicle to the corked bottle of wine, raw milk, dangling air freshener, or litter heading for the gutter, would give rise to a basis to search containers within the backseat "seriously undervalues the privacy interests at stake." *Gant*, 556 U.S. at 344-45. Rather, the non-criminal offense was self-contained. Yes, it was *possible* that additional marijuana would be found in the vehicle, but the officers provided no specific and articulable facts which would warrant that conclusion. Rather, the officers' testimony was entirely tautological: having found one rolling paper and one bag of marijuana, all of the necessary ingredients for one marijuana cigarette, Hassan testified that he believed Balkissoon had more because he "stated that, that's all he had." Hrg. Tr. 120:13-21. A

17

defendant's exculpatory statement, fully corroborated by the observed physical evidence, cannot seriously be considered a specific and articulable fact supporting the opposite.

The officers here did not testify to a specific odor arising from the back seat, or the backpack. They did not allege that they observed a green, leafy substance there, nor any paraphernalia. Rather, the officers unambiguously stated that they searched the backseat pursuant to their belief in the very same *per se* rule rejected in the open container cases as violative of the Fourth Amendment. Their actions belie their stated claim that they were in fact looking for additional marijuana. These were officers assigned to a specialized unit, dedicated to finding firearms; that was the majority of their work. They searched behind seat cushions and notified each other to be sure to check secreted compartments. They failed to voucher the very paraphernalia of the type they claimed to be continuing to search for—the feet-long fronto leaf— until seven months after the arrest and the filing of suppression papers, at which time they vouchered an inch of biological material and concluded it one in the same.

These officers harbored an incorrect belief that when they smelled marijuana, they could look for guns. But when New York decriminalized marijuana, the suspicion it gave rise to changed. These officers were applying that law eighteen months after it took effect, and were aware of its implications. As Hassan freely admitted, in February 2021, when officers had only a traffic infraction, and odor of marijuana, and visible marijuana, "there was no arrest to be made." Hrg. Tr. at 158:6-14. That is an objective, rather than subjective, legal conclusion: upon that combination of circumstances, officers lacked any evidence of a crime, as required to search the vehicle under either potentially applicable exception. And as Hassan likewise agreed, those circumstances were "exactly like this case." *Id.* at 157:13-15. Officers had no probable cause to

search the first vehicle, nor Balkissoon's. When they entered his backpack on the back seat, they violated the Fourth Amendment.

**III.     Conclusion**

Balkissoon has demonstrated that the stop of his motor vehicle lacked reasonable suspicion. Even if not, the warrantless search of his vehicle occurred absent probable cause. In either event, the motion should be granted, and the gun must be suppressed.

Respectfully Submitted,

/s/
Mia Eisner-Grynberg
Staff Attorney
(718) 330-1257

cc:     Clerk of Court (EK) (by ECF and email)
        AUSA Garen Marshall (by ECF and email)